ORIGINAL

FILED
SEP 13 2006
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**HASLER, INC.**

**Plaintiff,**

**v.**

**UNITED STATES OF AMERICA**

**Defendant.**

No. 06-653 C

**COMPLAINT**

Pursuant to Rule 3 of the Rules of the United States Court of Federal Claims, Plaintiff, Hasler, Inc., hereby appears in this action and asserts its claims against the United States as follows:

**Nature of Action**

1. This is an action seeking recovery of damages due to the United States' breach of Contract No. 102591-03-P-0454 ("the Contract").

**Parties**

2. Plaintiff, Hasler, Inc. ("Hasler"), is a Delaware corporation with corporate headquarters in Shelton, Connecticut.

3. Defendant is the United States, acting by and through the United States Postal Service ("Postal Service"). The Postal Service is an independent establishment of the executive branch of the Government of the United States. *See* 39 U. S. C. §201.

**Jurisdiction**

4. The Court possesses jurisdiction over this action pursuant to 41 U.S.C. § 609(a)(1), 28 U.S.C. § 1491(a), the "Disputes" clause of the Contract, and clause B-9 ("Claims and Disputes") of the Postal Service's Purchasing Manual.

**Facts**

5. In November 2000, the Postal Service's Postage Technology Management ("PTM") group contacted Hasler to assess the company's interest in participating in a "test" program being conducted by the Postal Service. Under the test program, the Postal Service planned to partner with Hallmark Cards, Inc. ("Hallmark") and a supplier of mailing systems to provide postal services at certain of Hallmark's retail stores throughout the U.S. Hallmark is the nationally prominent retailer of greeting cards, gifts, ornaments, and flowers. The goal of the test program was to provide Postal Service customers with better access to postal services by offering these services in convenient Hallmark locations.

6. The Postal Service's PTM group provides approval for postage meters and oversight for all postage-meter providers under the guidelines set forth in 39 C.F.R. Part 410 (Authorizations to Manufacture and Distribute Postage Meters). As such, the PTM group believed that a modified version of Hasler's existing "PostLink" mailing system would provide an attractive and cost-effective solution for the test program. Hasler is an approved provider of postage meters and processes through its 140,000 postage meters, which process $4 billion worth of postage each year.

7. After several meetings with the Postal Service, Hasler developed a prototype postage-metering system for the test program and, in January 2001, demonstrated the system to Hallmark representatives in Kansas City. Following this demonstration, Hallmark and the Postal Service asked Hasler to participate in a six-month test of the system at selected Hallmark

locations. Hasler agreed, and the test program commenced in February 2001 in Las Vegas, Nevada (18 locations) and in March 2001 in Omaha, Nebraska (3 locations).

8. To implement the test program, the Postal Service contracted with Hasler for the postage-metering systems to be installed in Hallmark stores. The Hasler systems worked well, and the test initiative was deemed successful. As a result, the Postal Service decided to expand to a "pilot" program that would be implemented on a nationwide basis.

9. In June 2002, to support the pilot program, the Postal Service issued Solicitation No. 102590-02-A-0069 ("the Solicitation") for the competitive procurement of customized, postage-metering systems and related support services. The Postal Service encouraged Hasler to submit a proposal in response to the solicitation. Specifically, following the release of the Solicitation, Hasler received phone calls from several groups within the Postal Service, including the PTM group and the Retail group, to encourage Hasler to respond to the Solicitation. In these calls, Postal Service representatives represented that the initiative with Hallmark was just the start of a much larger program of retail postal services. Postal Service representatives stated that, based on the results of the test program, the Postal Service was planning to partner with other national retail organizations to offer a similar solution. This "retail" approach to postal services was reportedly critical for the Postal Service to meet their objective of increasing mail access without an increased investment in Postal Service facilities.

10. The Solicitation contemplated the award of an Indefinite-Delivery Indefinite-Quantity ("IDIQ") contract, under which the successful contractor would lease postage meters and scales to the Postal Service, as well as provide installation, technical support, and maintenance services for the meters and scales. The Solicitation required the contractor to provide a base quantity of between 1,800 and 2,400 meters and scales, plus adequate reserves for replacement of damaged or broken meters and scales. In addition, the Solicitation required the

contractor to provide additional quantities of up to 40% of the base quantity. In the Solicitation, the Postal Service committed to make reasonable efforts to deploy up to 2,400 meters with scales.

11. In submitting its proposal in response to the Solicitation, Hasler relied on the representations of both the Solicitation and Postal Service officials, who promised a long-term partnership with the successful contractor. At no time prior to proposal submission did the Postal Service ever indicate to Hasler that: (a) the Contract would face opposition from postal workers' unions; or (b) postal workers' unions were opposed generally to the provision of postal services through non-union, retail outlets. In addition, at no time prior to proposal submission did the Postal Service ever disclose to Hasler that: (a) the Postal Service had previously attempted to implement a nationwide program of "retail" postal services in partnership with Sears, Roebuck & Co. ("Sears"); (b) the Sears initiative had been strongly opposed by the postal workers' unions; or (c) based on the opposition of the postal workers' unions, the Sears initiative had been prematurely terminated by the Postal Service. On information and belief, the Postal Service knew or should have known all of the foregoing facts at the time it released the Solicitation.

12. On September 30, 2002, Plaintiff was awarded Contract No. 102591-03-P-0454 by the Postal Service. The Contract was a fixed-price, IDIQ contract for the monthly lease of meters and scales, plus related support services. The Contract had a base period of October 1, 2002 to March 30, 2004, plus four one-year options. Pursuant to Section B of the Statement of Work ("SOW"), Hasler was required to provide 1,800 to 2,400 units. Section C of the SOW stipulated a minimum lease commitment of eighteen (18) months for each of the leased units. In addition, the Postal Service reserved the right to add an additional quantity, up to 40% of the base quantity, as

needed for performance of the Contract. Units had to be delivered within thirty (30) to forty-five (45) days from receipt of a delivery order, and all quantities were subject to delivery without interruption.

13. In October 2002, Hasler began performing the Contract as required. The meters and scales required by the Solicitation required customization of existing commercial equipment. Hasler incurred significant expense and committed substantial time and resources to modify its commercial "PostLink" system to conform to the unique requirements specified in Section C of the SOW. In addition, Hasler procured the required components, diverted and reserved commercial inventory, accumulated the specialized inventory, and entered into several minimum-quantity supplier agreements with third parties, as necessary, in reliance on the requirements set forth in the Contract and on the Postal Service's representations regarding performance under the Contract.

14. In anticipation of a long-term relationship with the Postal Service, Hasler also performed application development and procured staging and production servers that would meet the requirements of the Hallmark initiative, including scalability to the full population identified in the SOW. The Solicitation required Hasler to ". . . comply with the Information Security Assessment (ISA) processes *in effect*" at the time of award (emphasis added). Upon award, the ISA requirements were understated and did not reflect the Postal Service's future needs. Nonetheless, the Postal Service insisted that Hasler fully comply with its new ISA requirements, which resulted in costly site review, planning, document preparation, hardening of the server infrastructure, and facility inspection and improvements.

15. During performance of the Contract, the Postal Service did not provide Hasler with a deployment schedule or an extended forecast for delivery orders. Therefore, Hasler had to

be prepared to deliver -- within 30-45 days (or less) -- up to the maximum quantity of units required under the Contract (*i.e.*, 3,360 units). In reliance on these Contract requirements, as well as on continued indications of program success and assurances of strong support from both the Postal Service and Hallmark, Hasler committed to supplier agreements that would allow it to satisfy all Contract requirements.

16. During the course of performance, Hasler was required to respond to changes in the Contract requirements. In addition to the changes in ISA requirements (described in paragraph 14 above), Hasler also implemented the following changes to Contract requirements: (a) modifications of the system in response to changes directed by the Postal Service after award; (b) added work to support testing of the electronic data exchange between the Postal Service and Hasler; (c) added work to develop installation and training documentation; and (d) added work to address compressed delivery and program schedules.

17. Additionally, the Postal Service failed to allocate sufficient resources to the program and failed to perform significant activities that undermined the success of the program. Despite promising in the Contract to "make the effort to deploy up to 2,400 meters with scales," the Postal Service failed to take full and adequate measures to do so. Individual Hallmark locations complained that the Postal Service refused to pick up mail or refused to do so during normal business hours. Hallmark locations also complained that local Contracting Officer's Representatives failed to execute obligations specified in the Contract Postal Unit ("CPU") agreement (including but not limited to timely installation support and program training support) or to provide other program support, either at all or within the time specified in the CPU agreement. Such inconsistencies undermined program performance and support at the individual store level and compromised the Postal Service's ability to realize the volumes estimated in both the Solicitation and the Contract.

18. Notwithstanding these challenges, Hasler successfully performed the Contract and, by the second quarter of 2004, overall program revenues were increasing. The Postal Service issued fourteen (14) delivery orders to Hasler over a 16-month period (Feb. 1, 2003 to June 14, 2004) for a total of 1,756 units. Furthermore, in May 2004, the Postal Service exercised its options on the Contract through September 7, 2007. On information and belief, the Postal Service also exercised options on Hallmark's separate contract in the same timeframe.

19. One month later, in June 2004, the Postal Service advised Hasler not to deliver the units due in July, because the program was being reviewed. Thereafter, in a meeting on October 18, 2004, the Postal Service provided oral notice to Hasler that it planned to terminate the program effective January 31, 2005.

20. Hasler subsequently learned, on information and belief, that the Postal Service had elected to terminate the Contract due to pressure from the American Postal Workers Union. The union reportedly was opposed to the concept of using retail outlets to sell basic postal services, and it threatened to repeat the economic attack it had mounted on Sears in 1989 when the Postal Service had attempted to establish a similar "retail" approach to postal service. In the dispute with Sears, union members reportedly boycotted Sears for working with the Postal Service to provide retail postal services.

21. As requested by the Postal Service during the October 18, 2004 meeting, Hasler sent a letter to the Postal Service on November 5, 2004 outlining a settlement proposal for Hasler's performance under the Contract. Thereafter, the parties met and exchanged correspondence for over a year in an attempt to arrive at a settlement of Hasler's request for compensation. At the request of the Postal Service, a team from Hasler traveled to Denver, Colorado in December 2004 and to Washington, D.C. in July of 2005 for the purpose of coming to a mutually beneficial settlement. In the course of

these discussions, the Postal Service agreed to pay Hasler for the so-called "minimum" quantity of 1,800 units required under the Contract, for a period of 18 months per unit. In addition, the Postal Service conceded its obligation to pay for movement costs and fees. The Postal Service refused to pay the remaining costs and unrealized revenues claimed by Hasler.

22. Prior to and during the settlement discussions, Hasler provided the Postal Service with lease extensions of units in certain Hallmark locations for periods ranging from ½ month to 11 months. These lease extensions were agreed to as an exception to the 12-month extensions required by the Contract, with Hasler reserving the right to require full 12-month extensions if a mutually beneficial settlement did not take place.

23. On August 8, 2005, Hasler submitted a certified claim to the Postal Service in the amount of $ 2,470,817.93, pursuant to the Contract Disputes Act of 1978, as amended, and the terms of the Contract. The claim consisted of three parts, as summarized below:

(a) Under Section C of the claim, Hasler asserted a claim for recovery of $1,033,800.00, representing the residual unit value of the customized PostLink mailing systems at the termination of the Contract. As described above, Hasler was required to modify the commercial PostLink mailing system hardware and application to conform to the unique requirements specified in the SOW, and the remaining value of the units cannot be recouped in the commercial market.

(b) Under Section D of the claim, Hasler asserted a claim for recovery of $776,506.19, representing the value of: (i) customized

part and component inventory that was procured in order to modify the PostLink mailing system for use under the Contract; and (ii) standalone components procured from third-party suppliers for use under the Contract. The Contract required Hasler to incur the cost of procurement as a condition to being prepared to comply with the delivery requirements of future orders. Hasler acquired parts and component inventory based upon the Postal Service's estimates of the number of units to be deployed, the availability and lead-times for various suppliers, minimum-quantity purchase commitments with suppliers, the abbreviated delivery period specified in the contract, and the delivery order trends. Hasler acted prudently in managing inventory levels, including ceasing acquisition of inventory and further manufacturing efforts immediately upon receipt of the Postal Service's oral notice of its intent to terminate the Contract. In addition, Hasler incurred significant expense for the mass, premature return processing of leased units, consistent with Postal Service regulations, as well as the warehousing of the returned units during a compressed period.

(c) Under Section E of the claim, Hasler asserted a claim for recovery of upfront capital investment in the amount of $660,511.74 for application development and procurement of staging and production server infrastructures. Performance under the Contract required Haler to incur the full cost of infrastructure deployment

as a condition to being prepared to provide system availability and dependable collection and transmission of program data to the Postal Service, including scalability for uninterrupted service to support the full population identified in the SOW. This investment included conformance with changed requirements of the Contract, including ISA security hardening and operational guidelines.

Hasler explained in its claim that it had expended all of these costs in accordance with the Contract's terms and in reasoned anticipation of a long-lived, successful program, consistent with the Postal Service's pre-award and post-award representations and actions.

24. On September 14, 2005, the Contracting Officer denied Hasler's claim in its entirety.

**Count I**
**Breach of Contract: Failure to Terminate Contract for Convenience**

25. Hasler incorporates the allegations in paragraphs 1 through 24 above as if fully restated herein.

26. The Contract entered into between Hasler and the Postal Service is a valid, enforceable contract. Under the terms of the Contract, Hasler had to be prepared to deliver -- within 30-45 days (or less) -- up to the maximum quantity of units required under the Contract (3,360 units). Hasler reasonably procured inventory and other resources to support its delivery obligations under the Contract, as well as invested development and capital resources in the program to make it a success.

27. In addition, the Contract required the Postal Service to allocate sufficient resources to the program and to make an effort to secure orders for the maximum

quantity specified in the SOW. The Postal Service breached these obligations, compromising the Postal Service's ability to realize the volumes estimated in the Solicitation and Contract.

28. Prior to and following cancellation of the Contract, Hasler expended considerable time and resources in attempting to reach a settlement with the Postal Service. Hasler has not been able to recover any of the costs related to this settlement effort.

29. Prior to and following cancellation of the Contract, and at the Postal Service's request, Hasler extended the lease periods for certain units on a short-term basis, rather than on the 12-month basis required by the Contract. Hasler agreed to the request contingent on the parties reaching a mutually satisfactory settlement, with the understanding that, if no settlement was reached, Hasler would be paid for performance for the full period under the extension. Because the parties never reached such a settlement, Hasler is due a full, 12-month payment on each of the extended units (minus actual lease payments made). Hasler has not been able to recover such payments.

30. The Contract included a "Termination for the Postal Service's Convenience" clause that permitted the Postal Service to terminate the Contract for its sole convenience. In the event of such a termination, the Postal Service was to pay Hasler the following: (a) a percentage of the work performed prior to the notice of termination; and (b) reasonable costs resulting from the termination.

31. The Postal Service breached the Contract by improperly refusing to treat the cancellation of the Contract as a termination for convenience. As a result, Hasler has not been able to recover its claimed costs, which are properly payable under the Contract's "Termination for the Postal Service's Convenience" clause.

WHEREFORE, Hasler is entitled to an award of damages it sustained as a result the Postal Service's breach in the amount of $ 1,437,017.93, plus other legal and equitable relief.

**Count II**
**Breach of Implied Duty of Good Faith and Fair Dealing:**
**Failure to Estimate Requirements In Good Faith**

32. Hasler incorporates the allegations in paragraphs 1 through 31 above as if fully restated herein.

33. The Postal Service was required to realistically estimate the number of units to be ordered under the Contract. Specifically, Section 2.4.6.c.3 of the Postal Service Purchasing Manual states that, in an IDIQ contract, "the minimum quantity must not exceed known requirements, and the maximum quantity must be realistic" (emphases added).

34. The Postal Service estimated its requirements in bad faith by failing to account for the known risk of program termination and by issuing estimates that were knowingly unrealistic and non-representative of the facts, with the intent to induce the contractor to rely on the estimates to its detriment. Specifically, the Postal Service failed to estimate its requirements in good faith by not realistically accounting for the foreseeable opposition from the postal workers' unions, and by knowingly failing to advise Hasler of the following material facts: (a) that the Contract would face opposition from postal workers' unions; (b) that the postal workers' unions were opposed generally to the provision of postal services through non-union, retail outlets; (c) that the Postal Service had previously attempted to implement a nationwide program of "retail" postal services in partnership with Sears; (d) that the Sears initiative had been strongly opposed by the postal workers' unions; and (e) that, based on the opposition of the postal

workers' unions, the Sears initiative had been prematurely terminated by the Postal Service.

35. At the same time that it omitted these facts from communications with Hasler, Postal Service representatives actively encouraged Hasler to compete for the Contract and led Hasler to believe that the program would result in a long-term partnership for retail postal services.

36. Hasler relied on the Postal Service's estimates, actions, and representations to its detriment.

37. By failing to estimate its requirements in good faith, the Postal Service breached its obligation of good faith and fair dealing under the Contract and prevented Hasler from recovering its costs and unrealized revenues under the Contract.

WHEREFORE, Hasler is entitled to an award of damages it sustained as a result the Postal Service's breach in the amount of $ 2,470,817.93, plus other legal and equitable relief.

**Count III**
**Tortious Breach of Contract: Fraudulent Misrepresentation**

38. Hasler incorporates the allegations in paragraphs 1 through 37 above as if fully restated herein.

39. The Postal Service knew or should have known that, in preparing its prices under the Contract, Hasler would give substantial weight to the estimated quantities set forth in the Solicitation, as well as the oral representations of the Postal Service regarding its intent to establish a long-term partnership with Hasler concerning retail postal services. Hasler and the Postal Service worked with each other on a number of other initiatives and their relationship had always been open and honest.

40. Nonetheless, as described in paragraph 34 above, the Postal Service either knowingly or with reckless disregard failed to factor its prior failure in establishing retail postal-service facilities into its estimates. In addition, as described in paragraphs 34 and 35 above, the Postal Service knowingly or with reckless disregard failed to advise Hasler of material facts concerning the reliability and realism of those estimates, and the degree to which performance of the Contract was at risk, while encouraging Hasler regarding the long-term prospects of the Contract and the parties' relationship.

41. The Postal Service's fraudulent and material misrepresentations and omissions induced Hasler into entering the Contract. Hasler relied on the Postal Service's representations and omissions and was justified in doing so.

42. By fraudulently and materially misrepresenting its requirements, the Postal Service tortiously breached the Contract and prevented Hasler from recovering its costs and unrealized revenues under the Contract.

WHEREFORE, Hasler is entitled to an award of damages it sustained as a result the Postal Service's tortious breach in the amount of $ 2,470,817.93, and other legal and equitable relief.

**Count IV**
**Breach of Implied Duty of Good Faith and Fair Dealing:**
**Failure to Disclose Superior Knowledge**

43. Hasler incorporates the allegations in paragraphs 1 through 42 above as if fully restated herein.

44. The Postal Service was obligated by law to disclose to Hasler, prior to contract award, vital information regarding the Contract requirements, including information that had to be disclosed to keep Hasler from being misled.

45. Hasler undertook to perform the Contract without vital knowledge of the material facts described in paragraph 34 above.

46. The Postal Service was aware that Hasler had no knowledge of those facts and had no reason to obtain such knowledge. Nonetheless, the Postal Service knowingly and in bad faith failed to provide to Hasler the relevant, material facts described in paragraph 34 above.

47. The estimated quantities in the Solicitation and Contract, as well as the Postal Service's actions and representations leading up to award, misled Hasler into believing that the Contract would be performed in accordance with the full population identified in the RFP and was not at risk for premature termination.

48. By failing to disclose its superior knowledge regarding the risk of Contract termination and the overstatement of its estimated quantities, the Postal Service breached its obligation of good faith and fair dealing under the Contract and constructively changed the Contract. As a result, Hasler has been unable to recover its costs and unrealized revenues under the Contract.

WHEREFORE, Hasler is entitled to an award of damages it sustained as a result the Postal Service's breach in the amount of $ 2,470,817.93, plus other legal and equitable relief.

**Count V**
**Breach of Implied Duty of Good Faith and Fair Dealing:**
**Failure to Support the Program**

49. Hasler incorporates the allegations in paragraphs 1 through 48 above as if fully restated herein.

50. The Postal Service failed to allocate sufficient resources to the program and failed to perform significant activities that undermined the success of the program. Despite promising

in the Contract to "make the effort to deploy up to 2,400 meters with scales," the Postal Service failed to take full and adequate measures to do so. Such failures undermined program performance and support at the individual store level and compromised the Postal Service's ability to realize the volumes estimated in both the Solicitation and the Contract.

51. By failing to support the program as obligated under the Contract, the Postal Service breached its obligation of good faith and fair dealing and prevented Hasler from recovering its costs and unrealized revenues under the Contract.

WHEREFORE, Hasler is entitled to an award of damages it sustained as a result the Postal Service's breach in the amount of $ 2,470,817.93, and other legal and equitable relief.

**Count VI**
**Breach of Contract: Contract Changes**

52. Hasler incorporates the allegations in paragraphs 1 through 51 above as if fully restated herein.

53. Hasler and the Postal Service were obligated to perform the Contract in accordance with its requirements.

54. The Postal Service changed the Contract requirements after award, including the following changes: (a) making revisions in the Postal Service's ISA requirements; (b) directing changes in the SOW and specifications; (c) requiring added work to support testing of the electronic data exchange between the Postal Service and Hasler; (d) requiring added work to develop installation and training documentation; and (e) accelerating delivery and program schedules.

55. The Postal Service's changes to Contract requirements resulted in additional costs to Hasler. These costs, in the amount of $660,511.74, are compensable under the Contract.

WHEREFORE, Hasler is entitled to an award of damages it sustained as a result the Postal Service's breach in the amount of $660,511.74, plus other legal and equitable relief.

**PRAYER FOR RELIEF**

Hasler respectfully requests that this Court enter judgment against Defendant, the United States, and award Hasler the following relief:

A. Compensatory damages in an amount to be determined at trial, but not less than $2,470,817.93; and

B. Such other and further relief that this Court deems just and equitable.

Respectfully submitted,

Richard P. Rector

DLA Piper US LLP
1200 Nineteenth Street, N.W.
Washington, DC 20036
Tel: (202) 861-6426
Fax: (202) 223-2085

Attorney of Record for Plaintiff,
Hasler, Inc.

Dated: September 13, 2006