DLA PIPER

**DLA Piper US LLP**
1200 Nineteenth Street, NW
Washington, DC 20036-2412
www.dlapiper.com

Richard P. Rector
richard.rector@dlapiper.com
**T** 202.861.6426
**F** 202.689.7597

December 6, 2006

**VIA FACSIMILE AND OVERNIGHT MAIL**

Ms. Caroline Z. Conway
Contracting Officer
United States Postal Service
3300 S. Parker Road, Suite 400
Aurora, CO 80014-3500

**Re: Claim and Request for Final Decision Under Contract No. 102591-03-P-0454**

Dear Ms. Conway:

Hasler, Inc. ("Hasler"), by and through the undersigned counsel, hereby submits this claim pursuant to the "Disputes" clause of Contract No. 102591-03-P-0454 (the "Contract"), Clause B-9 ("Claims and Disputes") of the United States Postal Service's Purchasing Manual, and the Contract Disputes Act ("CDA") of 1978 (41 U.S.C. § 601-613). Hasler respectfully requests that the Contracting Officer issue a final decision on this claim within 60 days, as contemplated by the CDA.

As you know, Hasler previously submitted a claim under the Contract on August 8, 2005, and you issued a final decision on that claim on September 14, 2005. One year later, on September 13, 2006, Hasler appealed that final decision by filing a Complaint in the U.S. Court of Federal Claims. In that case, the Government argued that significant portions of the Complaint had not been properly presented to the Contracting Officer for a final decision. By Order dated November 16, 2006, the court dismissed any claims that had not been properly presented to the Contracting Officer, but retained jurisdiction over the case based on claims that had been properly presented. The court further noted that, if Hasler resubmitted its claims to the Contracting Officer and received a decision on those claims, Hasler would be permitted to file an amended Complaint.

Therefore, the purpose of this claim is to supplement the prior claim submitted by Hasler on August 8, 2005 and to present all of Hasler's claims, in one document, for decision by the Contracting Officer. In doing so, we have identified a common set of operative facts that support each element of the claim, as well as alternative legal theories upon which the elements of the claim are based. We have cited and attached copies of, and hereby incorporate by reference, numerous documents exchanged between the parties regarding the underlying set of operative facts, and we also have included the Declaration of George H. Hesse III to verify certain factual allegations in the claim (see attached Declaration). Finally, the claim has been certified as required by the CDA (see attached Certification).

The claim consists of six parts that correspond, with minor changes, to the six counts of the Complaint. Each part of the claim is made in the alternative. The six parts of the claim are as follows:

I. A claim for recovery of $1,437,017.93 for breach of contract because the United States Postal Service ("USPS" or "Postal Service") refused to treat the cancellation of the Contract as a termination for convenience;

DLA PIPER



II. A claim for recovery of $2,470,817.93 for breach of the implied duty of good faith and fair dealing because the USPS failed to estimate the Contract requirements in good faith;

III. A claim for recovery of $2,470,817.93 for tortious breach of the Contract because the USPS fraudulently and materially misrepresented its requirements;

IV. A claim for recovery of $2,470,817.93 for breach of the implied duty of good faith and fair dealing because the USPS failed to disclose superior knowledge regarding the risk of Contract termination and the overstatement of its estimated quantities,

V. A claim for recovery of $2,470,817.93 for breach of contract because the USPS failed to support the program as obligated under the Contract and failed to reimburse Hasler for the full term of certain lease extensions; and

VI. A claim for recovery of $660,511.74 for constructive changes to the Contract requirements.

Hasler submits that it suffered damages in the alternative amounts described above in accordance with the Contract's terms and in reasoned anticipation of a long-lived, successful program that would be consistent with the Postal Service's pre-award and post-award representations and actions. Hasler's claims and the background facts that support the claims are detailed more fully below.

## Background Facts

In November 2000, the Postal Service's Postage Technology Management ("PTM") group contacted Hasler to assess the company's interest in participating in a "test" program being conducted by the Postal Service. Under the test program, the Postal Service planned to partner with Hallmark Cards, Inc. ("Hallmark") and a supplier of mailing systems to provide postal services at certain of Hallmark's retail stores throughout the U.S. Hallmark is the nationally prominent retailer of greeting cards, gifts, ornaments, and flowers. The goal of the test program was to provide Postal Service customers with better access to postal services by offering these services in convenient Hallmark locations.

The Postal Service's PTM group provides approval for postage meters and oversight for all postage-meter providers under the guidelines set forth in 39 C.F.R. Part 410 (Authorizations to Manufacture and Distribute Postage Meters). As such, the PTM group believed that a modified version of Hasler's existing "PostLink" mailing system would provide an attractive and cost-effective solution for the test program. Hasler is an approved provider of postage meters and processes through its 140,000 postage meters, which process approximately $4 billion worth of postage each year.

After several meetings with the Postal Service, Hasler developed a prototype postage-metering system for the test program and, in January 2001, demonstrated the system to Hallmark representatives in Kansas City. Following this demonstration, Hallmark and the Postal Service asked Hasler to participate in a six-month test of the system at selected Hallmark locations. Hasler agreed, and the test program

DLA PIPER



commenced in February 2001 in Las Vegas, Nevada (18 locations) and in March 2001 in Omaha, Nebraska (3 locations). [Declaration of George H. Hesse III ("Hesse Declaration"), ¶ 3]

To implement the test program, the Postal Service contracted with Hasler for the postage-metering systems to be installed in Hallmark stores. The Hasler systems worked well, and the test initiative was deemed successful. As a result, the Postal Service decided to expand to a "pilot" program that would be implemented on a nationwide basis.

In June 2002, to support the pilot program, the Postal Service issued Solicitation No. 102590-02-A-0069 ("the Solicitation") for the competitive procurement of customized, postage-metering systems and related support services. The Postal Service encouraged Hasler to submit a proposal in response to the solicitation. [Hesse Declaration, ¶ 4] Specifically, following the release of the Solicitation, Hasler received phone calls from several groups within the Postal Service, including the PTM group and the Retail group, to encourage Hasler to respond to the Solicitation. [*Id.*] In these calls, Postal Service representatives represented that the initiative with Hallmark was just the start of a much larger program of retail postal services. [*Id.*] Postal Service representatives stated that, based on the results of the test program, the Postal Service was planning to partner with other national retail organizations to offer a similar solution. [*Id.*] This "retail" approach to postal services was reportedly critical for the Postal Service to meet their objective of increasing mail access without an increased investment in Postal Service facilities.

The Solicitation contemplated the award of an Indefinite-Delivery Indefinite-Quantity ("IDIQ") contract, under which the successful contractor would lease postage meters and scales to the Postal Service, as well as provide installation, technical support, and maintenance services for the meters and scales. [Exhibit 1 (Solicitation Statement of Work), ¶¶ A., B.] The Solicitation required the contractor to provide a base quantity of between 1,800 and 2,400 meters and scales, plus adequate reserves for replacement of damaged or broken meters and scales. [Exhibit 1 (Solicitation Statement of Work), ¶ B.] In addition, the Solicitation required the contractor to provide additional quantities of up to 40% of the base quantity. [*Id.*] In the Solicitation, the Postal Service committed to make the effort to deploy up to 2,400 meters with scales. [*Id.*]

In submitting its proposal in response to the Solicitation, Hasler relied on the representations of both the Solicitation and Postal Service officials, who promised a long-term partnership with the successful contractor. [Hesse Declaration, ¶¶ 2, 4] At no time prior to proposal submission did the Postal Service ever indicate to Hasler that: (a) the Contract would face opposition from postal workers' unions; or (b) postal workers' unions were opposed generally to the provision of postal services through non-union, retail outlets. [Hesse Declaration, ¶ 9] In addition, at no time prior to proposal submission did the Postal Service ever disclose to Hasler that: (a) the Postal Service had previously attempted to implement a nationwide program of "retail" postal services in partnership with Sears, Roebuck & Co. ("Sears"); (b) the Sears initiative had been strongly opposed by the postal workers' unions; or (c) based on the opposition of the postal workers' unions, the Sears initiative had been prematurely terminated by the Postal Service. [*Id.*; Exhibit 16, at 3 ("For the record, at no time during the solicitation, contract award, product development or product rollout was Hasler informed of possible union disputes or pressures that could jeopardize the program or result in its termination.")]

Hasler believes that the Postal Service knew or should have known all of the foregoing facts at the time it released the Solicitation. [Exhibit 2 (Business Mailers Review, October 11, 2004), at 6 ("Hallmark and the Postal Service pulled the plug on a pilot test that had Hallmark selling retail postal services. The American Postal Workers Union pressured Hallmark to end the program, making reference

DLA PIPER



to the Sears effort in 1989 in a letter to Hallmark CEO Donald Hall. APWU members boycotted Sears when it tried a similar plan of performing postal retails services.")]

On September 30, 2002, Hasler was awarded Contract No. 102591-03-P-0454 by the Postal Service. The Contract was a fixed-price, IDIQ contract for the monthly lease of meters and scales, plus related support services. [Exhibit 3 (Contract), ¶¶ 1.3, 1.5, 2.8] The Contract had a base period of October 1, 2002 to March 30, 2004, plus four one-year options that began on September 6, 2003 and ran through September 7, 2007. [*Id.*, ¶ 1.4]. Pursuant to Section B of the Statement of Work ("SOW"), Hasler was required to provide 1,800 to 2,400 units. [Exhibit 3 (Contract SOW), ¶ B.] The Contract further stipulated a minimum lease commitment of eighteen (18) months for each of the leased units. [*Id.*, ¶ C1.c)] In addition, the Postal Service reserved the right to add an additional quantity, up to 40% of the base quantity, as needed for performance of the Contract. [*Id.*, ¶ B.] In the Contract as awarded, units had to be delivered in accordance with a deployment schedule that was to be provided by the USPS after award and updated by the USPS every two weeks thereafter. [*Id.*, C1.b)].

In October 2002, Hasler began performing the Contract as required. The meters and scales required by the Solicitation required customization of existing commercial equipment. Hasler incurred significant expense and committed substantial time and resources to modify its commercial "PostLink" system to conform to the unique requirements specified in Section C of the SOW. In addition, Hasler procured the required components, diverted and reserved commercial inventory, accumulated the specialized inventory, and entered into several minimum-quantity supplier agreements with third parties, as necessary, in reliance on the requirements set forth in the Contract and on the Postal Service's representations regarding performance under the Contract. [Hesse Declaration, ¶ 5]

In anticipation of a long-term relationship with the Postal Service, Hasler also performed application development and procured staging and production servers that would meet the requirements of the Hallmark initiative, including scalability to the full population identified in the SOW. [Hesse Declaration, ¶ 6; Exhibit 4, at 2] The Contract required Hasler to ". . . comply with the Information Security Assessment (ISA) processes *in effect*" at the time of award (emphasis added). [Exhibit 3 (Contract SOW), ¶ C4.c)(4)(a)] After award, however, Hasler learned that the ISA requirements in effect were understated and did not reflect the Postal Service's future needs. Nonetheless, the Postal Service insisted that Hasler fully comply with its new ISA requirements, which resulted in costly site review, planning, document preparation, hardening of the server infrastructure, and facility inspection and improvements. [Exhibit 5, ¶ 4; Exhibit 6, at 3]

During performance of the Contract, the Postal Service did not provide Hasler with a deployment schedule or an extended forecast for delivery orders. Therefore, Hasler had to be prepared to deliver -- within 30-45 days (or less) -- up to the maximum quantity of units required under the Contract (*i.e.*, 3,360 units). [Exhibit 5, ¶ 6] In reliance on these Contract requirements, as well as on continued indications of program success and assurances of strong support from both the Postal Service and Hallmark, Hasler committed to supplier agreements that would allow it to satisfy all Contract requirements. [*Id.*, ¶¶ 6-7 ; *id.*, ¶ 6 ("Hasler increased this investment on the basis of continued assurances and signals from the Postal Service that the program was a centerpiece of the Postal Service's transformation for the future.")]

During the course of performance, Hasler also was required to respond to other changes in the Contract requirements. In addition to the changes in ISA requirements and delivery schedules (described above), Hasler also performed added work in connection with the following changes to Contract requirements: (a) modifications of the system in response to changes directed by the Postal Service after award; (b) added work to support testing of the electronic data exchange between the Postal Service and

DLA PIPER



Hasler; (c) added work to develop installation and training documentation; and (d) added work to address compressed delivery and program schedules. [Exhibit 5, ¶ 4 (bullets 1-3); *id.*, ¶ 5 (bullet 4); Exhibit 6, at 3]

Additionally, the Postal Service failed to allocate sufficient resources to the program and failed to perform significant activities that undermined the success of the program. Despite promising in the Contract to "make the effort to deploy up to 2,400 meters with scales," the Postal Service failed to take full and adequate measures to do so. Individual Hallmark locations complained that the Postal Service refused to pick up mail or refused to do so during normal business hours. Hallmark locations also complained that local Contracting Officer's Representatives failed to execute obligations specified in the Contract Postal Unit ("CPU") agreement (including but not limited to timely installation support and program training support) or to provide other program support, either at all or within the time specified in the CPU agreement. Such inconsistencies undermined program performance and support at the individual store level and compromised the Postal Service's ability to realize the volumes estimated in both the Solicitation and the Contract. [Hesse Declaration, ¶¶ 11-12; Exhibit 5, ¶ 5]

Notwithstanding these challenges, Hasler successfully performed the Contract and, by the second quarter of 2004, overall program revenues were increasing. [Exhibit 5, ¶ 7] The Postal Service issued fourteen (14) delivery orders to Hasler over a 16-month period (Feb. 1, 2003 to June 14, 2004) for a total of 1,756 units. Furthermore, in May 2004, the Postal Service exercised its options on the Contract through September 7, 2007. [*Id.* ("The Postal Service continued to highlight the Hallmark partnership publicly and privately – citing it as a key component of its plan to expand access points to its products and services . . . The trend of delivery orders in the second quarter of 2004, notification of a continued strong flow applications from additional Hallmark stores, modification of the contract to exercise option periods, and assurances from the Postal Service that the mailing system was fully satisfactory, gave every indication that installation over and beyond the IDIQ minimum of 1,800 units was imminent.")] In addition, Hasler understands that the Postal Service may also have exercised options on Hallmark's separate contract in the same timeframe.

One month later, in June 2004, the Postal Service advised Hasler not to deliver the units due in July, because the program was being reviewed. [Hesse Declaration, ¶ 7; Exhibit 5, ¶ 7-8] Thereafter, in a meeting on October 18, 2004, the Postal Service provided oral notice to Hasler that it planned to terminate the program effective January 31, 2005. [Hesse Declaration, ¶ 8; Exhibit 5, ¶ 7-8]

Hasler subsequently learned that the Postal Service had elected to terminate the Contract due to pressure from the American Postal Workers Union. [Exhibit 2; Hesse Declaration, ¶ 10]. The union reportedly was opposed to the concept of using retail outlets to sell basic postal services, and it threatened to repeat the economic attack it had mounted on Sears in 1989 when the Postal Service had attempted to establish a similar "retail" approach to postal service. [*Id.*] In the dispute with Sears, union members reportedly boycotted Sears for working with the Postal Service to provide retail postal services. [*Id.*]

As requested by the Postal Service during the October 18, 2004 meeting, Hasler sent a letter to the Postal Service on November 5, 2004 outlining a settlement proposal for Hasler's performance under the Contract. [Exhibit 7] At the request of the Postal Service, a team from Hasler traveled to Denver, Colorado in December 2004 to meet with the Contracting Officer and the Postal Service team. The Contracting Officer advised Hasler that, if a negotiated settlement could not be reached, then the Postal Service's "*only option will be to exercise [its] rights under the Termination for Convenience clause*" of the Contract. [Exhibit 8 (emphasis added)]

DLA PIPER



Thereafter, the parties exchanged correspondence for over a year, and met in Washington, D.C. in July 2005, in an attempt to arrive at a settlement of Hasler's request for compensation. [Exhibits 9-14] In the course of these discussions, the Postal Service changed its position and refused to address the program cancellation under the Termination for Convenience clause of the Contract. Rather, the Postal Service agreed only to pay Hasler for the so-called "minimum" quantity of 1,800 units required under the Contract, for a period of 18 months per unit. [*Id.*] In addition, the Postal Service conceded its obligation to pay for movement costs and fees. [*Id.*] The Postal Service refused to pay the remaining costs and unrealized revenues claimed by Hasler. [*Id.*]

Prior to and during the settlement discussions, Hasler provided the Postal Service with lease extensions of units in certain Hallmark locations for periods ranging from ½ month to 11 months. These lease extensions were agreed to as an exception to the 12-month extensions required by the Contract, with Hasler reserving the right to require full 12-month extensions if a mutually beneficial settlement did not take place. [Exhibit 11, at 1 of 3 ("This offer does not constitute a waiver of Hasler's right to recovery of automatically triggered lease extensions in the event no settlement is reached.")]

On August 8, 2005, Hasler submitted a certified claim to the Postal Service in the amount of $2,470,817.93, pursuant to the Contract Disputes Act of 1978, as amended, and the terms of the Contract. [Exhibit 4] The claim consisted of three parts, as summarized below:

(a) Under Section C of the claim, Hasler asserted a claim for recovery of $1,033,800.00, representing the residual unit value of the customized PostLink mailing systems at the termination of the Contract. Hasler was required to modify the commercial PostLink mailing system hardware and application to conform to the unique requirements specified in the SOW, and the remaining value of the units could not be recouped in the commercial market. [*Id.*]

(b) Under Section D of the claim, Hasler asserted a claim for Recovery of $776,506.19, representing the value of: (i) customized part and component inventory that was procured in order to modify the PostLink mailing system for use under the Contract; and (ii) standalone components procured from third-party suppliers for use under the Contract. The Contract required Hasler to incur the cost of procurement as a condition to being prepared to comply with the delivery requirements of future orders. Hasler acquired parts and component inventory based upon the Postal Service's estimates of the number of units to be deployed, the availability and lead-times for various suppliers, minimum-quantity purchase commitments with suppliers, the abbreviated delivery period specified in the contract, and the delivery order trends. [*Id.*] Hasler acted prudently in managing inventory levels, including ceasing acquisition of inventory and further manufacturing efforts immediately upon receipt of the Postal Service's oral notice of its intent to terminate the Contract. In addition, Hasler incurred significant expense for the mass, premature return processing of leased units, consistent with Postal Service regulations, as well as the warehousing of the returned units during a compressed period. [*Id.*]

(c) Under Section E of the claim, Hasler asserted a claim for recovery of up-front capital investment in the amount of $660,511.74 for application development and procurement of staging and production server infrastructures. Performance under the Contract required Hasler to incur the full cost of infrastructure deployment as a condition to being prepared to provide system availability and dependable collection and transmission of program data to the Postal Service, including scalability for uninterrupted service to support the full population identified in the SOW. This investment included conformance with changed requirements of the Contract, including ISA security hardening and operational guidelines. [*Id.*]

DLA PIPER



Hasler explained in its claim that it had expended all of these costs in accordance with the Contract's terms and in reasoned anticipation of a long-lived, successful program, consistent with the Postal Service's pre-award and post-award representations and actions. [*Id.*]

On September 15, 2005, the Contracting Officer denied Hasler's claim in its entirety. [Exhibit 15] The Contracting Officer did not request any additional information from Hasler prior to denying the claim.

On November 4, 2005, Hasler met with Mr. Keith Strange, Vice President of Supply Management for the Postal Service, and presented its claims and concerns, including its concern that "[t]he Postal Service did not divulge that there was potential for dispute with the Postal Service union that could jeopardize the program and the contract." [Exhibit 5, ¶ 9] At that meeting, Hasler was asked to address several issues regarding its claim, including (i) the remaining invoice value, (ii) the carrying cost for inventory build-up, (iii) the applicable ISA documentation, (iv) Hasler's estimated costs for ISA implementation, (v) the lease extensions that were outside the terms of the Contract, and (vi) Hasler's knowledge, if any, about potential union risks that jeopardized the program. Hasler responded to each of these questions and provided additional supporting information for its claims on November 10, 2005. [Exhibit 16]

On December 5, 2005, the Contracting Officer advised Hasler that, as part of her investigation of whether to consider Hasler's inventory costs of $776,506, she needed additional supporting information. [Exhibit 17] Hasler provided that information on December 8, 2005. [Exhibit 18]

On December 8 and December 12, 2005, the Contracting Officer again requested additional information regarding sections C and D of Hasler's claim. [Exhibits 19-20] On February 23, 2006, Hasler provided this supporting information, including an inventory summary, a bill of material, actual invoices and other documentation supporting the bill of material, a description of Hasler's overhead calculation, and a summary of ISA impacts and costs. [Exhibit 21]

On March 1, 2006, the Contracting Officer advised Hasler that the Defense Contract Audit Agency ("DCAA") would be conducting an audit of Hasler's claim. [Exhibit 22] Thereafter, the audit was conducted and, on May 22, 2006, the Contracting Officer advised Hasler that DCAA found the entire amount of Hasler's claim to be unallowable in accordance with the express terms and conditions of the Contract. The Contracting Officer also cautioned Hasler that DCAA's confirmation of her final decision did not change Hasler's appeal rights concerning its claim. [Exhibit 23]

## Claims

The foregoing set of operative facts support multiple claims for recovery of damages or additional costs under the Contract. The basis for each claim is described below.

### I. Breach of Contract: Failure to Terminate Contract for Convenience

Under the terms of the Contract, Hasler had to be prepared to deliver -- within 30-45 days (or less) -- up to the maximum quantity of units required under the Contract (3,360 units). Hasler reasonably procured inventory and other resources to support its delivery obligations under the Contract, as well as invested significant development and capital resources in the program to make it a success. In addition, the Contract required the Postal Service to allocate sufficient resources to the program and to make an effort to secure orders for up to 2,400 units. The Postal Service did not fulfill these obligations, compromising the Postal Service's ability to realize the volumes estimated in the Solicitation and Contract and causing Hasler to incur additional costs. Hasler has not been able to recover its reasonable performance costs resulting from the termination.

DLA PIPER



In addition, prior to and following cancellation of the Contract, Hasler expended considerable time and resources in attempting to reach a termination settlement with the Postal Service. Hasler has not been able to recover any of the costs related to this settlement effort.

The Contract included a "Termination for the Postal Service's Convenience" clause that permitted the Postal Service to terminate the Contract for its sole convenience. In the event of such a termination, the Postal Service was to pay Hasler the following: (a) a percentage of the work performed prior to the notice of termination; and (b) reasonable costs resulting from the termination. [Exhibit 3 (Contract), ¶2.2.I]

After initially stating that a Termination for Convenience was the "only option" available if the parties could not reach a satisfactory settlement, the Postal Service reversed its position and improperly refused to treat the cancellation of the Contract as a termination for convenience.

As a result, Hasler has not been able to recover incurred costs in the amount of $1,437,017.93, which are properly payable under the Contract's "Termination for the Postal Service's Convenience" clause. This amount represents: (i) $776,506.19 in inventory build-up costs (Section D of the August 8, 2005 claim); and (ii) $660,511.74 in development and capital investment costs (Section E of the August 8, 2005 claim). As outlined above, supporting information for these amounts has been previously provided to the Contracting Officer.

**II. <u>Breach of Implied Duty of Good Faith and Fair Dealing: Failure to Estimate Requirements In Good Faith</u>**

The Postal Service was required to realistically estimate the number of units to be ordered under the Contract. Specifically, Section 2.4.6.c.3 of the Postal Service Purchasing Manual states that, in an IDIQ contract, "the minimum quantity *must* not exceed known requirements, and the maximum quantity *must* be realistic" (emphases added).

The Postal Service did not estimate its requirements in good by failing to account for the known risk of program termination and by issuing estimates that were knowingly unrealistic and non-representative of the facts, while also knowing and intending that the contractor would rely on the estimates to its detriment. Specifically, the Postal Service failed to estimate its requirements in good faith by not realistically accounting for the foreseeable opposition from the postal workers' unions, and by knowingly failing to advise Hasler of the following material facts: (a) that the Contract would face opposition from postal workers' unions; (b) that the postal workers' unions were opposed generally to the provision of postal services through non-union, retail outlets; (c) that the Postal Service had previously attempted to implement a nationwide program of "retail" postal services in partnership with Sears; (d) that the Sears initiative had been strongly opposed by the postal workers' unions; and (e) that, based on the opposition of the postal workers' unions, the Sears initiative had been prematurely terminated by the Postal Service.

At the same time that it omitted these facts from communications with Hasler, Postal Service representatives actively encouraged Hasler to compete for the Contract and led Hasler to believe that the program would result in a long-term partnership for retail postal services. Hasler relied on the Postal Service's estimates, actions, and representations to its detriment.

By failing to estimate its requirements in good faith, the Postal Service breached its obligation of good faith and fair dealing under the Contract and prevented Hasler from recovering its costs and unrealized revenues under the Contract. Therefore, Hasler is entitled to an award of damages it sustained as a result the Postal Service's breach in the amount of $2,470,817.93. This amount

DLA PIPER



represents: (i) $1,033,800.00 in residual unit value (Section C of the August 8, 2005 claim); (ii) $776,506.19 in inventory build-up costs (Section D of the August 8, 2005 claim); and (iii) $660,511.74 in development and capital investment costs (Section E of the August 8, 2005 claim). As outlined above, supporting information for these amounts has been previously provided to the Contracting Officer.

**III. Tortious Breach of Contract: Fraudulent Misrepresentation**

The Postal Service knew or should have known that, in preparing its prices under the Contract, Hasler would give substantial weight to the estimated quantities set forth in the Solicitation, as well as the oral representations of the Postal Service regarding its intent to establish a long-term partnership with Hasler concerning retail postal services. Hasler and the Postal Service worked with each other on a number of other initiatives and their relationship had always been open and honest.

Nonetheless, the Postal Service either knowingly or with reckless disregard failed to factor its prior failure in establishing retail postal-service facilities into its estimates. In addition, the Postal Service knowingly or with reckless disregard failed to advise Hasler of material facts concerning the reliability and realism of those estimates, and the degree to which performance of the Contract was at risk, while encouraging Hasler regarding the long-term prospects of the Contract and the parties' relationship. The Postal Service's fraudulent and material misrepresentations and omissions induced Hasler into entering the Contract. Hasler relied on the Postal Service's representations and omissions and was justified in doing so.

By fraudulently and materially misrepresenting its requirements, the Postal Service tortiously breached the Contract and prevented Hasler from recovering its costs and unrealized revenues totaling $2,470,817.93 under the Contract. This amount represents: (i) $1,033,800.00 in residual unit value (Section C of the August 8, 2005 claim); (ii) $776,506.19 in inventory build-up costs (Section D of the August 8, 2005 claim); and (iii) $660,511.74 in development and capital investment costs (Section E of the August 8, 2005 claim). As outlined above, supporting information for these amounts has been previously provided to the Contracting Officer.

**IV. Breach of Implied Duty of Good Faith and Fair Dealing: Failure to Disclose Superior Knowledge**

The Postal Service was obligated by law to disclose to Hasler, prior to contract award, vital information regarding the Contract requirements, including information that had to be disclosed to keep Hasler from being misled. The Postal Service was aware that Hasler had no knowledge of those facts and had no reason to obtain such knowledge. As stated above, the Postal Service nonetheless failed to provide to Hasler the relevant, material facts, including: (a) that the Contract would face opposition from postal workers' unions; (b) that the postal workers' unions were opposed generally to the provision of postal services through non-union, retail outlets; (c) that the Postal Service had previously attempted to implement a nationwide program of "retail" postal services in partnership with Sears; (d) that the Sears initiative had been strongly opposed by the postal workers' unions; and (e) that, based on the opposition of the postal workers' unions, the Sears initiative had been prematurely terminated by the Postal Service.

The estimated quantities in the Solicitation and Contract, as well as the Postal Service's actions and representations leading up to award, misled Hasler into believing that the Contract would be performed in accordance with the full population identified in the RFP and was not at risk for premature termination.

DLA PIPER



By failing to disclose its superior knowledge regarding the risk of Contract termination and the overstatement of its estimated quantities, the Postal Service breached its obligation of good faith and fair dealing under the Contract and constructively changed the Contract. As a result, Hasler has been unable to recover its costs and unrealized revenues totaling $2,470,817.93 under the Contract. This amount represents: (i) $1,033,800.00 in residual unit value (Section C of the August 8, 2005 claim); (ii) $776,506.19 in inventory build-up costs (Section D of the August 8, 2005 claim); and (iii) $660,511.74 in development and capital investment costs (Section E of the August 8, 2005 claim). As outlined above, supporting information for these amounts has been previously provided to the Contracting Officer.

**V. <u>Breach of Contract: Failure to Support the Program and Failure To Pay for Full Lease Extensions</u>**

The Postal Service failed to allocate sufficient resources to the program and failed to perform significant activities that undermined the success of the program. Despite promising in the Contract to "make the effort to deploy up to 2,400 meters with scales," the Postal Service failed to take full and adequate measures to do so. Such failures undermined program performance and support at the individual store level and compromised the Postal Service's ability to realize the volumes estimated in both the Solicitation and the Contract.

In addition, prior to and following cancellation of the Contract, and at the Postal Service's request, Hasler extended the lease periods for certain units on a short-term basis, rather than on the 12-month basis required by the Contract. Hasler agreed to the request contingent on the parties reaching a mutually satisfactory settlement. Because the parties never reached such a settlement, Hasler is due a full, 12-month payment on each of the extended units (minus actual lease payments made).

By failing to support the program as obligated under the Contract, and by failing to pay Hasler for the full term of the lease extensions, the Postal Service breached its obligations under the contract, including the duty of good faith and fair dealing, and prevented Hasler from recovering its costs and unrealized revenues totaling $2,470,817.93 under the Contract. This amount represents: (i) $1,033,800.00 in residual unit value (Section C of the August 8, 2005 claim); (ii) $776,506.19 in inventory build-up costs (Section D of the August 8, 2005 claim); and (iii) $660,511.74 in development and capital investment costs (Section E of the August 8, 2005 claim). As outlined above, supporting information for these amounts has been previously provided to the Contracting Officer.

**VI. <u>Contract Changes</u>**

The Postal Service made changes in the Contract requirements after award, including the following: (a) making revisions in the Postal Service's ISA requirements; (b) directing changes in the SOW and specifications; (c) requiring added work to support testing of the electronic data exchange between the Postal Service and Hasler; (d) requiring added work to develop installation and training documentation; and (e) accelerating delivery and program schedules.

The Postal Service's changes to Contract requirements resulted in additional development and capital investment costs to Hasler, which are compensable as constructive changes under the "Changes" clause of the Contract. [Exhibit 3 (Contract), ¶2.2.c] These additional costs are $660,511.74 (Section E of the August 8, 2005 claim). As outlined above, supporting information for this amount has been previously provided to the Contracting Officer.

DLA PIPER



**Conclusion**

Hasler respectfully requests that the Contracting Officer review these claims and the accompanying documentation, all of which has previously been presented through the parties' negotiations, and reach a prompt and equitable settlement of the claim. If a settlement cannot be reached promptly, Hasler requests that the Contracting Officer issue a final decision on this claim within 60 days, as contemplated by the Contract Disputes Act.

Thank you for your attention to this important matter.

Sincerely,

Richard P. Rector
Eric M. O'Neill

Counsel for Hasler, Inc.

Attachments (23)

cc: Timothy P. McIlmail, Esq. (w/Attachments)
Department of Justice

**Claim Certification**

I certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the supplier believes the Postal Service is liable, and that I am duly authorized to certify the claim on behalf of the supplier.

Executed this 6th Day of December 2006.

Frank Crudo