DLA PIPER

DLA Piper US LLP
1200 Nineteenth Street, NW
Washington, DC 20036-2412
www.dlapiper.com

Richard P. Rector
richard.rector@dlapiper.com
T 202.861.6426
F 202.689.7597

December 6, 2006

VIA FACSIMILE AND OVERNIGHT MAIL

Ms. Caroline Z. Conway
Contracting Officer
United States Postal Service
3300 S. Parker Road, Suite 400
Aurora, CO 80014-3500

Re: Claim and Request for Final Decision Under Contract No. 102591-03-P-0454

Dear Ms. Conway:

Hasler, Inc. ("Hasler"), by and through the undersigned counsel, hereby submits this claim pursuant to the "Disputes" clause of Contract No. 102591-03-P-0454 (the "Contract"), Clause B-9 ("Claims and Disputes") of the United States Postal Service's Purchasing Manual, and the Contract Disputes Act ("CDA") of 1978 (41 U.S.C. § 601-613). Hasler respectfully requests that the Contracting Officer issue a final decision on this claim within 60 days, as contemplated by the CDA.

As you know, Hasler previously submitted a claim under the Contract on August 8, 2005, and you issued a final decision on that claim on September 14, 2005. One year later, on September 13, 2006, Hasler appealed that final decision by filing a Complaint in the U.S. Court of Federal Claims. In that case, the Government argued that significant portions of the Complaint had not been properly presented to the Contracting Officer for a final decision. By Order dated November 16, 2006, the court dismissed any claims that had not been properly presented to the Contracting Officer, but retained jurisdiction over the case based on claims that had been properly presented. The court further noted that, if Hasler resubmitted its claims to the Contracting Officer and received a decision on those claims, Hasler would be permitted to file an amended Complaint.

Therefore, the purpose of this claim is to supplement the prior claim submitted by Hasler on August 8, 2005 and to present all of Hasler's claims, in one document, for decision by the Contracting Officer. In doing so, we have identified a common set of operative facts that support each element of the claim, as well as alternative legal theories upon which the elements of the claim are based. We have cited and attached copies of, and hereby incorporate by reference, numerous documents exchanged between the parties regarding the underlying set of operative facts, and we also have included the Declaration of George H. Hesse III to verify certain factual allegations in the claim (see attached Declaration). Finally, the claim has been certified as required by the CDA (see attached Certification).

The claim consists of six parts that correspond, with minor changes, to the six counts of the Complaint. Each part of the claim is made in the alternative. The six parts of the claim are as follows:

I. A claim for recovery of $1,437,017.93 for breach of contract because the United States Postal Service ("USPS" or "Postal Service") refused to treat the cancellation of the Contract as a termination for convenience;

DLA PIPER



II. A claim for recovery of $2,470,817.93 for breach of the implied duty of good faith and fair dealing because the USPS failed to estimate the Contract requirements in good faith;

III. A claim for recovery of $2,470,817.93 for tortious breach of the Contract because the USPS fraudulently and materially misrepresented its requirements;

IV. A claim for recovery of $2,470,817.93 for breach of the implied duty of good faith and fair dealing because the USPS failed to disclose superior knowledge regarding the risk of Contract termination and the overstatement of its estimated quantities,

V. A claim for recovery of $2,470,817.93 for breach of contract because the USPS failed to support the program as obligated under the Contract and failed to reimburse Hasler for the full term of certain lease extensions; and

VI. A claim for recovery of $660,511.74 for constructive changes to the Contract requirements.

Hasler submits that it suffered damages in the alternative amounts described above in accordance with the Contract's terms and in reasoned anticipation of a long-lived, successful program that would be consistent with the Postal Service's pre-award and post-award representations and actions. Hasler's claims and the background facts that support the claims are detailed more fully below.

## Background Facts

In November 2000, the Postal Service's Postage Technology Management ("PTM") group contacted Hasler to assess the company's interest in participating in a "test" program being conducted by the Postal Service. Under the test program, the Postal Service planned to partner with Hallmark Cards, Inc. ("Hallmark") and a supplier of mailing systems to provide postal services at certain of Hallmark's retail stores throughout the U.S. Hallmark is the nationally prominent retailer of greeting cards, gifts, ornaments, and flowers. The goal of the test program was to provide Postal Service customers with better access to postal services by offering these services in convenient Hallmark locations.

The Postal Service's PTM group provides approval for postage meters and oversight for all postage-meter providers under the guidelines set forth in 39 C.F.R. Part 410 (Authorizations to Manufacture and Distribute Postage Meters). As such, the PTM group believed that a modified version of Hasler's existing "PostLink" mailing system would provide an attractive and cost-effective solution for the test program. Hasler is an approved provider of postage meters and processes through its 140,000 postage meters, which process approximately $4 billion worth of postage each year.

After several meetings with the Postal Service, Hasler developed a prototype postage-metering system for the test program and, in January 2001, demonstrated the system to Hallmark representatives in Kansas City. Following this demonstration, Hallmark and the Postal Service asked Hasler to participate in a six-month test of the system at selected Hallmark locations. Hasler agreed, and the test program

DLA PIPER



commenced in February 2001 in Las Vegas, Nevada (18 locations) and in March 2001 in Omaha, Nebraska (3 locations). [Declaration of George H. Hesse III ("Hesse Declaration"), ¶ 3]

To implement the test program, the Postal Service contracted with Hasler for the postage-metering systems to be installed in Hallmark stores. The Hasler systems worked well, and the test initiative was deemed successful. As a result, the Postal Service decided to expand to a "pilot" program that would be implemented on a nationwide basis.

In June 2002, to support the pilot program, the Postal Service issued Solicitation No. 102590-02-A-0069 ("the Solicitation") for the competitive procurement of customized, postage-metering systems and related support services. The Postal Service encouraged Hasler to submit a proposal in response to the solicitation. [Hesse Declaration, ¶ 4] Specifically, following the release of the Solicitation, Hasler received phone calls from several groups within the Postal Service, including the PTM group and the Retail group, to encourage Hasler to respond to the Solicitation. [*Id.*] In these calls, Postal Service representatives represented that the initiative with Hallmark was just the start of a much larger program of retail postal services. [*Id.*] Postal Service representatives stated that, based on the results of the test program, the Postal Service was planning to partner with other national retail organizations to offer a similar solution. [*Id.*] This "retail" approach to postal services was reportedly critical for the Postal Service to meet their objective of increasing mail access without an increased investment in Postal Service facilities.

The Solicitation contemplated the award of an Indefinite-Delivery Indefinite-Quantity ("IDIQ") contract, under which the successful contractor would lease postage meters and scales to the Postal Service, as well as provide installation, technical support, and maintenance services for the meters and scales. [Exhibit 1 (Solicitation Statement of Work), ¶¶ A., B.] The Solicitation required the contractor to provide a base quantity of between 1,800 and 2,400 meters and scales, plus adequate reserves for replacement of damaged or broken meters and scales. [Exhibit 1 (Solicitation Statement of Work), ¶ B.] In addition, the Solicitation required the contractor to provide additional quantities of up to 40% of the base quantity. [*Id.*] In the Solicitation, the Postal Service committed to make the effort to deploy up to 2,400 meters with scales. [*Id.*]

In submitting its proposal in response to the Solicitation, Hasler relied on the representations of both the Solicitation and Postal Service officials, who promised a long-term partnership with the successful contractor. [Hesse Declaration, ¶¶ 2, 4] At no time prior to proposal submission did the Postal Service ever indicate to Hasler that: (a) the Contract would face opposition from postal workers' unions; or (b) postal workers' unions were opposed generally to the provision of postal services through non-union, retail outlets. [Hesse Declaration, ¶ 9] In addition, at no time prior to proposal submission did the Postal Service ever disclose to Hasler that: (a) the Postal Service had previously attempted to implement a nationwide program of "retail" postal services in partnership with Sears, Roebuck & Co. ("Sears"); (b) the Sears initiative had been strongly opposed by the postal workers' unions; or (c) based on the opposition of the postal workers' unions, the Sears initiative had been prematurely terminated by the Postal Service. [*Id.*; Exhibit 16, at 3 ("For the record, at no time during the solicitation, contract award, product development or product rollout was Hasler informed of possible union disputes or pressures that could jeopardize the program or result in its termination.")]

Hasler believes that the Postal Service knew or should have known all of the foregoing facts at the time it released the Solicitation. [Exhibit 2 (Business Mailers Review, October 11, 2004), at 6 ("Hallmark and the Postal Service pulled the plug on a pilot test that had Hallmark selling retail postal services. The American Postal Workers Union pressured Hallmark to end the program, making reference

DLA PIPER



to the Sears effort in 1989 in a letter to Hallmark CEO Donald Hall. APWU members boycotted Sears when it tried a similar plan of performing postal retails services.")]

On September 30, 2002, Hasler was awarded Contract No. 102591-03-P-0454 by the Postal Service. The Contract was a fixed-price, IDIQ contract for the monthly lease of meters and scales, plus related support services. [Exhibit 3 (Contract), ¶¶ 1.3, 1.5, 2.8] The Contract had a base period of October 1, 2002 to March 30, 2004, plus four one-year options that began on September 6, 2003 and ran through September 7, 2007. [*Id.*, ¶ 1.4]. Pursuant to Section B of the Statement of Work ("SOW"), Hasler was required to provide 1,800 to 2,400 units. [Exhibit 3 (Contract SOW), ¶ B.] The Contract further stipulated a minimum lease commitment of eighteen (18) months for each of the leased units. [*Id.*, ¶ C1.c)] In addition, the Postal Service reserved the right to add an additional quantity, up to 40% of the base quantity, as needed for performance of the Contract. [*Id.*, ¶ B.] In the Contract as awarded, units had to be delivered in accordance with a deployment schedule that was to be provided by the USPS after award and updated by the USPS every two weeks thereafter. [*Id.*, C1.b)].

In October 2002, Hasler began performing the Contract as required The meters and scales required by the Solicitation required customization of existing commercial equipment. Hasler incurred significant expense and committed substantial time and resources to modify its commercial "PostLink" system to conform to the unique requirements specified in Section C of the SOW. In addition, Hasler procured the required components, diverted and reserved commercial inventory, accumulated the specialized inventory, and entered into several minimum-quantity supplier agreements with third parties, as necessary, in reliance on the requirements set forth in the Contract and on the Postal Service's representations regarding performance under the Contract. [Hesse Declaration, ¶ 5]

In anticipation of a long-term relationship with the Postal Service, Hasler also performed application development and procured staging and production servers that would meet the requirements of the Hallmark initiative, including scalability to the full population identified in the SOW. [Hesse Declaration, ¶ 6; Exhibit 4, at 2] The Contract required Hasler to ". . . comply with the Information Security Assessment (ISA) processes *in effect*" at the time of award (emphasis added). [Exhibit 3 (Contract SOW), ¶ C4.c)(4)(a)] After award, however, Hasler learned that the ISA requirements in effect were understated and did not reflect the Postal Service's future needs. Nonetheless, the Postal Service insisted that Hasler fully comply with its new ISA requirements, which resulted in costly site review, planning, document preparation, hardening of the server infrastructure, and facility inspection and improvements. [Exhibit 5, ¶ 4; Exhibit 6, at 3]

During performance of the Contract, the Postal Service did not provide Hasler with a deployment schedule or an extended forecast for delivery orders. Therefore, Hasler had to be prepared to deliver -- within 30-45 days (or less) -- up to the maximum quantity of units required under the Contract (*i.e.*, 3,360 units). [Exhibit 5, ¶ 6] In reliance on these Contract requirements, as well as on continued indications of program success and assurances of strong support from both the Postal Service and Hallmark, Hasler committed to supplier agreements that would allow it to satisfy all Contract requirements. [*Id.*, ¶¶ 6-7 ; *id.*, ¶ 6 ("Hasler increased this investment on the basis of continued assurances and signals from the Postal Service that the program was a centerpiece of the Postal Service's transformation for the future.")]

During the course of performance, Hasler also was required to respond to other changes in the Contract requirements. In addition to the changes in ISA requirements and delivery schedules (described above), Hasler also performed added work in connection with the following changes to Contract requirements: (a) modifications of the system in response to changes directed by the Postal Service after award; (b) added work to support testing of the electronic data exchange between the Postal Service and

DLA PIPER



Hasler; (c) added work to develop installation and training documentation; and (d) added work to address compressed delivery and program schedules. [Exhibit 5, ¶ 4 (bullets 1-3); *id.*, ¶ 5 (bullet 4); Exhibit 6, at 3]

Additionally, the Postal Service failed to allocate sufficient resources to the program and failed to perform significant activities that undermined the success of the program. Despite promising in the Contract to "make the effort to deploy up to 2,400 meters with scales," the Postal Service failed to take full and adequate measures to do so. Individual Hallmark locations complained that the Postal Service refused to pick up mail or refused to do so during normal business hours. Hallmark locations also complained that local Contracting Officer's Representatives failed to execute obligations specified in the Contract Postal Unit ("CPU") agreement (including but not limited to timely installation support and program training support) or to provide other program support, either at all or within the time specified in the CPU agreement. Such inconsistencies undermined program performance and support at the individual store level and compromised the Postal Service's ability to realize the volumes estimated in both the Solicitation and the Contract. [Hesse Declaration, ¶¶ 11-12; Exhibit 5, ¶ 5]

Notwithstanding these challenges, Hasler successfully performed the Contract and, by the second quarter of 2004, overall program revenues were increasing. [Exhibit 5, ¶ 7] The Postal Service issued fourteen (14) delivery orders to Hasler over a 16-month period (Feb. 1, 2003 to June 14, 2004) for a total of 1,756 units. Furthermore, in May 2004, the Postal Service exercised its options on the Contract through September 7, 2007. [*Id.* ("The Postal Service continued to highlight the Hallmark partnership publicly and privately – citing it as a key component of its plan to expand access points to its products and services . . . The trend of delivery orders in the second quarter of 2004, notification of a continued strong flow applications from additional Hallmark stores, modification of the contract to exercise option periods, and assurances from the Postal Service that the mailing system was fully satisfactory, gave every indication that installation over and beyond the IDIQ minimum of 1,800 units was imminent.")] In addition, Hasler understands that the Postal Service may also have exercised options on Hallmark's separate contract in the same timeframe.

One month later, in June 2004, the Postal Service advised Hasler not to deliver the units due in July, because the program was being reviewed. [Hesse Declaration, ¶ 7; Exhibit 5, ¶ 7-8] Thereafter, in a meeting on October 18, 2004, the Postal Service provided oral notice to Hasler that it planned to terminate the program effective January 31, 2005. [Hesse Declaration, ¶ 8; Exhibit 5, ¶ 7-8]

Hasler subsequently learned that the Postal Service had elected to terminate the Contract due to pressure from the American Postal Workers Union. [Exhibit 2; Hesse Declaration, ¶ 10]. The union reportedly was opposed to the concept of using retail outlets to sell basic postal services, and it threatened to repeat the economic attack it had mounted on Sears in 1989 when the Postal Service had attempted to establish a similar "retail" approach to postal service. [*Id.*] In the dispute with Sears, union members reportedly boycotted Sears for working with the Postal Service to provide retail postal services. [*Id.*]

As requested by the Postal Service during the October 18, 2004 meeting, Hasler sent a letter to the Postal Service on November 5, 2004 outlining a settlement proposal for Hasler's performance under the Contract. [Exhibit 7] At the request of the Postal Service, a team from Hasler traveled to Denver, Colorado in December 2004 to meet with the Contracting Officer and the Postal Service team. The Contracting Officer advised Hasler that, if a negotiated settlement could not be reached, then the Postal Service's "*only option will be to exercise [its] rights under the Termination for Convenience clause*" of the Contract. [Exhibit 8 (emphasis added)]

DLA PIPER



Thereafter, the parties exchanged correspondence for over a year, and met in Washington, D.C. in July 2005, in an attempt to arrive at a settlement of Hasler's request for compensation. [Exhibits 9-14] In the course of these discussions, the Postal Service changed its position and refused to address the program cancellation under the Termination for Convenience clause of the Contract. Rather, the Postal Service agreed only to pay Hasler for the so-called "minimum" quantity of 1,800 units required under the Contract, for a period of 18 months per unit. [*Id.*] In addition, the Postal Service conceded its obligation to pay for movement costs and fees. [*Id.*] The Postal Service refused to pay the remaining costs and unrealized revenues claimed by Hasler. [*Id.*]

Prior to and during the settlement discussions, Hasler provided the Postal Service with lease extensions of units in certain Hallmark locations for periods ranging from ½ month to 11 months. These lease extensions were agreed to as an exception to the 12-month extensions required by the Contract, with Hasler reserving the right to require full 12-month extensions if a mutually beneficial settlement did not take place. [Exhibit 11, at 1 of 3 ("This offer does not constitute a waiver of Hasler's right to recovery of automatically triggered lease extensions in the event no settlement is reached.")]

On August 8, 2005, Hasler submitted a certified claim to the Postal Service in the amount of $2,470,817.93, pursuant to the Contract Disputes Act of 1978, as amended, and the terms of the Contract. [Exhibit 4] The claim consisted of three parts, as summarized below:

(a) Under Section C of the claim, Hasler asserted a claim for recovery of $1,033,800.00, representing the residual unit value of the customized PostLink mailing systems at the termination of the Contract. Hasler was required to modify the commercial PostLink mailing system hardware and application to conform to the unique requirements specified in the SOW, and the remaining value of the units could not be recouped in the commercial market. [*Id.*]

(b) Under Section D of the claim, Hasler asserted a claim for Recovery of $776,506.19, representing the value of: (i) customized part and component inventory that was procured in order to modify the PostLink mailing system for use under the Contract; and (ii) standalone components procured from third-party suppliers for use under the Contract. The Contract required Hasler to incur the cost of procurement as a condition to being prepared to comply with the delivery requirements of future orders. Hasler acquired parts and component inventory based upon the Postal Service's estimates of the number of units to be deployed, the availability and lead-times for various suppliers, minimum-quantity purchase commitments with suppliers, the abbreviated delivery period specified in the contract, and the delivery order trends. [*Id.*] Hasler acted prudently in managing inventory levels, including ceasing acquisition of inventory and further manufacturing efforts immediately upon receipt of the Postal Service's oral notice of its intent to terminate the Contract. In addition, Hasler incurred significant expense for the mass, premature return processing of leased units, consistent with Postal Service regulations, as well as the warehousing of the returned units during a compressed period. [*Id.*]

(c) Under Section E of the claim, Hasler asserted a claim for recovery of up-front capital investment in the amount of $660,511.74 for application development and procurement of staging and production server infrastructures. Performance under the Contract required Hasler to incur the full cost of infrastructure deployment as a condition to being prepared to provide system availability and dependable collection and transmission of program data to the Postal Service, including scalability for uninterrupted service to support the full population identified in the SOW. This investment included conformance with changed requirements of the Contract, including ISA security hardening and operational guidelines. [*Id.*]

DLA PIPER



Hasler explained in its claim that it had expended all of these costs in accordance with the Contract's terms and in reasoned anticipation of a long-lived, successful program, consistent with the Postal Service's pre-award and post-award representations and actions. [*Id.*]

On September 15, 2005, the Contracting Officer denied Hasler's claim in its entirety. [Exhibit 15] The Contracting Officer did not request any additional information from Hasler prior to denying the claim.

On November 4, 2005, Hasler met with Mr. Keith Strange, Vice President of Supply Management for the Postal Service, and presented its claims and concerns, including its concern that "[t]he Postal Service did not divulge that there was potential for dispute with the Postal Service union that could jeopardize the program and the contract." [Exhibit 5, ¶ 9] At that meeting, Hasler was asked to address several issues regarding its claim, including (i) the remaining invoice value, (ii) the carrying cost for inventory build-up, (iii) the applicable ISA documentation, (iv) Hasler's estimated costs for ISA implementation, (v) the lease extensions that were outside the terms of the Contract, and (vi) Hasler's knowledge, if any, about potential union risks that jeopardized the program. Hasler responded to each of these questions and provided additional supporting information for its claims on November 10, 2005. [Exhibit 16]

On December 5, 2005, the Contracting Officer advised Hasler that, as part of her investigation of whether to consider Hasler's inventory costs of $776,506, she needed additional supporting information. [Exhibit 17] Hasler provided that information on December 8, 2005. [Exhibit 18]

On December 8 and December 12, 2005, the Contracting Officer again requested additional information regarding sections C and D of Hasler's claim. [Exhibits 19-20] On February 23, 2006, Hasler provided this supporting information, including an inventory summary, a bill of material, actual invoices and other documentation supporting the bill of material, a description of Hasler's overhead calculation, and a summary of ISA impacts and costs. [Exhibit 21]

On March 1, 2006, the Contracting Officer advised Hasler that the Defense Contract Audit Agency ("DCAA") would be conducting an audit of Hasler's claim. [Exhibit 22] Thereafter, the audit was conducted and, on May 22, 2006, the Contracting Officer advised Hasler that DCAA found the entire amount of Hasler's claim to be unallowable in accordance with the express terms and conditions of the Contract. The Contracting Officer also cautioned Hasler that DCAA's confirmation of her final decision did not change Hasler's appeal rights concerning its claim. [Exhibit 23]

## Claims

The foregoing set of operative facts support multiple claims for recovery of damages or additional costs under the Contract. The basis for each claim is described below.

### I. Breach of Contract: Failure to Terminate Contract for Convenience

Under the terms of the Contract, Hasler had to be prepared to deliver -- within 30-45 days (or less) -- up to the maximum quantity of units required under the Contract (3,360 units). Hasler reasonably procured inventory and other resources to support its delivery obligations under the Contract, as well as invested significant development and capital resources in the program to make it a success. In addition, the Contract required the Postal Service to allocate sufficient resources to the program and to make an effort to secure orders for up to 2,400 units. The Postal Service did not fulfill these obligations, compromising the Postal Service's ability to realize the volumes estimated in the Solicitation and Contract and causing Hasler to incur additional costs. Hasler has not been able to recover its reasonable performance costs resulting from the termination.

DLA PIPER



In addition, prior to and following cancellation of the Contract, Hasler expended considerable time and resources in attempting to reach a termination settlement with the Postal Service. Hasler has not been able to recover any of the costs related to this settlement effort.

The Contract included a "Termination for the Postal Service's Convenience" clause that permitted the Postal Service to terminate the Contract for its sole convenience. In the event of such a termination, the Postal Service was to pay Hasler the following: (a) a percentage of the work performed prior to the notice of termination; and (b) reasonable costs resulting from the termination. [Exhibit 3 (Contract), ¶2.2.I]

After initially stating that a Termination for Convenience was the "only option" available if the parties could not reach a satisfactory settlement, the Postal Service reversed its position and improperly refused to treat the cancellation of the Contract as a termination for convenience.

As a result, Hasler has not been able to recover incurred costs in the amount of $1,437,017.93, which are properly payable under the Contract's "Termination for the Postal Service's Convenience" clause. This amount represents: (i) $776,506.19 in inventory build-up costs (Section D of the August 8, 2005 claim); and (ii) $660,511.74 in development and capital investment costs (Section E of the August 8, 2005 claim). As outlined above, supporting information for these amounts has been previously provided to the Contracting Officer.

II. <u>Breach of Implied Duty of Good Faith and Fair Dealing: Failure to Estimate Requirements In Good Faith</u>

The Postal Service was required to realistically estimate the number of units to be ordered under the Contract. Specifically, Section 2.4.6.c.3 of the Postal Service Purchasing Manual states that, in an IDIQ contract, "the minimum quantity *must* not exceed known requirements, and the maximum quantity *must* be realistic" (emphases added).

The Postal Service did not estimate its requirements in good by failing to account for the known risk of program termination and by issuing estimates that were knowingly unrealistic and non-representative of the facts, while also knowing and intending that the contractor would rely on the estimates to its detriment. Specifically, the Postal Service failed to estimate its requirements in good faith by not realistically accounting for the foreseeable opposition from the postal workers' unions, and by knowingly failing to advise Hasler of the following material facts: (a) that the Contract would face opposition from postal workers' unions; (b) that the postal workers' unions were opposed generally to the provision of postal services through non-union, retail outlets; (c) that the Postal Service had previously attempted to implement a nationwide program of "retail" postal services in partnership with Sears; (d) that the Sears initiative had been strongly opposed by the postal workers' unions; and (e) that, based on the opposition of the postal workers' unions, the Sears initiative had been prematurely terminated by the Postal Service.

At the same time that it omitted these facts from communications with Hasler, Postal Service representatives actively encouraged Hasler to compete for the Contract and led Hasler to believe that the program would result in a long-term partnership for retail postal services. Hasler relied on the Postal Service's estimates, actions, and representations to its detriment.

By failing to estimate its requirements in good faith, the Postal Service breached its obligation of good faith and fair dealing under the Contract and prevented Hasler from recovering its costs and unrealized revenues under the Contract. Therefore, Hasler is entitled to an award of damages it sustained as a result the Postal Service's breach in the amount of $2,470,817.93. This amount

DLA PIPER



represents: (i) $1,033,800.00 in residual unit value (Section C of the August 8, 2005 claim); (ii) $776,506.19 in inventory build-up costs (Section D of the August 8, 2005 claim); and (iii) $660,511.74 in development and capital investment costs (Section E of the August 8, 2005 claim). As outlined above, supporting information for these amounts has been previously provided to the Contracting Officer.

III. Tortious Breach of Contract: Fraudulent Misrepresentation

The Postal Service knew or should have known that, in preparing its prices under the Contract, Hasler would give substantial weight to the estimated quantities set forth in the Solicitation, as well as the oral representations of the Postal Service regarding its intent to establish a long-term partnership with Hasler concerning retail postal services. Hasler and the Postal Service worked with each other on a number of other initiatives and their relationship had always been open and honest.

Nonetheless, the Postal Service either knowingly or with reckless disregard failed to factor its prior failure in establishing retail postal-service facilities into its estimates. In addition, the Postal Service knowingly or with reckless disregard failed to advise Hasler of material facts concerning the reliability and realism of those estimates, and the degree to which performance of the Contract was at risk, while encouraging Hasler regarding the long-term prospects of the Contract and the parties' relationship. The Postal Service's fraudulent and material misrepresentations and omissions induced Hasler into entering the Contract. Hasler relied on the Postal Service's representations and omissions and was justified in doing so.

By fraudulently and materially misrepresenting its requirements, the Postal Service tortiously breached the Contract and prevented Hasler from recovering its costs and unrealized revenues totaling $2,470,817.93 under the Contract. This amount represents: (i) $1,033,800.00 in residual unit value (Section C of the August 8, 2005 claim); (ii) $776,506.19 in inventory build-up costs (Section D of the August 8, 2005 claim); and (iii) $660,511.74 in development and capital investment costs (Section E of the August 8, 2005 claim) As outlined above, supporting information for these amounts has been previously provided to the Contracting Officer.

IV. Breach of Implied Duty of Good Faith and Fair Dealing: Failure to Disclose Superior Knowledge

The Postal Service was obligated by law to disclose to Hasler, prior to contract award, vital information regarding the Contract requirements, including information that had to be disclosed to keep Hasler from being misled. The Postal Service was aware that Hasler had no knowledge of those facts and had no reason to obtain such knowledge. As stated above, the Postal Service nonetheless failed to provide to Hasler the relevant, material facts, including: (a) that the Contract would face opposition from postal workers' unions; (b) that the postal workers' unions were opposed generally to the provision of postal services through non-union, retail outlets; (c) that the Postal Service had previously attempted to implement a nationwide program of "retail" postal services in partnership with Sears; (d) that the Sears initiative had been strongly opposed by the postal workers' unions; and (e) that, based on the opposition of the postal workers' unions, the Sears initiative had been prematurely terminated by the Postal Service.

The estimated quantities in the Solicitation and Contract, as well as the Postal Service's actions and representations leading up to award, misled Hasler into believing that the Contract would be performed in accordance with the full population identified in the RFP and was not at risk for premature termination.

DLA PIPER



By failing to disclose its superior knowledge regarding the risk of Contract termination and the overstatement of its estimated quantities, the Postal Service breached its obligation of good faith and fair dealing under the Contract and constructively changed the Contract. As a result, Hasler has been unable to recover its costs and unrealized revenues totaling $2,470,817.93 under the Contract. This amount represents: (i) $1,033,800.00 in residual unit value (Section C of the August 8, 2005 claim); (ii) $776,506.19 in inventory build-up costs (Section D of the August 8, 2005 claim); and (iii) $660,511.74 in development and capital investment costs (Section E of the August 8, 2005 claim). As outlined above, supporting information for these amounts has been previously provided to the Contracting Officer.

V. <u>Breach of Contract: Failure to Support the Program and Failure To Pay for Full Lease Extensions</u>

The Postal Service failed to allocate sufficient resources to the program and failed to perform significant activities that undermined the success of the program. Despite promising in the Contract to "make the effort to deploy up to 2,400 meters with scales," the Postal Service failed to take full and adequate measures to do so. Such failures undermined program performance and support at the individual store level and compromised the Postal Service's ability to realize the volumes estimated in both the Solicitation and the Contract.

In addition, prior to and following cancellation of the Contract, and at the Postal Service's request, Hasler extended the lease periods for certain units on a short-term basis, rather than on the 12-month basis required by the Contract. Hasler agreed to the request contingent on the parties reaching a mutually satisfactory settlement. Because the parties never reached such a settlement, Hasler is due a full, 12-month payment on each of the extended units (minus actual lease payments made).

By failing to support the program as obligated under the Contract, and by failing to pay Hasler for the full term of the lease extensions, the Postal Service breached its obligations under the contract, including the duty of good faith and fair dealing, and prevented Hasler from recovering its costs and unrealized revenues totaling $2,470,817.93 under the Contract. This amount represents: (i) $1,033,800.00 in residual unit value (Section C of the August 8, 2005 claim); (ii) $776,506.19 in inventory build-up costs (Section D of the August 8, 2005 claim); and (iii) $660,511.74 in development and capital investment costs (Section E of the August 8, 2005 claim). As outlined above, supporting information for these amounts has been previously provided to the Contracting Officer.

VI. <u>Contract Changes</u>

The Postal Service made changes in the Contract requirements after award, including the following: (a) making revisions in the Postal Service's ISA requirements; (b) directing changes in the SOW and specifications; (c) requiring added work to support testing of the electronic data exchange between the Postal Service and Hasler; (d) requiring added work to develop installation and training documentation; and (e) accelerating delivery and program schedules.

The Postal Service's changes to Contract requirements resulted in additional development and capital investment costs to Hasler, which are compensable as constructive changes under the "Changes" clause of the Contract. [Exhibit 3 (Contract), ¶2.2.c] These additional costs are $660,511.74 (Section E of the August 8, 2005 claim). As outlined above, supporting information for this amount has been previously provided to the Contracting Officer.

DLA PIPER



## Conclusion

Hasler respectfully requests that the Contracting Officer review these claims and the accompanying documentation, all of which has previously been presented through the parties' negotiations, and reach a prompt and equitable settlement of the claim. If a settlement cannot be reached promptly, Hasler requests that the Contracting Officer issue a final decision on this claim within 60 days, as contemplated by the Contract Disputes Act.

Thank you for your attention to this important matter.

Sincerely,

Richard P. Rector
Eric M. O'Neill

Counsel for Hasler, Inc.

Attachments (23)

cc: Timothy P. McIlmail, Esq. (w/Attachments)
Department of Justice

## Claim Certification

I certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the supplier believes the Postal Service is liable, and that I am duly authorized to certify the claim on behalf of the supplier.

Executed this 6th Day of December 2006.

Frank Crudo

**Before the United States Postal Service**
**Claim of Hasler, Inc.**
**Contract No. 102591-03-P-0454**

**DECLARATION OF GEORGE H. HESSE III**

I, George H. Hesse III, do swear and affirm under penalty of perjury that the following statements are true and accurate to the best of my knowledge and belief:

1. I am the Director, Business Operations for Hasler, Inc. ("Hasler"). From November 2000 until the present I have been involved in the United States Postal Service ("Postal Service") competitive procurement of customized, postage-metering systems and related support services (the "Program").

2. In submitting Hasler's proposal in response to Solicitation No. 102590-02-A-0069, Hasler relied in part on the representations of Postal Service officials for a long-term partnership with the successful contractor.

3. Hasler Inc was selected and actively participated in a field test with USPS and Hallmark, prior to the solicitation. The field test included 22 Hallmark stores and was originally planned for 6 months, but was extended to 18 months to allow the USPS to quantify the market opportunity.

4. The Postal Service encouraged Hasler to submit a proposal in response to the solicitation. Specifically, following the release of the Solicitation, Hasler received phone calls from several groups within the Postal Service, including the Postage Technology Management ("PTM") group and the Retail group, to encourage Hasler to respond to the Solicitation. In these calls, and in subsequent conversations with the Postal Service representatives represented that the initiative with Hallmark was just the start of a much larger program of retail postal services. Postal Service representatives stated that, based on the results of the test program, the Postal Service was planning to partner with other national retail organizations to offer a similar solution.

5. The meters and scales required by the Solicitation required customization of existing commercial equipment. Hasler incurred significant expense and committed substantial time and resources to modify its commercial "PostLink" system to conform to the unique requirements specified in Section C of the SOW. In addition, Hasler procured the required components, diverted and reserved commercial inventory, and accumulated the specialized inventory in reliance on the requirements set forth in the Contract and on the Postal Service's representations regarding performance under the Contract.

6. In anticipation of a long-term relationship with the Postal Service, Hasler also performed application development and procured staging and production servers that would meet the requirements of the Hallmark initiative, including scalability to the full population identified in the SOW, and as identified during the ISA audit.

7. In June 2004, the Postal Service advised Hasler not to deliver the units due in July, because the Program was being reviewed.

8. In a meeting on October 18, 2004, the Postal Service provided oral notice to Hasler that it planned to terminate the Program effective January 31, 2005.

9. At no time either prior to Hasler's proposal submission or during contract performance did the Postal Service ever indicate to Hasler that:

   a. The Contract would face opposition from postal workers' unions;

   b. Postal workers' unions were opposed generally to the provision of postal services through non-union, retail outlets;

   c. The Postal Service had previously attempted to implement a nationwide program of "retail" postal services in partnership with Sears, Roebuck & Co. ("Sears");

   d. The Sears initiative had been strongly opposed by the postal workers' unions; or

   e. Based on the opposition of the postal workers' unions, the Sears initiative had been prematurely terminated by the Postal Service.

10. Hasler learned that the Postal Service had decided to terminate the Program due to pressure from the American Postal Workers Union. The union reportedly was opposed to the concept of using retail outlets to sell basic postal services, and it threatened to repeat the economic attack it had mounted on Sears in 1989 when the Postal Service had attempted to establish a similar "retail" approach to postal service. In the dispute with Sears, union members reportedly boycotted Sears for working with the Postal Service to provide retail postal services.

11. The Postal Service failed to allocate sufficient resources to the Program and failed to perform significant activities that undermined the success of the Program. Specifically:

   a. Despite promising in the Contract to "make the effort to deploy up to 2,400 meters with scales," the Postal Service failed to take full and adequate measures to do so;

   b. Individual Hallmark locations complained that the Postal Service refused to pick up mail or refused to do so during normal business hours; and

   c. Hallmark locations also complained that local Contracting Officer's Representatives failed to execute obligations specified in the Contract Postal Unit ("CPU") agreement (including but not limited to timely installation support and program training support) or to provide other program support, either at all or within the time specified in the CPU agreement.

12. Such inconsistencies undermined Program performance and support at the individual store level and compromised the Postal Service's ability to realize the volumes estimated in both the Solicitation and the Contract.

Executed this 29th Day of November 2006.

George H. Hesse III

# Exhibit 1

# STATEMENT OF WORK

## POSTAGE METER MANUFACTURERS

### A. INTRODUCTION

The U.S. Postal Service (USPS) is committed to providing the highest possible level of customer service to the American public. While striving to reach this goal, we are entering into a contract with an USPS authorized postage meter provider to furnish postage meters and scales to selected retail stores across the nation.

Providing postage meters to retailers allows extended customer service for the Postal Service. Our goal is to provide customers with convenience and better access to basic postal services by offering these services through retail partnerships. The off site postal offerings may include but are not limited to our most common transactions which are First-Class Mail, Express Mail, and Priority Mail, with additional special services such as Delivery Confirmation, Signature Confirmation, Return Receipt, and Insurance.

USPS in the future is also interested in replacing existing postage machines in USPS postal facilities. The new technology presented in this requirement presents an opportunity to the USPS to update their postal equipment in postal facilities. USPS will be investigating the possibility to utilize the technology provided in response to this solicitation to modernize equipment in postal facilities nationwide.

### B. SCOPE

The supplier will provide, on a lease basis, between 1,800 and 2,400 approved Information Based Indicia (IBI) compliant meters with scales and provide adequate reserves for replacement of damaged or broken meters or scales. In addition, the USPS reserves the right to add an additional quantity, up to 40% of the original order, of meters with scales, as they may be needed for the performance of this contract. The USPS will make the effort to deploy up to 2,400 meters with scales. USPS also reserves the right to remove meters with scales from any retail store which breaches the contract with USPS and reserves the option to return such meters to the supplier and terminate their leases. Supplier will ensure that appropriate meter setup instructions are included when the meters are shipped. Supplier will be responsible for all customer support and service functions, including, but not limited to shipping the meters and scales (via USPS) to their destinations, initializing the meter replacing damaged or broken meters, and updating meters for rate cases. Suppliers will also provide technical support and repair of meters and scales for each store. Supplier is responsible for ensuring the retail outlet has sufficient consumables for daily operation. The supplier will deliver a single postage meter to each of the up to 2,400 Hallmark retail outlets nationwide. A list of the Hallmark retail addresses will be furnished by the Postal Service after contract award.

## C. REQUIREMENTS

The following is specific information regarding the equipment that will be provided by the supplier, as well as the suppliers responsibilities involving meter maintenance, rate case updates and more. All customer support by the supplier including but not limited to shipping of meters with scales, repairing and replacing meters with scales, must follow the regulations listed in both the USPS *Domestic Mail Manual*, Section P030 - Postage Meters and Meter Stamps, and other sections as applicable, and the *Code of Federal Regulations (CFR)* Title 39, CFR 501, Authorization to Manufacture and Distribute Postage Meters or as appropriate draft Title 39 Code of Federal Regulations, 502, Authority to Produce and Distribute Postage Evidencing Systems that Generate Information-Based Indicia, as published for comment in the Federal Register October 2, 2000. The *Domestic Mail Manual*, and the *CFR* sections are attached. Compliance with Postal Service security requirements are in the attached Information Security Assurance (ISA) Process publication.

C1. Meter and Scale Deployment

a) The supplier will provide up to 2,400 approved Information Based Indicia (IBI) compliant meters with scales. Each individual meter must be electronically linked with a scale to operate as a unit.

b) All components and hardware of the proposed system must be deployed in accordance with a pre-determined rollout schedule provided by the USPS after contract award. Updates to the deployment schedule will be provided by USPS every two weeks thereafter. All meters with scales must be deployed no earlier than December, 2002, and deployment must be completed by no later than February 13, 2002 or as otherwise instructed.

c) Meters with scales will be leased for a minimum of eighteen (18) months. The leasing period will begin no earlier than November 2002 and end no later than June 2004. Fees will be paid to the supplier upon the deployment and start-up date of the meters with scales and end no later than June 2004; however, the leases may be terminated and the meters with scales returned to the supplier, in the event that the retail store breaches its contract with USPS.

d) Supplies and ancillary equipment (such as starter roll of labels, six-foot length telephone cord for data transmitting, etc) needed to begin use of the meter and scale must be included in the original shipment of the equipment.

e) Meter, scale, training information, reference materials and all other components required for installation must be shipped to retailer in one box.

f) Supplier will provide all necessary initialization/installation services to allow operation of the meter by the retailer.

C2. Physical Requirements of the Meter and Scale

a) *Size and Style*

1) Size is a determining factor. The meter and scale must take up to no more than a 1-foot by 1-foot area, and 18 inches in height.
2) The scale must be able to weigh accurately up to a 30lb package.
3) The meter and scale must be stand-alone units that interface electronically with each other. No computer-assisted equipment will be accepted.
4) Meter and scale must link directly to provide an automatic weight and price of the item being weighed.
5) Meter must be able to interface with an analog phone line or use another USPS approved process for the uploading of data and downloading of postage.
6) Meter must provide a simple, one-step method for accessing all mailing options, services and fees, provided under Services & Capabilities.
7) Scale must provide an accurate weight within a .10 ounce tolerance.
8) One-step method of accessing Return Receipt must have a disable capability.
9) Meter must be able to disable the Express Mail and Express Mail Flat Rate service.

b) *Business Functional Requirements:*

| FR # | Functional Requirements Description | | | |
|---|---|---|---|---|
| FR1.0 | **Postage Meter Functionality and Interface with Payment System** | | | |
| | FR1.1 | For Meter Provider, Process retail products and services – for each transaction, provide capability to capture postage, print indicia and store the summary details by Origin Destination Information System (ODIS) codes. (NOTE: meter and scale will have standard capability to ion accept and rate up to 30 lbs.). For APPS system that receives transaction and summarized meter usage data from supplier, provide capability to store, update and report on this data | | |
| | | FR1.1.1 | Process Priority Mail (NOTE: reference Priority Mail Zone Rate Charts) | |
| | | | FR1.1.1.1 | Process Priority Mail 1lb rate |
| | | | FR1.1.1.2 | Process Priority Mail by zone rate for 2 lbs. To 70 lbs. |
| | | | FR1.1.1.3 | Process Priority Mail with Delivery Confirmation |
| | | | FR1.1.1.4 | Process Priority Mail with Signature Confirmation |
| | | | FR1.1.1.5 | Process Priority Mail with Certified |
| | | | FR1.1.1.6 | Process Priority Mail with Certified + Returned Receipt |
| | | | FR1.1.1.7 | Process Priority Mail with Insurance |
| | | | FR1.1.1.8 | Process Priority Mail with Delivery Confirmation and insurance |
| | | | FR1.1.1.9 | Process Priority Mail with Signature Confirmation and insurance |
| | | | FR1.1.1.10 | Process Priority Mail with Delivery Confirmation, Restricted Delivery and insurance |
| | | | FR1.1.1.11 | Process Priority Mail with Signature Confirmation, Restricted Delivery and insurance |
| | | | FR1.1.1.12 | Process Priority Mail with flat rate envelope – apply the flat rate fee regardless of weight |
| | | FR1.1.2 | Process First-Class Mail (NOTE: reference First Class Mail Charts) | |
| | | | FR1.1.2.1 | Process First Class Mail |
| | | | FR1.1.2.2 | First–Class Mail Parcels with Signature Confirmation |
| | | | FR1.1.2.3 | First–Class Mail Parcels with Delivery Confirmation |
| | | | FR1.1.2.4 | Process First–Class Mail with Certified |
| | | | FR1.1.2.5 | Process First–Class Mail with Certified + Returned Receipt |
| | | FR1.1.3 | Express Mail | |
| | | | FR1.1.3.1 | Process Express Mail |
| | | | FR1.1.3.2 | Custom Designed w/Insurance |
| | | | FR1.1.3.3 | Next Day & Second Day PO to PO |
| | | | FR1.1.3.4 | Next Day & Second Day PO to Addressee |
| | FR1.2 | Warnings, Alerts and Special Processing (requirements for meter vendor only) | | |
| | | FR1.2.1 | Screen display to alert user of package over 30 lbs. | |
| | | FR1.2.2 | Restricted, and authenticated user, access to meter | |
| | | FR1.2.3 | Automatic meter date change and manual date override | |
| | | FR1.2.4 | Capability to print customer advertising (customer-identified info), in either text, graphics or both | |
| | | FR1.2.5 | Capability to rebuild meter summary data if meter crashes | |
| | FR1.3 | Exception Processing | | |
| | | FR1.3.1 | Process to cancel transaction before completion | |
| | | FR1.3.2 | Mark a transaction that results in spoiled postage | |
| | FR1.4 | Upload/Download Capabilities (requirements for meter vendor only) | | |
| | | FR.1.4.1 | Capability to download postage from meter provider | |

| | | | |
|---|---|---|---|
| | | FR1.4.2 | Capability to transmit summary data to USPS (format to be determined during requirements phase) |
| | | FR1.4.3 | Capability to transmit summary data to USPS (format to be determined during requirements phase) |

c) *Service and Capabilities*

1) The meter must provide the capability for the following services and fees: First-Class Mail, First-Class Oversized Mail, Priority Mail, Priority Mail Flat-Rate Envelope, Express Mail and Express Mail Flat Rate.
2) Meter must also provide the capability for these additional Special Services and Fees: Delivery Confirmation, Signature Confirmation and Insurance.
3) Meter must be able to enable and disable data capture functionality and operate as a standard postage meter.
4) Meter must be able to upload summary data based on requirements established by USPS San Mateo Integrated Business Systems Solutions Center (IBSSC).
5) Meter must automatically change the calendar date to the following calendar date at a pre-determined time. This time will be different for each retail store based on the time of the mail and package pick-up. In addition, the meter must have a manual override capability so that the calendar date can be manually adjusted forward only.
6) Meter must be able to determine Domestic Priority Mail and Domestic Express Mail rates by zone and weight. (Excludes APOs, FPOs).
7) Meter must have an USPS approved method to authenticate the user.
8) Meter must automatically disable at midnight on Friday if the retail store does not upload their weekly data from the meter at the end of the week. Meter will return to normal function after the upload of the data is made.

d) *Meter Administrative functions*

(1) Device sleep mode
(2) Sleep mode variable setting
(3) Minimum of six Supervisor IDs
(4) Supervisor has ability to add Users
(5) Supervisor has ability to delete Users
(6) Only Supervisor has ability to upload data
(7) Device has Operating Day data viewable
(8) Device has Operating Day data printable. Supplier shall construct on-line report retrieval tool. This site will be maintained and updated on a daily basis for use by USPS personnel. The site will be password protected and contain the following capabilities and information.
    (a) Ability to query by date range(s).
    (b) Ability to query by transaction type(s).
    (c) Ability to query by location ID(s).
    (d) Ability to provide summary and revenue totals.
    (e) Ability to analyze information according to postal periods, i.e. Accounting Periods/Monthly, Postal Quarters, & Year To Date.

e) *Postage and Postage Updates*

1) The supplier will provide all supplies associated with the meter and scale. These supplies will be sent directly to each retail store via USPS shipping. In addition, the supplier will provide a method for each store to re-order supplies.
2) Meter must be remotely reset by supplier's USPS approved computerized meter resetting system. It must be IBI compliant, and have a minimum download capability of $500 and a maximum postage limit of $10,000. The

postage download process must be able to be completed through an analog telephone line or another acceptable process, in a reasonable amount of time.

3) The download of postage to the postage meter vault must be electronic and have Automatic Clearinghouse (ACH) payment capabilities.

C3. On-Going Requirements of the Supplier

a) *Preventative Maintenance, Repairs and Warranty*

(1) Handling of faulty meters must be in accordance with CFR 501. Defective meters must be replaced with 48 hours.

(2) Supplier must supply sufficient reserve stock to repair or replace any defective, damaged or broken meters or scales at no additional charge.

b) *Rate Case Updates*

(1) Postage meter must always reflect accurate postage rates, and the updating of rate changes to the meter must be done with minimal user intervention. Meters must reflect any changes in rate, upon USPS effective date.

c) *Technical and Informational Support*

(1) Supplier must provide a toll-free phone number for retail store employees to call for technical support and customer service, seven days per week, between the hours of 9:00 A.M. Eastern Standard Time and 9:30 P.M. Pacific Standard Time. If calls are not answered live, the original call must be returned within a 24-hour period so that the store does not experience down time of the meter and scale for longer than 2 business days. The answering device must have sufficient capacity to accommodate the volume of calls from the retailers.

(2) Supplier must support the customer acceptance testing coordinated by the USPS. Note: The hours of support may have to be extended due to time zone differences for customer acceptance testing.

d) *Information and Reference Materials*

(1) Quick reference information must be provided to each store. This information must include, but is not limited to, information on how to solve minor problems, malfunctions, and complications with the meter and scale. In addition, the quick reference information should contain a step-by-step assembly guide for the meter and scale, troubleshooting points, and a toll-free technical support/customer service phone number to call if there are problems assembling the equipment.

(2) The supplier must provide an operation guide for the meter and scale that explains, in detail, each specific function of the meter and scale.

(3) All training and reference material must be included in the original, one box shipment of the meter and scale.

e) *Fees and Expenses*

(1) All fees related to meter and scale lease including: postage reset fees, postage rate case update fees, and monthly leasing fees must be itemized and included in one monthly leasing fee invoices submitted to USPS.

(2) All costs for consumable items must be itemized (including store location) and included in a separated monthly invoice submitted to USPS.

C4. Data Reporting

a) *Data Specifics*

(1) Meter will store summary data broken down by category/AIC (see attached draft file layout):

(a) Mailing Service

- First-Class Mail
- First-Class Parcel
- First-Class Mail Nonstandard Surcharge
- Priority Mail
- Priority Mail Flat-Rate Envelope
- Express Mail
- Express Mail Flat-Rate Envelope

(b) Special Service
- Delivery Confirmation
- Signature Confirmation
- Insurance
- Certified Mail
- Returned Receipt

(c) Summary Data
- Date
- Time
- Price

b) *Supplier Data Capture*

(1) All data uploaded from the meter must provide an audit trail that allows USPS to validate all data at any time.

(2) The supplier must accept weekly uploads of data from the retail store. In addition, the supplier must accept uploads of data any other time the meter is connected to the system for any purpose. Meter provider will support functionality or capability to confirm successful transmission meter usage data from the meter. NOTE: If the retail store does not upload the of meter data by midnight on Friday each week, the meter must automatically disable until the uploading of data occurs.

(3) Retail stores will upload the weekly data after the close of business every Friday. Additionally, the retail store will upload data on the evening of the last day of the USPS Accounting Period for commission payment purposes.

(4) If a meter malfunction occurs, data must be saved and retained in the meter. The data must be transferred to the suppliers file by the service personnel.

(5) Supplier must verify that the information uploaded from stores each Friday evening came from the store the meter was originally assigned to.

(6) Supplier must ensure that proper ports are available on the meter for data transmission.

c) Reporting Information

(1) All data captured/reported is confidential and remains the property of the U.S. Postal Service.

(2) All data must be provided to USPS in an electronic format.

(3) The supplier must save data uploaded from the units by meter serial number after the data is sent to USPS for a period of one (1) year.

(4) Manufacturer will provide all reports required by USPS regulations and procedures for meters and in addition, the following special reports (data files).

(a) Summarized sales data by serial number for each Accounting Period (AP)/Month. File will be transmitted within seven days of the close of the postal AP/Month. This file will be sent by way of VPN to the Accounting Center in San Mateo. (Specific location to be discussed.). Supplier must comply with the Information Security Assurance (ISA) processes in effect.

(b) Detailed summary data by Origin Destination Information System (ODIS) code for each meter. File will be transmitted within seven days of the close of the postal AP/Month. This file will be sent by way of VPN to the Accounting Center in San Mateo. (Specific location to be discussed.)

(c) Process capability to acknowledge that data files are received. All summary data must be sent to Postage Technology Management in accordance with the requirements of the IBIP performance criteria.

5) Promptly report to USPS any problem identified with the operation of meters leased under this contract.
6) Monitor use of consumables and notify USPS when usage is not supported by postage printed.

C5. Supplier Payment

a) *Length of Contract*
   a) USPS expects to award a contract with an 18-month base period, plus four 12-month option periods.
b) .*Billing Cycle/Invoicing*
   (1) USPS Headquarters on an Accounting Period (AP)/Monthly base through invoicing will pay all associated fees to the supplier. USPS will provide the supplier with an Accounting Period calendar.
   (2) USPS will be responsible for all of the following fees: meter/scale lease, rolls of labels, data capture/reports, rate change fees, and postage download fees.

C6. End of Contract

a) USPS will notify the supplier 30 days in advance of the expiration of the then-existing contract of USPS intention to exercise any option period.
b) If contract option is not exercised the USPS shall be responsible for ensuring the return of the meters to the supplier. The USPS shall also bear shipping costs associated with return/disposal of the meters.
c) The USPS shall be responsible for loss/damage/fair wear and tear to the meter during the contractual term.

Timeline:
These dates indicate our current plan. However, these dates cannot be viewed as an unwavering timeframe, since many activities are dependent upon the performance of tasks beyond Postal Service control. Indeed, the timeline does not allow for any delays that may be occasioned by the completion of any activities in less than a complete manner, in accordance with the timeline. However, it is also possible that the timeline may be completed earlier than stated. As such, the timeline is subject to the foregoing Letter of Intent, and reflects the intent of the Postal Service.

| Milestones | Dates |
|---|---|
| Solicitation released | 06/28/02 |
| Questions due back from vendors | 07/09/02 9:00 am |
| *Atlanta Buy Meeting* | *07/09/02 07/11/02* |
| USPS respond to questions | 07/15/02 |
| Vendor proposals due | 07/19/02 3:00 pm |
| *Los Angeles Buy Meeting* | *07/20/02 – 07/21/02* |
| Demo invitations out to vendors | 07/23/02 |
| Demos | 07/24/02 – 07/26/02 |
| *Chicago Buy Meeting* | *07/25/02 – 07/26/02* |
| *Start development of training program w/Hallmark* | *07/28/02* |
| Award contract and notify vendors | 08/19/02 – 08/23/02 |
| Vendor customization per USPS requirements | 08/26/02 – 09/26/02 |
| Provide test file to USPS | 09/20/02 |
| Vendor product test | 09/27/02 – 10/10/02 |
| Customer acceptance test (CAT) - end to end test | 10/11/02 – 11/22/02 |
| Final vendor modifications based on CAT | 11/25/02 – 12/13/02 |
| Preparations for deployment/final sign-offs | 12/16/02 – 12/20/02 |
| Vendor ship meters – Western Area | 12/30/02 – 01/09/03 |
| Vendor ship meters – Pacific Area | 01/10/03 – 01/16/03 |
| Vendor ship meters – Southwest and Southeast Areas | 01/17/03 – 01/23/03 |
| Vendor ship meters – Greater Lakes Area | 01/24/03 – 01/30/03 |
| Vendor ship meters – Eastern and Capital Metro Areas | 01/31/03 – 02/06/03 |
| Vendor ship meters – Northeast and New York Metro Areas | 02/07/03 – 02/13/03 |

Proposed summarized usage data file lay-out (from meter provider):

| Field Number | Field Name | Contents/Format | From | To | Length | Comments |
|---|---|---|---|---|---|---|
| 1 | PARTNERS-MONTH | 9 (2) | 1 | 2 | 2 | 2-byte numeric field containing the month of the year the data is summarized for, e.g. '01' if the usage data in the file is from meter usage uploaded during January. Leading zeroes. |
| 2 | PARTNERS-WEEK-OF-MONTH | 9(1) | 3 | 3 | 1 | 1-byte numeric field containing the week of the month the data in the file is summarized for, e.g. '1' for first week, '2' for second week, etc. |
| 3 | PARTNERS-DATE | | | | | 8-byte numeric field containing the date of when the input file was created by the meter provider and sent to CPPS (file creation date) |
| | PARTNERS-CENTURY | 9(2) | 4 | 5 | 2 | 2-byte numeric field containing the first two digits of file creation year, e.g. '20' for year 2002,etc. |
| | PARTNERS-YEAR | 9(2) | 6 | 7 | 2 | 2-byte numeric field containing the last two digits of file creation year, e.g. '02' for year 2002,etc. Leading zeroes. |
| | PARTNERS-MONTH | 9(2) | 8 | 9 | 2 | 2-byte numeric field containing the file creation month, e.g. '01' for January, etc. Leading zeroes. |
| | PARTNERS-DAY | 9(2) | 10 | 11 | 2 | 2-byte numeric field containing the file creation day |
| 4 | PARTNERS-FINANCE-NUMBER | 9(6) | 12 | 17 | 6 | 6-digit numeric field containing the finance number associated with the local Post Office, the jurisdiction within which the Hallmark store belongs to |
| 5 | PARTNERS-UNIT-ID | 9(4) | 18 | 21 | 4 | 4-digit numeric field containing the unit ID associated with the local Post Office, the jurisdiction within which the Hallmark store belongs to |
| 6 | FILLER | 9(5) | 22 | 26 | 5 | 5-byte filler, zeroes filled |
| 7 | PARTNERS-AIC | X(3) | 27 | 29 | 3 | AIC code |
| 8 | FILLER | X | 30 | 30 | 1 | 1-byte filler, space filled |
| 9 | PARTNERS-REVENUE-AMOUNT | S9(12)v99 | 31 | 44 | 14 | 14-byte signed numeric field with 2 decimal places, containing the total revenue from postage transactions for the month |

marketing manager.

Walz praises the cooperation of the Postal Service for helping make the model so successful. "It's been a great experience getting this service on line," Walz says.

*For more information on Walz Secured Outsourcing Services, Temecula, CA, call 877-325-3800.*

## BRIEFS

The Postal Rate Commission recommended approval of the two-year experiment to test Priority Mail flat-rate boxes, at a rate of $7.70. The relatively quick action by the rate commission, and parties to the case who reached a settlement agreement, allows the USPS to offer the flat-rate boxes — and presumably launch an advertising campaign — during the upcoming holiday season. This assumes the Board of Governors approves the PRC recommendation. The experiment would allow the USPS to offer two different flat-rate boxes, part of a USPS effort to make its expedited services easier to use. The flat-rate box is similar in concept to the flat-rate Priority Mail envelope. Customers would be charged $7.70 for whatever they can fit in the box, regardless of its weight or zones traveled. See the commission's decision in MC2004-2 at *www.prc.gov.*

The Stamps.com market test for PhotoStamps(TM) ended on Sept. 30, but not before a flurry of purchases on the last day. The company said it received 600,000 orders in the final 24-hour period. The company said the USPS is considering its formal request to extend the test, which has generated more than $1 million in postage revenue in 52 days. The Postal Service has indicated it would make a decision within 90 days, Stamps.com said. Postal observers give Stamps.com and the USPS high marks for testing this innovative concept and they hope the Postal Service won't pull the plug on the idea completely.

The Periodicals Complaint case before the Postal Rate Commission is in the midst of the interrogatory stage, with some key procedural dates coming up. Intervenors recently submitted statements concerning witness availability. Surrebuttal testimony is due Oct. 28. Initial briefs in the case are due Nov. 22 and reply briefs are due Dec. 6. The commission appears to be shooting for a recommended decision in January, although it is not required to meet a timetable in a complaint case. The commission will rule only on the classification issues in the case, not on the rate changes proposed by Time Warner et. al in the complaint. Earlier this year, Time Warner, Conde Nast, Readers Digest, Newsweek and TV Guide petitioned the commission for an alternative rate structure, based on cost-based rates, to today's Periodicals rates (*BMR* 1/19, 4/12).

It's a new name for the Siemens organization that handles its postal automation. The company is now known as Siemens Logistics and Assembly Inc., with Postal Automation a distinct division within the company. Siemens has finalized the integration of Siemens Dematic Corp. of Grand Rapids, MI, and Siemens Dematic Postal Automation of Arlington, TX, as well as Siemens Dematic Electronic Assembly Systems of GA.

United Parcel Service's mal division, UPS Mail Innovations is offering international mail services through relationships with a portfolio of global postal authorities. UPS Mail Innovation will process U.S.-outbound business mail and transport it to postal authorities for delivery to addresses in more than 200 countries. In April UPS Mail Innovations bought OMNIsort International, which included its operations in New York and California. Through its workshare relationship with the Postal Service, UPS Mail Innovations offers expedited domestic service on flats, light parcels and Bound Printed Matter.

Hallmark and the Postal Service pulled the plug on a pilot test that had Hallmark selling retail postal services. The American Postal Workers Union pressured Hallmark to end the program, making reference to the Sears effort in 1989 in a letter to Hallmark CEO Donald Hall. APWU members boycotted Sears when it tried a similar plan of performing postal retails services.

**Correction:** *BMR* incorrectly listed the phone number for Fairrington Transportation in the Sept. 13 issue of the newsletter. If you are interested in learning more about the company's co-palletization services, call 630-783-9200 or 800-323-5935.

*BUSINESS MAILERS REVIEW* (ISSN: 0739-3873) is published biweekly by Sedgwick Publishing Co., an independent newsletter firm. Subscriptions to *BUSINESS MAILERS REVIEW* are $377/year in the U.S., Canada and Mexico; delivered airmail for $362 elsewhere. Authorization to photocopy items for internal or personal use, or the internal or personal use of specific clients, is granted by Sedgwick Publishing Co. for libraries and other users upon request. *BUSINESS MAILERS REVIEW* is available electronically via e-mail. Contact the circulation department at 301-528-0011, or email to support@pnmsi.com. © 2004 by Sedgwick Publishing Co.

Kate Phelan Muth, Editor ........ 703-237-7962
Tod Sedgwick, Publisher ........ 540-364-7380
Kathy Thorne, Group Publisher ........ 301-528-0011

Editorial Fax: 703-538-6841
Editorial email: muth@erols.com
Editorial address: 5209 N. 30th St.
Arlington, VA 22207-1803

POSTMASTER: Send address changes to *BUSINESS MAILERS REVIEW*, PO Box 328, Boyds, MD 20841.

Enter my subscription to *BUSINESS MAILERS REVIEW*:
O One-year subscription — $377 ($392 airmail)
O Check enclosed to Sedgwick Publishing Co.
O Charge: O Visa O MasterCard O American Express
Acct: ________ Exp. ________
Name ________
Company ________
Address ________
City/State/Zip ________
Signature ________
Phone ________

Mail to: *BUSINESS MAILERS REVIEW*, P.O. Box 328, Boyds, Maryland 20841 or call 301-528-0011; fax, 301-528-2497.

*SEDGWICK PUBLISHING CO.*

## Siemens Applies PARS Technology to List Environment

Siemens Logistics and Assembly Systems (Siemens L&A) is applying its Postal Automated Redirection System (PARS) technology to the list processing environment, where it expects to create the most accurate and updated addresses possible — before a list is even printed.

Siemens L&A, the new name of Siemens Dematic Postal Automation, unveiled a demonstration of the technology, which it is calling Fusion, at the National Postal Forum. Fusion uses a name-address database to enhance the address matching and validation process. Siemens is working with Experian, using Experian's commercial names database. Siemens has hired NGI Solutions LLC to work on the project. Former USPS manager of addressing Mike Murphy has been hired by NGI Solutions and demonstrated the Fusion technology at the Siemens booth.

The idea is to check the address at the last possible stage before it is printed, Murphy explained to *BMR*.

Fusion is similar in concept to the Postal Service's distribution quality improvement (DQI), only it is for the commercial market and the technology is being applied before the address list is printed. DQI is the USPS initiative to improve barcode assignment rates on collection box mail. It plans to use commercially available names and addresses database at origin as mail is sorted (*BMR* 6/19). As non-barcoded mail runs through the sorter, the reader looks at the address and sprays the correct 11-digit barcode on it. If an address is missing a piece, such as an apartment number or a directional, it can be incorrectly sorted. The USPS will run these unresolved addresses through the commercial names databases to see if they can code the piece at origin. However, DQI will run against the database as a "moment in time." The Postal Service will not compile the information or use the database to correct mailing lists.

Siemens is looking to do just that. It is taking its PARS technology and moving it to the list processing environment, Murphy said. PARS is the Postal Service's new system for forwarding undeliverable as addressed mail. Siemens is the PARS vendor.

With Fusion, Siemens is taking Experian's name-address database into its fast look-up directory. An incomplete address is run against the Experian "name" database to see what is missing. Once the address is fixed, it can be sent over to the move-update vehicle. Once the fix is captured, users can update their master database or update their ZIP+4 database.

Mailers can use the Fusion CASS engine or in combination with their own integrated software systems, Murphy said. Siemens is seeing a 10% to 20% improvement on uncodable mail, he claimed.

## Walz Opens Outsourcing Company for Certified Mail Users

With so much attention on the big three classes of mail, Special Services often seem like an afterthought when focusing on new opportunities and growth for postal products.

Not so for Walz Postal Solutions. For years its Walz Certified Mailer© has been the most widely used alternative to the free forms provided by the Postal Service. It has sold more than 160 million USPS-approved forms to date. Banks, mortgage companies, insurers and municipalities are among the regular large users of Certified Mail.

Earlier this year, Walz spun off a new company called Walz Secured Outsourcing Services for users of USPS Certified Mail services. The company provides full printing, address cleansing, mailing and digital imaging of Certified Mail letters and returned mail. Walz provides a secure Web interface for customers to monitor the Postal Service's delivery tracking system, as well as for researching mailings or retrieving images.

Rod Walz, founder and chairman of the board of Walz Secured Outsourcing, says the Walz outsourcing solution can eliminate up to 95% of a customer's process steps, and the customer can get rid of paper files. Working with each client, Walz determines the best method for importing and exporting data. It offers single or multi-page printing and mailing, using First Class Mail, Certified Mail, Certified Mail with Return Receipt or Certificate of Mailing. Walz makes a computerized listing of all Certified and Certificate of Mailing notices, which it gets signed and round-dated by the USPS as proof of deposit. This Firm Mailing Book (Form 3877) is digitally imaged and the physical copy and image are returned to the client.

Walz also processes returned items. All mail will have a return address to a client-owned post office box in Temecula, CA, where Walz daily retrieves the client's returned mail, such as return receipts or unclaimed mail pieces, then processes the results and digitally returns the images to the client. Walz bundles the returns, tracks the position of each item in the bundle and either returns all of them to the client or manages their storage. Images of items can be retrieved through Walz's web system.

At the moment, Walz is gearing its outsourcing services to clients with volume of 5,000 pieces or more of Certified Mail per month, Rod Walz says. But the company is looking ahead and sees an opportunity to work with the little guys as well.

"We want to be a company with plants in five places around the country," says Jim Hutchinson, president of Walz Secured Outsourcing and a former Hewlett Packard

# Exhibit 3

# ORDER/SOLICITATION/OFFER/AWARD

OFFEROR TO COMPLETE BLOCKS 13, 14, 16, 18, 23, 24 and 28

1. REQUISITION NO. 02-05421 | PAGE 1 OF 1

2. CONTRACT/ORDER NO. 102591-03-Q-0454
3. AWARD/EFFECTIVE DATE 09/30/2002
4. MASTER/AGENCY CONTRACT NO
5. SOLICITATION NO 102590-02-A-0069
6. SOLICITATION ISSUE DATE 06/28/2002

7. FOR SOLICITATION INFORMATION CALL
a. NAME Janet Crowe
b. TELEPHONE NO. (202) 268-7306
c. FAX NO (202) 268-3677
8. OFFER DUE DATE/TIME 07/19/2002 3:00 PM

9. ISSUED BY:
U. S. POSTAL SERVICE
HEADQUARTERS PURCHASING, IT
475 L'ENFANT PL SW RM 4541
WASHINGTON DC 20260-6238
EMAIL: jcrowe@email.usps.gov

10. ACO CODE 102591

11. SOLICITATION METHOD
☐ RFQ
☐ RFP
☐ ORAL

12. DELIVERY FOR FOB DESTINATION UNLESS BLOCK IS CHECKED
☐ SEE SCHEDULE

13. DISCOUNT TERMS
NET 30

14a. SUPPLIER
HASLER INC
Graham Fulghum

19 Forest Parkway
Shelton CT 06484-6140
TEL: (800) 237-9154 FAX: (703) 758-9069
EMAIL:

15a. BILLING ADDRESS

USPS Retail
Attn: Reginald Sykes RM 5007
1735 N. Lynn Street
Arlington VA 22209-6432

14b. ☐ CHECK BOX IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER

15b. SUBMIT INVOICES TO ADDRESS SHOWN BLOCK 15a UNLESS BLOCK IS CHECKED ☐ SEE ADDENDUM

16. TYPE OF BUSINESS ORGANIZATION *(Check all that apply)*

a. ☐ MINORITY BUSINESS
☐ BLACK AMERICAN
☐ HISPANIC AMERICAN
☐ NATIVE AMERICAN
☐ ASIAN AMERICAN

b. ☐ WOMAN-OWNED
c. ☐ SMALL BUSINESS
d. ☐ EDUCATIONAL INSTITUTION
e. ☐ NON-PROFIT ORGANIZATION
f. ☐ NONE OF THE ABOVE ENTITIES

17a. DELIVERY ADDRESS
See Part 1

Arlington VA 22209-6432

17b. TELEPHONE NO.:
17c. DELIVER BY/END DATE:

18. TAXPAYER IDENTIFICATION NO 06-0798198

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| 001 | Monthly Lease of Meters | 0.000 | EA | $0.0000 | $0.00 |
| 002 | Support Costs | | EA | $0.0000 | $0.00 |
| 003 | Label Costs | 0.000 | PH | $0 0000 | $0.00 |

25. TOTAL AWARD AMOUNT *(USPS Use Only)* 0

26. ☒ The supplier is required to sign this document and return ___ copies to the issuing office. The supplier agrees, subject to the terms and conditions specified herein, to provide and deliver all items identified above and on any additional sheets.

27. ☒ Award of Contract: Your offer on solicitation (block 5) is accepted as to items ______

28a. SIGNATURE OF SUPPLIER: Brian T. Leary

29a. UNITED STATES POSTAL SERVICE *(SIGNATURE OF CONTRACTING OFFICER)*: Janet Crowe

28b. PRINTED NAME AND TITLE OF SUPPLIER: BRIANT Leary Director

28c. DATE SIGNED: 10/10/2002

29b. PRINTED NAME OF CONTRACTING OFFICER: Janet Crowe

29c. DATE SIGNED: 10/1/02

102591-03-Q-0454

# PRIVACY ACT STATEMENT

To the extent that the information you provide is about an individual, the Privacy Act will apply. Collection of that information is authorized by 39 USC 401. As a routine use, the information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants, or other benefits; to a congressional office at your request; to an expert, consultant, or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; to a labor organization as required by the National Labor Relations Act; to a federal, state or local agency, financial institution or other appropriate entity for the purpose of verifying an individual's or entity's eligibility or suitability for engaging in a transaction. In addition, the following disclosures may be made to any person: a solicitation mailing list when a purchase is highly competitive and competitions will not be harmed by release, or to provide an opportunity for potential subcontractors seeking business; a list of lessors of real or personal property to the Postal Service; a list of entities with whom the Postal Service transacts for goods or services, interests in real property, construction, financial instruments, or intellectual property; and the identity of the successful offeror. Completion of this form is voluntary; however, if this information is not provided, we will be unable to process your request.

PART 1 - CONTINUATION SHEET/SCHEDULE

## 1.1 DELIVERY/PERFORMANCE

**FOB Point Legend**
A = USPS Pre-paid Mailing Labels
C = Commercial Bill of Lading
D = Destination
E = Other (e.g. Pick-up)
G = Government Bill of Lading
P = Prepay/Add Charges

**Delivery Date Legend**
ACA = After Contract Award
AFA = After First Article Approval
ANP = After Notice to Proceed
ARO = After Receipt of Order
EAD = Earliest Available Date
Where D = Days, W = Weeks, M = Months

==================================================================

DELIVERY ADDRESS:
United States Postal Service
Retail Planning & Develop
1735 N. Lynn St. Room 5007
Arlington VA 22209-6432

CONTACT: Reginald Sykes Telephone: (703) 292-3769
DELIVERY HOURS:
DELIVERY INSTRUCTIONS:

**Item Number:** 001 **PSN (If applicable): PSIN (If applicable):**

| Quantity | Unit of Measure | FOB Point | Delivery Date |
|---|---|---|---|
| [redacted] | EA | D | 11/01/2002 |

**Item Number:** 002 **PSN (If applicable): PSIN (If applicable):**

| Quantity | Unit of Measure | FOB Point | Delivery Date |
|---|---|---|---|
| [redacted] | EA | D | 11/01/2002 |

**Item Number:** 003 **PSN (If applicable): PSIN (If applicable):**

| Quantity | Unit of Measure | FOB Point | Delivery Date |
|---|---|---|---|
| [redacted] | PH | D | 11/01/2002 |

## 1.2 ACKNOWLEDGMENT OF AMENDMENTS (Clause OB-199) (January 1997)

The offeror acknowledges receipt of amendments to the solicitation numbered and dated as follows:

Amendment Number Date Amendment Number
Date

| ____ | ________ | ____ | ________ |
|---|---|---|---|
| ____ | ________ | ____ | ________ |
| ____ | ________ | ____ | ________ |
| ____ | ________ | ____ | ________ |
| ____ | ________ | ____ | ________ |

1.3 CONTRACT TYPE

This contract is being established as an Indefinite Delivery Order contract. Delivery Orders will be issued under this contract and include funding for each schedule.

1.4 PERIOD OF PERFORMANCE (Clause OB-12) Alternate I (June 1988)

The period of performance of this contract is as follows:

| | | |
|---|---|---|
| Base Period | Start date: 10/01/02 | End Date: 03/30/04 |
| Option Period 1 | Start date: 09/06/03 | End Date: 09/07/04 |
| Option Period 2 | Start date: 09/06/04 | End Date: 09/07/05 |
| Option Period 3 | Start date: 09/06/05 | End Date: 09/07/06 |
| Option Period 4 | Start date: 09/06/06 | End Date: 09/07/07 |

1.5 Detailed Item Prices

| | | |
|---|---|---|
| 001 PostLink 18 month Lease Option | Unit per month | |
| ACH Payment | $48.59 | |
| Check Payment | $51.71 | |
| 002 Monthly Support Costs | $30.50 | |
| 003 Savings Options | Lease | Support |
| 3A Expand reference material | (.25) | |
| 3B Service Hours of (EST: M-F 8AM-11PM, Sat 9AM-5PM, Sun 11AM-3PM) | | (7.47) |
| 3C Monthly data email | (1.35) | (.31) |

004 Label Cost $13.95
004A (3 Pack w/FOB Destination, First Class shipment) $23.95
004B (6 Pack w/FOB Destination, Priority Mail shipment)

005 18 month End of Lease Buyout Option
PostLink $360 per unit
Scale (30 lb) $240 per unit

1.5.1 Other Lease Options

006 PostLink 24 month Lease Option Unit per month
ACH Payment $39.34

007 24 month End of Lease Buyout Option
PostLink $230 per unit
Scale (30 lb) $150 per unit

008 PostLink 36 month Lease Option Unit per month
ACH Payment $30.88

009 36 month End of Lease Buyout Option
PostLink $100 per unit
Scale (30 lb) $ 70 per unit

010 Movement Fee $50.00 per unit
(only charged when over 5% of the installed base is moved in a given year.)

011 Purchase Option

| | |
|---|---|
| Custom PostLink machine | $640.00 per unit |
| 30 LB. Scale | $475.00 per unit |
| Scale Stands | $ 55.00 per unit |

**1.6 DEPLOYMENT SCHEDULE**

The delivery/deployment schedule will be an expanding schedule for the duration of this contract. A set deployment schedule for the initial rollout will be attached to the first Delivery Order issued under this contract. Subsequent delivery schedules will be included under following Delivery Orders.

**1.7 DATA TRANSFER**

The data transfer required under this contract will be accomplished in the following two ways:

1) Data will be transferred from participating Hallmark retail locations once every Saturday evening.
2) Data will be transferred from the Contractor to USPS monthly on the COB 2nd business day from the close of the previous month. The data is to be emailed until such time that the file becomes too large, and then other equitable means will be addressed. Email addresses will be supplied by either the COR or Project Manager. The data file will be in either Microsoft Excel, Microsoft Access or a file form approved by the COR or Project Manager.

PART 2 - CLAUSES

## 2.1 CLAUSES INCORPORATED BY REFERENCE

The following clauses are incorporated by reference as if set forth in full text. The text of these clauses may be accessed electronically in Appendix B, Contract Clauses, of the Purchasing Manual (PM) at this address http://www.usps.com/cpim/ftp/manuals/pm/pmtc.pdf or will be provided by the contracting officer upon request. PM citations that prescribe the clauses are shown in parentheses.

| CLAUSE NUMBER | DATE | TITLE |
|---|---|---|
| 1-9 | April 2000 | PREFERENCE FOR DOMESTIC SUPPLIES (1.7.12) |

## 2.2 CONTRACT TERMS AND CONDITIONS - COMMERCIAL ITEMS (Clause 4-2) (January 1997)

a. Inspection and Acceptance. The supplier shall only tender for acceptance those items that conform to the requirements of this contract. The Postal Service reserves the right to inspect or test supplies or services that have been tendered for acceptance. The Postal Service may require repair or replacement of nonconforming supplies or reperformance of nonconforming services at no increase in contract price. The Postal Service must exercise its post acceptance rights (1) within a reasonable period of time after the defect was discovered or should have been discovered and (2) before any substantial change occurs in the condition of the items, unless the change is due to the defect in the item.

b. Assignment. The supplier or its assignee's rights to be paid amounts due as a result of performance of this contract may be assigned to a bank, trust company, or other financing institution, including any Federal lending agency in accordance with the Assignment of Claims Act (31 U.S.C. 3727).

c. Changes. Changes in the terms and conditions of this contract may be made only in written agreement of the parties.

d. Disputes. This contract is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613). Failure of the parties to this contract to reach agreement on any request for equitable adjustment, claim, appeal or action arising under or relating to this contract shall be a dispute to be resolved in accordance with the clause at PM B-9 Claims and Disputes, which is incorporated herein by reference. The supplier shall proceed diligently with performance of this contract pending final

resolution of any dispute arising under the contract.

e. Definitions. The clause at PM B-1, Definitions, is incorporated herein by reference.

f. Excusable delays. The supplier shall be liable for default unless nonperformance is caused by occurrence beyond reasonable control of the supplier and without fault or negligence such as acts of God or the public enemy, acts of the Postal Service in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers. The supplier shall notify the contracting officer in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the contracting officer of the cessation of such occurrence.

g. Invoice. The supplier shall submit an original invoice and three copies (or electronic invoice if authorized) to the address designated in the contract to receive invoices. An invoice must include

1. Name and Address of the supplier
2. Invoice date;
3. Contract number, contract line number and if applicable, the order number;
4. Description, quantity, unit of measure, unit price and extended price of the items delivered;
5. Shipping number and date of shipment including the bill of lading number and weight of shipment if shipped on a Postal Service bill of lading;
6. Terms of any prompt payment discount offered;
7. Name and address of official to whom payment is to be sent; and
8. Name, title and phone number of person to be notified in event of defective invoice.

Invoices will be handled in accordance with the Prompt Payment Act (31 U.S.C. 3903) and Office of Management and Budget (OMB) Circular A-125, Prompt Payment.

h. Patent indemnity. The supplier shall indemnify the Postal Service and its officers, employees and agents against liability, including costs for actual or alleged direct or contributory infringement of, or inducement to infringe, any United States or foreign patent, trademark, or copyright, arising out of the performance of this contract, provided the supplier is reasonably notified of such claims and proceedings.

i. Payment. Payment shall be made for items accepted by the Postal Service that

have been delivered to the delivery destinations set forth in this contract. The Postal Service will make payment in accordance with the Prompt Payment Act (31 U.S.C. 3903) and Office of Management and Budget (OMB) Circular A-125, Prompt Payment. Payments under this contract may be made by the Postal Service either by check, electronic funds transfer or government credit card at the option of the Postal Service.

In conjunction with any discount offered for early payment, time shall be computed from the date of the invoice. For purposes of computing the discount earned, payment shall be considered to have been made on the date which appears on the payment check or the date on which an electronic funds transfer was made.

j. Risk of loss. Unless the contract specifically provides otherwise, risk of loss or damage to the supplies provided under this contract shall remain with the supplier until, and shall pass to the Postal Service upon:

1. Delivery of the supplies to a carrier, if transportation of f.o.b. origin, or;

2. Delivery of the supplies to the Postal Service at the destination specified in the contract, if transportation is f.o.b. destination.

k. Taxes. The contract price includes all applicable Federal, State, and local; taxes and duties.

l. Termination for the Postal Service's convenience. The Postal Service reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the supplier shall immediately stop all work and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the supplier shall be paid a percentage of the work performed prior to the notice of termination, plus reasonable charges the supplier can demonstrate to the satisfaction of the Postal Service using its standard record keeping system, have resulted from the termination. The supplier shall not be required to comply with the cost accounting standards and principles for this purpose. This paragraph does not give the Postal Service any right to audit the supplier's records. The supplier shall not be paid for any work performed or costs incurred which reasonable could have been avoided.

m. Termination for default. The Postal Service may terminate this contract, or any part hereof, for default by the supplier, or if the supplier fails to provide the Postal Service, upon request, with adequate assurances of future performance. In the event of termination for default, the Postal Service shall not be liable to the supplier for any amount for supplies or services not accepted, and the supplier shall be liable to the Postal Service for any and all rights and remedies provided by law. If it is determined that the Postal Service improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

n. Title. Unless specified elsewhere in this contract, title to items furnished under this contract shall pass to the Postal Service upon acceptance, regardless of when or were the Postal Service takes physical possession.

o. Warranty. The supplier warrants and implies that the items delivered under this contract are merchantable and fit for the use for the particular purpose described in this contract.

p. Limitation of liability. Except as otherwise provided by an express or implied warranty, the supplier will not be liable to the Postal Service for consequential damages resulting from any defect or deficiencies in accepted items.

q. Other compliances. The supplier shall comply with all applicable Federal, State, and local laws, executive orders, rules and regulations applicable to its performance under this contract.

r. Order of precedence. Any inconsistencies in this solicitation or contract shall be resolved by giving precedence in the following order; (1) the schedule of supplies and services; (2) the Assignment, Disputes, Payments, Invoice, Other Compliances and Compliance with Laws Unique to the Postal Service Contracts paragraphs of this clause; (3) the clause at 4-3 Contract Terms and Conditions Required to Implement Statutes or Executive Orders - Commercial Items; (4) addenda to this solicitation or contract, including any license agreements for computer software; (5) solicitation provisions if this is a solicitation; (6) other paragraphs of this clause; (7) PS Form 8203; (8) other documents, exhibits, and attachments, and (9) the specifications.

## 2.3 NON-DISCLOSURE OF ADDRESS INFORMATION (Clause 1-7) (January 1997)

a. General. This contract requires the supplier to have access to address information (i.e., addresses and return addresses) that appears on pieces of mail. To ensure the confidentiality of this address information, except as permitted by this clause, no supplier or subcontractor, and no employee or former employee of any supplier or subcontractor may, at any time, during or after the completion of this contract, disclose to any third party any address information obtained in the performance of this contract. This contract does not give the supplier proprietary interest in address information, and the supplier's right to have, use, and disclose address information is restricted by the terms of this clause.

b. Restriction of Access. The supplier agrees to control and restrict access to address information to persons who need it to perform work under this contract, and to prohibit the reproduction of this information.

c. Confidentiality and Non-Disclosure Agreement. The supplier must require an employee (including any employee of a subcontractor) to sign the following agreement before the employee is granted access to address information:

CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

I agree to hold in confidence any and all address information (i.e., addresses and return addresses) disclosed by the Postal Service or otherwise obtained or developed in the course of performance under Postal Service contract No.__________. I understand that no address information may be disclosed to any third party without prior written consent of the United States Postal Service.

Signature

Date

d. Legal Demands for Information. If a legal demand is made for address information (such as by subpoena), the supplier will immediately notify the contracting officer and the nearest office of the postal inspectors. After notification, the Postal Service will then determine whether and to what extent, to resist the legal demand. Should the Postal Service give in to or unsuccessfully resist a legal demand, the supplier may, with the written permission of the contracting officer, release that address information specifically requested by the legal demand.

e. Indemnification. The supplier will indemnify the Postal Service, its employees and agents, against all liability (including costs and fees) for damages arising out of the intentional or negligent disclosure of address information other than as permitted by this clause.

f. Subcontracts. The supplier must include this clause, modified as necessary, in any subcontract.

## 2.4 USE OF FORMER POSTAL SERVICE EMPLOYEES (Clause 1-14) (October 2001)

During the term of this contract, the supplier must identify any former Postal Service employee it proposes to be engaged, directly or indirectly, in contract performance. Such individuals may not commence performance without the contracting officer's prior approval. If the contracting officer does not provide such approval, the supplier must replace the proposed individual with another individual equally qualified to provide the services called for in the contract.

## 2.5 FIRST ARTICLE APPROVAL - POSTAL SERVICE TESTING (Clause 2-5) (January 1997)

a. At the time specified for first article testing, the supplier must deliver the units specified in the Schedule to the Postal Service at the testing facility set forth in the Schedule. The shipping documentation accompanying the first article must contain the number of this contract and the lot/item identification. The performance or other characteristics that the first article must meet, and the tests to which it will be subjected, are contained or referenced in this contract.

b. The contracting officer must, by written notice to the supplier within the time specified in the Schedule, approve, conditionally approve, or disapprove the first article. The notice of approval or conditional approval does not relieve the supplier from complying with all requirements of the specifications and all other terms and conditions of this contract. A notice of conditional approval will state any further action required of the supplier. A notice of disapproval will cite reasons for the disapproval.

c. If the first article is disapproved, the supplier may be required, at the option of the

Postal Service, to submit an additional first article for first article approval test. After each notification by the Postal Service to submit an additional first article, the supplier must at no additional cost to the Postal Service make any necessary changes, modifications, or repairs to the first article, or select another first article for testing. The additional first article must be furnished to the Postal Service under the terms and conditions and within the time specified in the notification. The Postal Service must take action on this additional first article within the same time limit referred to in paragraph b above. The costs of additional first article approval tests and all costs related to such tests must be borne by the supplier. The Postal Service reserves the right to require an equitable adjustment of the contract price for any extension of the delivery schedule necessitated by additional first article approval tests.

d. If the supplier fails to deliver a first article on time, or if the contracting officer disapproves a first article, the contract may be terminated for default. Waiver of the right to terminate this contract for default does not relieve the supplier of responsibility to meet the delivery schedule for production quantities.

e. When the first article is not consumed or destroyed in testing, and unless otherwise provided in this contract, the supplier:

1. May deliver an approved first article as a part of the contract quantity if it meets all terms and conditions of this contract for acceptance; and

2. Is responsible for removal and disposition of any first article from the Postal Service test site at the supplier's expense.

f. The supplier is responsible for spare-parts support and repair of the first article during any first article approval test.

g. Before first article approval, acquisition of materials or components for the balance of the contract quantity or commencement of production is at the supplier's sole risk.

h. Costs incurred under paragraph g above are not allocable to this contract for progress payments before first article approval or for a termination settlement in the event of termination for convenience before first article approval.

**2.6 OPTION ITEM (Clause 2-18) (January 1997)**

The Postal Service may increase the quantity of supplies called for in this contract by requiring the delivery of the numbered line item identified in the Schedule as an option item, in the quantity and at the price set forth in the Schedule. The contracting officer may exercise this option, at any time within the period specified in the Schedule, by giving written notice to the supplier. Delivery of the items added by the exercise of this option will continue immediately after, and at the same rate as, delivery of like items called for under this contract, unless the parties otherwise agree.

**2.7 DELIVERY-ORDER LIMITATIONS (Clause 2-40) (January 1997)**

a. When the Postal Service requires supplies or services covered by this contract in an amount less than $100.00, the Postal Service is not obligated to purchase, and the supplier is not obligated to furnish, those supplies or services under this contract.

b. The supplier is not obligated to honor:

1. Any order for a single item in excess of __________;

2. Any order for a combination of items in excess of __________; or

3. A series of orders from the same ordering office in the course of __________ days that together call for quantities exceeding the limitations stated in subparagraph b.1 or b.2 above.

c. If this is a requirements contract, the Postal Service is not required to order a part of any one requirement from the supplier if that requirement exceeds the limitations stated in paragraph b above.

d. If it is the supplier's intent not to honor an order received that exceeds the limitations stated in paragraph b above, the supplier must return the order to the ordering office within ___5___ days after issuance, with a written notice rejecting the order and giving the reasons; the Postal Service may then obtain the supplies or services from another source. If the supplier does not return the order with a notice of rejection as required, the supplier must honor the order as issued.

## 2.8 INDEFINITE QUANTITY (Clause 2-42) (January 1997)

a. This is an indefinite-quantity contract; the quantities of supplies or services specified in the Schedule are not purchased until ordered. If this contract resulted from multiple awards under a single solicitation for the same or similar supplies or services to two or more sources, some or all of the orders issued will be subject to the competitive procedures described in this contract.

b. Delivery or performance must be as directed in orders issued in accordance with the Ordering clause and the contract Schedule. The supplier must furnish to the Postal Service, when ordered, the supplies or services specified in the Schedule up to and including the quantity designated in the Schedule as the maximum. The Postal Service must order at least the quantity of supplies or services designated in the Schedule as the minimum. There is no limit on the number of orders that may be issued, unless specified in the Delivery-Order Limitations clause or in the contract Schedule. Orders may require delivery to multiple destinations or performance at multiple locations.

c. Any order issued during the effective period of this contract and not completed within that period must be completed by the supplier within the time specified in the order, and the rights and obligations of the supplier and the Postal Service with respect to the order will be the same as if the order were completed during the effective period of the contract.

2.9 CONTRACT TERMS AND CONDITIONS REQUIRED TO IMPLEMENT STATUTES OR EXECUTIVE ORDERS - COMMERCIAL ITEMS (Clause 4-3) (DECEMBER 1999)

a. The following clauses are incorporated in this contract by reference:

(1) Clause 9-1, Convict Labor (January 1997)

(2) Clause 9-5, Contract Work Hours and Safety Standards Act - Safety Standards (January 1997)

b. If this contract is valued at $500,000 or more, Clause 3-2, Participation of Small, Minority, and Woman-owned Businesses, is incorporated into this contract by reference.

c. If checked, the following clauses are incorporated in this contract by reference:

(Contracting officer will check as appropriate)

[ _] (1) Clause 9-10, Service Contract Act (January 1997)

[ _] (2) Clause 9-12, Fair Labor Standards Acts and Services Contract Act - Price Adjustments (January 1997)

[ _] (3) Clause 9-2, Contract Work Hours and Safety Standards Act - Overtime Compensation (January 1997)

[ _] (4) Clause 9-3, Davis-Bacon Act (January 1997)

[ X] (5) Clause 9-7, Equal Opportunity (January 1997)

[ X] (6) Clause 9-13, Affirmative Action for Handicapped Workers (January 1997)

[ X] (7) Clause 9-14, Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era (January 1997)

d. Examination of Records. The Postal Service or its authorized representative shall have access to and right to examine any of the supplier's directly pertinent records involving transactions related to this contract. The supplier shall make available at its offices at all reasonable times the records, materials and other evidence for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified for particular records. If this contract is completely or partially terminated, the records relating to the work terminated shall be made available for 3 years after any resulting final termination settlement. Records relating to appeals under the disputes clause or to litigation or the settlement of claims arising under or relating to this contract shall be made available until such appeals, litigation, or claims are finally resolved. As used in this clause, records include books, documents, account procedures and practices, and other

data, regardless of type and regardless of form. This does not require the supplier to create or maintain any record that the supplier does not maintain in the ordinary course of business or pursuant to a provision of law.

e. Notwithstanding the requirements of the clauses in paragraphs a., b., c., or d. of this clause, the supplier is not required to include any PM clause, other than those listed below (and as may be required by an addenda to this paragraph) in a subcontract for commercial items or commercial components:

(1) Clause 9-7, Equal Opportunity (January 1997)

(2) Clause 9-14, Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era (January 1997)

(3) Clause 9-13, Affirmative Action for Handicapped Workers (January 1997)

**2.10 SOFTWARE LICENSE WARRANTY AND INDEMNIFICATION (Clause 4-13) (January 1997)**

a. The supplier warrants that it has full power and authority to grant the rights contained in this contract with respect to the software without the consent of any other person. Neither the performance of the services by the supplier nor the license to and use by the Postal Service of the software and documentation (including copying) will in any way constitute an infringement or other violation of any copyright, trade secret, trademark, patent, invention, proprietary information, nondisclosure, or other rights of any third party.

b. The supplier indemnifies and holds harmless (including reasonable attorney's fees) the Postal Service and its employees or agents against all liability to third parties arising from the negligence of the supplier or its agents and the license to or use by the Postal Service of the software, including but not limited to the violation of any third party's trade secrets, proprietary information, trademark, copyright, or patent rights in connection with the licensing of the software. The Postal Service may, at this option, conduct the defense in any third-party action, and the supplier promises fully to cooperate with this defense. This indemnification is limited to the software delivered to the Postal Service or as modified by the supplier, and does not cover third-party claims arising from modifications by the Postal Service not authorized by the supplier.

c. If a third-party claim causes the Postal Service's quiet enjoyment and use of the software to be seriously endangered or disrupted, the supplier must either:

1. Replace the software, without additional charge, by a compatible, functionally equivalent, and noninfringing product;

2. Modify the software to avoid the infringement;

3. Obtain a license for the Postal Service to continue use of the software for the

term of this contract, and pay for any additional fee required for the license; or

4. If none of these alternatives is possible even after the supplier's best efforts, return a pro rata portion of the license, or ten years, whichever is less.

## 2.11 SOFTWARE DEVELOPMENT WARRANTY (Clause 4-14) (January 1997)

If at any time during the 12-month period immediately following acceptance, the supplier or the Postal Service discovers defects or errors in the software or any other respect in which the software fails to conform to the provisions of any warranty contained in this contract, the supplier must, entirely at its own expense, promptly correct the defects, errors, or nonconformity by, among other things, supplying the Postal Service with corrective codes and making additions, modification, or adjustments to the package as may be necessary to keep the software in operating order in conformity with the warranties in this contract.

## 2.12 SUBSTITUTION OF INFORMATION TECHNOLOGY (Clause 4-16) (January 1997)

This clause acknowledges that some of the contracted for equipment may not be readily available or may permanently go out of production. Based on the authority of this clause, the supplier may request a one-time or permanent substitution of one or more contract line items. Such requests must be made in writing to the contracting officer, with a copy to the COR.

The following conditions must be met:

a. The replacement item(s) must meet or exceed all contract specifications that were applicable to the items being replaced.

b. The replacement item(s) must be priced equal to, or less than, the item(s) being replaced

c. The replacement item(s) must be reviewed, and be determined to be acceptable by the Postal Service technical representative.

d. The replacement item(s) must be approved in writing by the contracting officer and incorporated into the contract.

The supplier's request for a replacement may not exceed the required delivery time of any items. Upon formal acceptance of a replacement, the contracting officer may grant a day-to-day extension to the delivery schedule for the time the Postal Service took to approve the replacement. No extension may be granted in the case of unaccepted proposed replacements.

## 2.13 TECHNOLOGY ENHANCEMENT (Clause 4-17) (January 1997)

a. Definitions

1. Enhancement, replacement and upgrade are used interchangeably throughout this clause.

2. Cost to performance ration is a form of comparative measurement and means the contracts costs of a given item or configuration per a quantifiable unit of performance or capability, such as (but not limited to) storage capacity (in megabytes), speed (in megahertz), energy consumption efficiency, etc.

b. The supplier must propose technology enhancement of information technology equipment, firmware, or software configurations being provided under this contract whenever product lines of newer technology become available that may save money, improve performance, or save energy. All proposed upgrades must meet the following requirements.

1. All mandatory requirements of the contract must continue to be met.

2. Overall contract life cycle costs may not increase as a result of the upgrade.

3. The proposed upgrade or enhancement will: (1) either afford a better cost to performance ration compared to existing contract offerings/configurations; or (2) at minimum, must result in at least equal operability, maintainability, reliability, and overall system performance while providing some additional benefit or advantage to the Postal Service.

4. The replacement configuration proposal must be acceptable to the COR.

c. As a minimum, the following information must be submitted by the supplier with each proposal:

1. A description of the difference between the existing contract requirement and the proposed change along with the comparative advantages and disadvantages of each.

2. Suggested contract requirements which should be changed if the proposed technology enhancement is adopted.

3. A complete pricing proposal which evidences the commerciality of the pricing. (The price for the upgraded product, or configuration, can be no greater than the standard commercial price of the replacement product less a discount factor equal at least to the discount afforded the Postal Service in the supplier's final proposal for the original, taking into account the age of the original product in its life cycle.

4. An evaluation of the proposed change's effect on collateral costs, costs of related items, and costs of maintenance and operation.

5. Timing as to when the modification adopting the technology enhancement must be issued to ensure the maximum benefit to the Postal Service.

6. Identify any effect on the contract completion or delivery schedule.

7. Any other information that may be required by the contracting officer.

d. Technology enhancements, as contemplated by this clause, will not be added to the contract except by written, bilateral modification to the contract.

e. The decision by the contracting officer to accept or reject any proposal under this contract is final and not subject to the Disputes clause

**2.14 INFORMATION TECHNOLOGY ACCESSIBILITY STANDARDS (Clause 4-18) (June 2001)**

a. Information technology purchased under this contract or order must conform to the applicable provisions of the Architectural and Transportation Barriers Compliance Board's Electronic and Information Technology Accessibility Standards (36 CFR part 1194) at the time of delivery, except when the contracting officer has advised that compliance is not required.

b. At the time of delivery, the supplier must provide documentation of the commercial availability of accessibility features incorporating the standards of the applicable provisions of 36 CFR part 1194 for the commercial off-the-shelf products ordered under this contract.

**2.15 CONTRACTING OFFICER'S REPRESENTATIVE (Clause 6-2) (January 1997)**

The contracting officer will appoint a contracting officer's representative (COR), responsible for the day-to-day administration of the contract, who will serve as the Postal Service's point of contact with the supplier on all routine matters. A copy of this notice will be furnished to the supplier upon award of the contract.

**2.16 PATENT RIGHTS (Clause 8-1) (January 1997)**

a. Definitions Used in This Clause

1. Subject invention. Any invention or discovery, whether or not patent able, conceived or first actually reduced to practice in the course of or under this contract. The term includes, but is not limited to, any art, method, process, machine, manufacture, design, or composition of matter, or any new and useful improvement thereof, or any variety of plant, that is or may be patent able under the patent laws of the United States of America or any foreign country.

2. Postal Service purposes. The right of the Postal Service to practice and have

practiced (make or have made, use or have used, sell or have sold) any subject invention throughout the world by or on behalf of the U.S. Postal Service.

3. Contract. Any contract, agreement, or other agreement or subcontract entered into, with, or for the benefit of the Postal Service.

4. Subcontract and subcontractor. Any subcontract or subcontractor of the supplier under this contract and any lower-tier subcontract or subcontractor under the contract.

5. To bring the invention to the point of practical application. To manufacture (in the case of a composition or product), practice (in the case of a process), or operate (in the case of a machine or system) under such conditions as to establish that the invention works and that its benefits are reasonably accessible to the public.

b. Rights Granted to the Postal Service. The supplier agrees to grant the Postal Service title in and to each subject invention. Nothing contained in this Patent Rights clause grants any rights with respect to any invention other than a subject invention.

c. Subject Invention Disclosure and Reports

1. With respect to subject inventions, the supplier must furnish the contracting officer the items described in (a) through (b) below:

(a) A written disclosure of each invention promptly after conception or first actual reduction to practice, whichever occurs first under this contract, sufficiently complete in technical detail to convey to one skilled in the art to which the invention pertains a clear understanding of the nature, purpose, operation, and (to the extent known) the physical, chemical, or electrical characteristics of the invention. When unable to submit a complete disclosure, the supplier must, within three months, submit a disclosure that includes all such technical detail then known; and unless the contracting officer authorizes a different period, submit all other technical detail necessary to complete the disclosure within three additional months.

(b) Before final settlement of this contract, a final report listing each invention, including all those previously listed, or certifying that there are no unreported inventions. (This final report and any interim report under (a) above must be submitted on Form 7398, Report of Inventions and Subcontracts, or other format acceptable to the contracting officer).

(c) Information in writing, as soon as practicable, of the date and identity of any (1) public use, sale, or publication of the invention made by or known to the supplier or (2) contemplated publication by the supplier.

(d) Upon request, any duly executed instruments and other papers (prepared by the Postal Service) necessary to (1) vest in the Postal Service the rights granted it under this clause and (2) and (2) enable the Postal Service to apply for and prosecute any patent application, in any country covering the

invention, where the Postal Service has the right under this clause to file such an application.

(e) Upon request, an irrevocable power of attorney to inspect and make copies of each United States patent application filed by, or on behalf of, the supplier covering the invention.

2. With respect to each subject invention in which the supplier has been granted rights, under license or otherwise, the supplier agrees to provide written reports at reasonable intervals, when requested by the Postal Service, as to:

(a) The commercial use being or intended to be made of the invention;

(b) Royalties payable to the Postal Service; and

(c) The steps taken by the supplier to bring the invention to the point of practical application, or to make the invention available for licensing.

d. Subcontracts

1. The supplier must, unless otherwise authorized or directed by the contracting officer, include a patent rights clause containing all the provisions of this Patent Rights clause except paragraph g below in any subcontract where a purpose of the subcontract is the conduct of experimental, developmental, research, or engineering work. If a subcontractor refused to accept this clause, the supplier:

(a) Must promptly submit a written report to the contracting officer setting forth the subcontractor's reasons for the refusal and any other pertinent information that may expedite disposition of the matter; and

(b) May not proceed with the subcontract without the written authorization of the contracting officer. The supplier may not, in any subcontract, or by using subcontract as consideration thereof, acquire any rights to subject inventions for its own use (as distinguished from rights required to fulfill its contract obligations to the Postal Service in the performance of this contract). Reports, instruments, and other information required to be furnished by a subcontractor to the contracting officer under a patent rights clause in a subcontract may, upon mutual consent of the supplier and the subcontractor (or by direction of the contracting officer), be furnished to the supplier for transmission to the contracting officer.

2. The supplier, at the earliest practicable date, must notify the contracting officer in writing of any subcontract containing a patent rights clause, furnish to the contracting officer a copy of the subcontract, and notify the contracting officer when the subcontract is completed. The Postal Service is a third-party beneficiary of any subcontract granting rights to the Postal Service in subject inventions, and the supplier hereby assigns to the Postal Service all the rights

that the supplier would have to enforce the subcontractor's obligations for the benefit of the Postal Service with respect to subject inventions. The supplier is not obligated to enforce the agreements of any subcontractor relating to the obligation of the subcontractor to the Postal Service regarding subject inventions.

e. Domestic Filing of Patent Applications by Supplier

1. If, pursuant to paragraph h below, greater rights are granted in a subject invention to the extent that the supplier may claim the invention, the supplier must file in due form and within six months of the granting of these rights a United States patent application claiming the invention and furnish, as soon as practicable, the serial number and filing date of the application and the patent number of any resulting patent. As to each invention in which the supplier has been given greater rights, the supplier must notify the contracting officer at the end of six-month period if it has failed to file or cause to be filed a patent application covering the invention. If the supplier has filed or caused to filed such an application within the six-month period, but elects not to continue prosecution of the application, it must notify the contracting officer not less than 60 days before the expiration of the response period. In either of these situations, the supplier forfeits all rights previously granted.

2. The following statement must be included in the first paragraph of any patent application filed or patent issued on an invention made under a Postal Service contract or a subcontract under a Postal Service contract: "The invention herein described was made in the course of or under a contract or subcontract there under with the United States Postal Service."

f. Foreign Filing of Patent Applications

1. If the supplier acquires greater rights in a subject invention and has filed a United States patent application claiming the invention, the supplier, or any party other than the Postal Service deriving rights from the supplier, has the exclusive rights, subject to the rights of the Postal Service, to file applications on the inventions in each foreign country within:

(a) Six months from the date a corresponding United States patent application is filed; or

(b) Such longer period as the contracting officer may approve.

2. The supplier must notify the contracting officer of each foreign application filed and, upon written request of the contracting officer, furnish an English translation of the application and convey to the Postal Service the entire right title and interest in the invention in each foreign country in which an application has not been filed within the time specified in subparagraph f.1. preceding.

g. Withholding Payment

1. Final payment under this contract will not be made until the supplier delivers to the contracting officer the reports required by paragraph c above and all information as to subcontracts required by paragraph d above.

2. If action is deemed warranted because of the supplier's performance under the Patent Rights clause of this contract or of other Postal Service contracts, the contracting officer may withhold from payment such sum as considered appropriate, not exceeding $50,000, or ten percent of the amount of this contract, whichever is less, to be held as a reserve until the supplier delivers all the reports, disclosures, and information specified in paragraph c above.

h. Supplier's Request for Greater Rights. The supplier, at the time of first disclosing a subject invention pursuant to paragraph c.1(a) above, but not later than three months thereafter, may submit in writing to the contracting officer a request for rights by license or otherwise in any invention. The contracting officer will review the supplier's request for rights and will notify the supplier whether it is granted in whole or in part. Any rights granted the supplier will be subject to, but not necessarily limited to, the provisions of paragraph i following.

i. Reservation of Rights to the Postal Service

1. If rights in any subject invention are vested in or granted to the supplier, such rights will, as a minimum, be subject to an irrevocable, nonexclusive, and royalty-free license to practice and have practiced the invention throughout the world for Postal Service purposes, including its practice:

(a) In the manufacture, use, and disposition of any article or material;

(b) In the use of any method; or

(c) In the performance of any service, acquired by or for the Postal Service or with funds otherwise derived through the Postal Service.

2. If rights are vested in the supplier, the supplier agrees to, and grants to the Postal Service the rights to, require the granting of a license to an applicant under any such invention:

(a) On a nonexclusive basis, unless the supplier, a licensee, or an assignee demonstrates to the Postal Service, at its request, that (1) effective steps have been taken within three years after a patent issues on the invention to bring the invention to the point of practical application or (2) the invention has been made available for licensing on terms that are reasonable in the circumstances, or can show cause why the title should be retained for a further period of time; or

(b) On terms that are reasonable in the circumstances to the extent that the invention is required for public use by Postal Service regulations or as may be necessary to fulfill health needs, or for other public purposes stipulated in the Schedule of this contract.

j. Right to Disclose Subject Inventions. The Postal Service may duplicate and disclose reports and disclosures of subject inventions required to be furnished by the supplier pursuant to this Patent Rights clause.

k. Forfeiture of Rights in Unreported Subject Inventions. The supplier forfeits to the Postal Service all rights in any subject invention that it fails to report to the contracting officer when or before it:

1. Files or causes to be filed a United States or foreign application thereon; or

2. Submits the final report required by c.1(b) above, whichever occurs later, provided, that the supplier will not forfeit rights in a subject invention if:

(a) Contending that the invention is not a subject invention, it nevertheless reports the invention and the facts pertinent to its contention to the contracting officer within the time specified in k.1 or k.2 above; or

(b) It establishes that failure to report was due entirely to causes beyond its control and without its fault or negligence. The supplier is deemed to hold any such forfeited subject invention, and the patent applications and patents pertaining to it, in trust for the Postal Service pending written assignment of the invention. The rights accruing to the Postal Service under this paragraph k are in addition to, and do not supersede, any other rights the Postal Service may have in relation to unreported subject inventions. Nothing contained in this clause may be construed to require the supplier to report any invention that is not in fact a subject invention.

l. Examination of Records Relating to Inventions. The contracting officer, or an authorized representative, until the expiration of three years after final payment under this contract, has the right to examine any books, records, documents, and other supporting data of the supplier that the contracting officer or authorized representative reasonably deems directly pertinent to the discovery or identification of subject inventions or to compliance by the supplier with the requirements of this clause.

**2.17 NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT (Clause 8-3) (January 1997)**

a. The supplier must report to the contracting officer, in writing, promptly and in reasonable detail, any notice, claim, or suit regarding patent or copyright infringement (or unauthorized use of a patent or copyright) based on performance of this contract.

b. At the contracting officer's request, the supplier must furnish all evidence and information in its possession pertaining to the suit or claim. The evidence and information will be furnished at the expense of the Postal Service except when the supplier has agreed to indemnify the Postal Service.

c. This clause must be included in all subcontracts under this contract, at any tier, over $50,000.

2.18 PATENT INDEMNITY (Clause 8-4) (January 1997)

a. Except as provided in paragraph d below, the supplier indemnifies the Postal Service, its employees, and its agents against liability, including costs and fees, for patent infringement (or unauthorized use) arising from the manufacture, use, or delivery of supplies, the performance of service, the construction or alteration of real property, or the disposal of property by or for the Postal Service, if the supplies, service, or property (with or without relatively minor modifications) have been or are being offered for sale or use in the commercial marketplace by the supplier.

b. The Postal Service must promptly notify the supplier of any claim or suit subject to the Indemnity of paragraph a above alleging patent infringement or unauthorized use of a patent.

c. To the extent allowed by law, the supplier may participate in the defense of any suit to which this clause applies.

d. This indemnification does not apply to:

1. Infringements for the unauthorized use of a private patent covered by this indemnity resulting from the contracting officer's specific written direction, compliance with which requires an infringement; or

2. Infringement or unauthorized use claims that are unreasonably settled without the supplier's consent before litigation.

e. This clause must be included in all subcontracts under this contract, at any tier, over $50,000.

2.19 INTELLECTUAL PROPERTY RIGHTS (Clause 8-13) (January 1997)

All intellectual property rights evolving from studies, reports, or other data delivered under this contract are the sole property of the Postal Service. The supplier agrees to make, execute, and deliver to the Postal Service any papers or other instruments in such terms and contents as may be required for the filing of any required instrument necessary for preserving an intellectual property right and does hereby assign and transfer to the Postal Service the entire right, title, and interest in and to the intellectual property rights. Before final settlement of this contract, a final report must be submitted on Form 7398, Report of Inventions and Subcontracts, or other format acceptable to the contracting officer.

2.20 POSTAL SERVICE TITLE IN TECHNICAL DATA AND COMPUTER SOFTWARE (Clause 8-16) (January 1997)

a. Definitions

1. Data. Data means technical data including drawings, technical reports, studies, and similar documents; computer software and computer software documentation, including but not limited to source code, object code, algorithms, formulas, and, other data that describe design, function, operation, or capabilities, and other recorded information, regardless of the form or the medium on which it may be recorded. It does not include information incidental to contract administration, such as financial, administrative, cost or pricing, or management information.

2. Form, fit, and function data. Data relating to an item or process that are sufficient to enable physical and functional interchangeability, as well as data identifying source, size, configuration, mating and attachment characteristics, functional characteristics, and performance requirements; except that for computer software, it means data identifying origin, functional characteristics, and performance requirements but specifically excludes the source code, algorithm, process, formulas, and machine-level flow charts of the computer software.

3. Limited rights data. Data other than computer software developed at private expense, including minor modifications of these data.

4. Technical data. Data other than computer software, of a scientific or technical nature.

5. Restricted computer software. Computer software developed at private expense that is a trade secret, is commercial or financial and confidential or privileged, or is published copyrighted computer software, including minor modifications of this computer software.

6. Restricted rights. The rights of the Postal Service in restricted computer software, as set forth in a Restricted Rights Notice as provided in paragraph h below, or as otherwise may be provided in a collateral agreement incorporated in and made part of this contract.

7. Unlimited rights. The rights of the Postal Service in technical data and computer software to use, disclose, reproduce, prepare derivative works, distribute copies to the public, and perform and display publicly, in any manner and for any purpose, and to have or permit others to do so.

b. Rights

1. The Postal Service has title to all data first produced in the performance of this

contract. Accordingly, the supplier assigns all rights, title, and interest to the Postal Service in all data first produced in performance of this contract. The supplier, unless directed otherwise by the contracting officer, must place on all such data delivered under this contract the following notice:

"This data is the confidential property of the U.S. Postal Service and may not be used, released, reproduced, distributed or published without the express written permission of the U.S. Postal Service."

2. The supplier grants to the Postal Service a royalty-free, nonexclusive, irrevocable license throughout the world to publish, translate, deliver, perform, use, and dispose of in any manner any portion of data that is not first produced in the performance of this contract but in which copyright is owned by the supplier and that is incorporated in the data furnished under this contract, and to authorize others to do so for Postal Service purposes.

3. Unless the contracting officer's written approval is obtained, the supplier may not include in any data prepared for or delivered to the Postal Service under this contract any data which is not owned by the supplier or the Postal Service without acquiring for the Postal Service any right necessary to perfect a license of the scope set forth in subparagraph b.2.

c. Indemnity. The supplier indemnifies the Postal Service (and its officers, agents, and employees acting for the Postal Service) against any liability, including costs and expenses, (1) for violation of proprietary rights, copyrights, or rights of privacy or publicity, arising out of the creation, delivery, or use of any works furnished under this contract, or (2) based upon any libelous or other unlawful matter contained in these works. This provision does not apply to material furnished by the Postal Service and incorporated in the works to which this clause applies.

d. Additional Rights in Technical Data

1. Except as provided in paragraph b, the Postal Service has unlimited rights in:

(a) Form fit, and function data, including such data developed at private expense, delivered under this contract, and

(b) Technical data delivered under this contract that constitute manuals or instructional and training material for installation, operation, or routine maintenance and repair of items, components, or processes delivered or furnished for use under this contract.

2. Copyright

(a) The contracting officer may direct the supplier to establish, or authorize the establishment of, claim to copyright in the technical data and to assign, or

obtain the written assignment of, the copyright to the Postal Service or its designated assignee.

(b) The supplier may not, without prior written permission of the contracting officer, incorporate in technical data delivered under this contract any data not first produced in the performance of this contract containing the copyright notice of 176 U.S.C. 401 or 402, unless the supplier identifies the data and grants to the Postal Service, or acquires on its behalf at no cost to the Postal Service, a paid-up, nonexclusive, irrevocable worldwide license in such copyright data to reproduce, prepare derivative works, distribute copies to the public, and perform and display the data publicly.

(c) The Postal Service agrees not to remove any copyright notices placed on data pursuant to this section d, and to include such notices on all reproductions of the data.

e. Release, Publication, and Use of Technical Data and Computer Software

1. Unless prior written permission is obtained from the contracting officer or to the extent expressly set forth in this contract, the supplier will not use, release to others, reproduce, distribute, or publish any technical data or computer software first produced by the supplier in the performance of the contract.

2. The supplier agrees that if it receives or is given access to data or software necessary for the performance of this contract that contain restrictive markings, the supplier will treat the data or software in accordance with the markings unless otherwise specifically authorized in writing by the contracting officer.

f. Unauthorized Marking of Data or Computer Software

1. If any technical data or computer software delivered under this contract are marked with the notice specified in paragraph h and the use of such a notice is not authorized by this clause, or if the data or computer software bear any other unauthorized restrictive markings, the contracting officer may at any time either return the data or software or cancel the markings. The contracting officer must afford the supplier at least 30 days to provide a written justification to substantiate the propriety of the markings. Failure of the supplier to timely respond, or to provide written justification, may result in the cancellation of the markings. The contracting officer must consider any written justification by the supplier and notify the supplier if the markings are determined to be authorized.

2. The foregoing procedures may be modified in accordance with Postal Service regulations implementing the Freedom of Information Act (5 U.S.C. 552) if necessary to respond to a request thereunder. In addition, the supplier is not precluded from bringing a claim in connection with any dispute that may arise as the result of the Postal Service's action to remove any markings on data or computer software, unless this action occurs as the result of a final disposition of the matter by a court of competent jurisdiction.

g. Omitted or Incorrect Markings

1. Technical data or computer software delivered to the Postal Service without the limited rights notice or restricted notice authorized by paragraph h, or the data rights notice required by paragraph b, will be deemed to have been furnished with unlimited rights, and the Postal Service assumes no liability for the disclosure, use, or reproduction of such data or computer software. However, to the extent the data or software have not been disclosed outside the Postal Service, the supplier may request, within six months (or a longer time approved by the contracting officer) after delivery of the data or software, permission to have notices placed on qualifying technical data or computer software at the supplier's expense, and the contracting officer may agree to do so if the supplier:

(a) Identifies the technical data or computer software to which the omitted notice is to be applied;

(b) Demonstrates that the omission of the notice was inadvertent;

(c) Establishes that the use of the proposed notice is authorized; and

(d) Acknowledges that the Postal Service has no liability with respect to the disclosure, use, or reproduction of any such data or software made before the addition of the notice or resulting from the omission of the notice.

2. The contracting officer may also (a) permit correction of incorrect notices, at the supplier's expense, if the supplier identifies the technical data or computer software on which correction of the notice is to be made and demonstrates that the correct notice is authorized, or (b) correct any incorrect notices.

h. Protection of Rights

1. Protection of Limited Rights Data. When technical data other than data listed in section d., above, are specified to be delivered under this contract and qualify as limited rights data, if the supplier desires to continue protection of such data, the supplier must affix the following "Limited Rights Notice" to the data, and the Postal Service will thereafter treat the data, subject to paragraphs f. and g. above, in accordance with the Notice:

"LIMITED RIGHTS NOTICE

These technical data are submitted with limited rights under Postal Service Contract No.______________ (and subcontract _______________, if appropriate). These data may be reproduced and used by the Postal Service with the express limitation that they will not, without written permission of the supplier, be used for purposes of manufacture or disclosed outside the Postal

Service; except that the Postal Service may disclose these data outside the Postal Service for the following purposes, provided that the Postal Service makes such disclosure subject to prohibition against further use and disclosure:

(1) Use (except for manufacture) by support service suppliers.

(2) Evaluation by Postal Service evaluators.

(3) Use (except for manufacture) by other suppliers participating in the Postal Service's program of which the specific contract is a part, for information and in connection with the work performed under each contract.

(4) Emergency repair or overhaul work.

This Notice must be marked on any reproduction of these data, in whole or in part."

2. Protection of Restricted Computer Software

(a) When computer software is specified to be delivered under this contract and qualifies as restricted computer software, if the supplier desires to continue protection of such computer software, the supplier must affix the following "Restricted Rights Notice" to the computer software, and the Postal Service will thereafter treat the computer software, subject to paragraphs f and g above, in accordance with the Notice:

"RESTRICTED RIGHTS NOTICE

a. This computer software is submitted with restricted rights under Postal Service Contract No.______________________________ (and subcontract ______________________________, if appropriate). It may not be used, reproduced, or disclosed by the Postal Service except as provided below or as otherwise stated in the contract.

b. This computer software may be:

(1) Used or copied for use in or with the computer or computers for which it was acquired, including use at any Postal Service installation to which the computer or computers may be transferred;

(2) Used or copied for use in a backup computer if any computer for which it was acquired is inoperative;

(3) Reproduced for safekeeping (archives) or backup purposes;

(4) Modified, adapted, or combined with other computer software, provided that the modified, adapted, or combined portions of any derivative software incorporating restricted computer software are made subject to the same restricted rights;

(5) Disclosed to and reproduced for use by support service suppliers in accordance with 1 through 4 above, provided the Postal Service makes such disclosure or reproduction subject to these restricted rights; and

(6) Used or copied for use in or transferred to a replacement computer.

c. Notwithstanding the foregoing, if this computer software is published copyrighted computer software, it is licensed to the Postal Service, without disclosure prohibitions, with the minimum rights set forth in the preceding paragraph.

d. Any other rights or limitations regarding the use, duplication, or disclosure of this computer software are to be expressly stated in, or incorporated in, the contract.

e. This Notice must be marked on any reproduction of this computer software, in whole or in part."

(b) When it is impracticable to include the above Notice on restricted computer software, the following short-form Notice may be used instead, on condition that the Postal Service's rights with respect to such computer software will be as specified in the above Notice unless otherwise expressly stated in the contract.

"RESTRICTED RIGHTS NOTICE (SHORT FORM)

Use, reproduction, or disclosure is subject to restrictions set forth in Contract No.____________________ (and subcontract ______________, if appropriate) with______________________________ name of supplier and subcontractor)."

i. Subcontracting. The supplier has the responsibility to obtain from its subcontractors all computer software and technical data and the rights therein necessary to fulfill the supplier's obligations under this contract. If a subcontractor refuses to accept terms affording the Postal Service such rights, the supplier must promptly bring such refusal to the attention of the contracting officer and may not proceed with subcontract award without further authorization.

j. Standard Commercial License or Lease Agreements. The supplier unconditionally accepts the terms and conditions of this clause unless expressly provided otherwise in this contract or in a collateral agreement incorporated in and made part of this

contract. Thus the supplier agrees that, notwithstanding any provisions to the contrary contained in the supplier's standard commercial license or lease agreement pertaining to any restricted computer software delivered under this contract, and irrespective of whether any such agreement has been proposed before or after issuance of this contract or of the fact that such agreement may be affixed to or accompany the restricted computer software upon delivery, the Postal Service has the rights set forth in this clause to use, duplicate, or disclose any restricted computer software delivered under this contract.

k. Relationship to Patents. Nothing contained in this clause implies a license to the Postal Service under any patent or may be construed as affecting the scope of any license or other right otherwise granted to the Postal Service.

2.21 DELIVERY OF LIMITED RIGHTS AND RESTRICTED COMPUTER SOFTWARE (Clause 8-17) (January 1997)

To the extent that the supplier has, in its proposal, identified pre-existing proprietary data or restricted computer software pursuant to the "Representation of Rights in Data" of the solicitation, the contracting officer, or a duly authorized representative, until the expiration of three years after final payment of this contract, will have the right to examine any books, records, documents or other data supporting the supplier's claim(s) hereunder. Notwithstanding the supplier's rights and claims of, and the Postal Service's agreement to protect, pre-existing proprietary data or software, the Postal Service will have unlimited or unrestricted rights without additional supplier compensation, to any data or software identified above, that is:

1. obtained independent of this contract;

2. in the public domain; or

3. determined, subsequent to the effective date of this contract, to not have qualified as pre-existing data or software or a derivative of pre-existing data or software to which the supplier would have such proprietary rights.

3.1 OFFEROR REPRESENTATIONS AND CERTIFICATIONS - COMMERCIAL ITEMS (Provision 4-3) (January 1997)

a. Type of Business Organization. The offeror, by checking the applicable blocks, represents that it:

(1) Operates as:

[__] a corporation incorporated under the laws of the State of ______________________;

[__] an individual;

[__] a partnership;

[__] a joint venture;

[__] a limited liability company;

[__] a nonprofit organization, _______ or;

[__] an educational institution; and

(2) Is (Check all that apply)

[__] a small business concern;

[__] minority business; [__] Black American

[__] Hispanic American

[__] Native American

[__] Asian American

[__] a woman-owned business;

[__] educational or other nonprofit organization, or

[__] none of the above entities.

(3) Small Business Concern. A small business concern for the purposes of Postal Service purchasing means a business, including an affiliate, that is independently owned and operated, is not dominant in producing or performing the supplies or services being purchased, and has no more than 500

employees, unless a different size standard has been established by the Small Business Administration (see 13 CFR 121, particularly for different size standards for airline, railroad, and construction companies). For subcontracts of $50,000 or less, a subcontractor having no more than 500 employees qualifies as a small business without regard to other factors.

(4) Minority Business. A minority business is a concern that is at least 51 percent owned by, and whose management and daily business operations are controlled by, one or more members of a socially and economically disadvantaged minority group, namely U.S. citizens who are Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, or Asian-Indian Americans. (Native Americans are American Indians, Eskimos, Aleuts, and Native Hawaiians. Asian-Pacific Americans are U.S. citizens whose origins are Japanese, Chinese, Filipino, Vietnamese, Korean, Samoan, Laotian, Kampuchea (Cambodian), Taiwanese or in the U.S. Trust Territories of the Pacific Islands. Asian-Indian Americans are U.S. citizens whose origins are in the Indian subcontinent.)

(5) Woman-owned Business. A woman-owned business is a concern at least 51 percent of which is owned by a woman (or women) who is a U.S. citizen, controls the firm by exercising the power to make policy decisions, and operates the business by being actively involved in day-to-day management.

(6) Educational or Other Nonprofit Organization. Any corporation, foundation, trust, or other institution operated for scientific or educational purposes, not organized for profit, no part of the net earnings of which inures to the profits of any private shareholder or individual.

b. Parent Company and Taxpayer Identification Number

(1) A parent company is one that owns or controls the basic business polices of an offeror. To own means to own more than 50 percent of the voting rights in the offeror. To control means to be able to formulate, determine, or veto basic business policy decisions of the offeror. A parent company need not own the offeror to control it; it may exercise control through the use of dominant minority voting rights, proxy voting, contractual arrangements, or otherwise.

(2) Enter the offeror's Taxpayer Identification Number (TIN) in the space provided. The TIN is the offeror's Social Security number or other Employee Identification Number used on the offeror's Quarterly Federal Tax Return, U.S. Treasury Form 941.

Offeror's TIN: ______________________________

(3) Check this block if the offeror is owned or controlled by a parent company: ☐

(4) If the block above is checked, provide the following information about the parent company:

Parent Company's Name:________________________________________

Parent Company's Main Office:__________________________________

Address:______________________________________________

No. and Street:____________________________________________

City:_____________________ State:______ Zip Code:______________

Parent Company's TIN:________________________________________

(5) If the offeror is a member of an affiliated group that files its federal income tax return on a consolidated basis (whether or not the offeror is owned or controlled by a parent company, as provided above) provide the name and TIN of the common parent of the affiliated group:

Name of Common Parent________________________________________

Common Parent's TIN_________________________________________

c. Certificate of Independent Price Determination

(1) By submitting this proposal, the offeror certifies, and in the case of a joint proposal each party to it certifies as to its own organization, that in connection with this solicitation:

(a) The prices proposed have been arrived at independently, without consultation, communication, or agreement, for the purpose of restricting competition, as to any matter relating to the prices with any other offeror or with any competitor;

(b) Unless otherwise required by law, the prices proposed have not been and will not be knowingly disclosed by the offeror before award of a contract, directly or indirectly to any other offeror or to any competitor; and

(c) No attempt has been made or will be made by the offeror to induce any other person or firm to submit or not submit a proposal for the purpose of restricting competition.

(2) Each person signing this proposal certifies that:

(a) He or she is the person in the offeror's organization responsible for the decision as to the prices being offered herein and that he or she has not participated, and will not participate, in any action contrary to paragraph a above; or

(b) He or she is not the person in the offeror's organization responsible for the decision as to the prices being offered but that he or she has been authorized in writing to act as agent for the persons responsible in certifying that they have not participated, and will not participate, in any action contrary to paragraph (a) above, and as their agent does hereby so certify; and he or she has not participated, and will not participate, in any action contrary to paragraph (a) above.

(3) Modification or deletion of any provision in this certificate may result in the disregarding of the proposal as unacceptable. Any modification or deletion should be accompanied by a signed statement explaining the reasons and describing in detail any disclosure or communication.

d. Certification of Nonsegregated Facilities

(1) By submitting this proposal, the offeror certifies that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not and will not permit its employees to perform services at any location under its control where segregated facilities are maintained. The offeror agrees that a breach of this certification is a violation of the Equal Opportunity clause in this contract.

(2) As used in this certification, segregated facilities means any waiting rooms, work areas, rest rooms or wash rooms, restaurants or other eating areas, time clocks, locker rooms or other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment area, transportation, or housing facilities provided for employees that are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise.

(3) The offeror further agrees that (unless it has obtained identical certifications from proposed subcontractors for specific time periods) it will obtain identical certifications from proposed subcontractors before awarding subcontracts exceeding $10,000 that are not exempt from the provisions of the Equal Opportunity clause; that it will retain these certifications in its files; and that it will forward the following notice to these proposed subcontractors (except when they have submitted identical certifications for specific time periods):

**NOTICE:** A certification of non segregated facilities must be submitted before the award of a subcontract exceeding $10,000 that is not exempt from the Equal Opportunity clause. The certification may be submitted either for each

subcontract or for all subcontracts during a period (quarterly, semiannually, or annually).

e. Equal Opportunity Affirmative Action Program.

The offeror, by checking the applicable block or blocks, represents that it (1) [__] has developed and has on file, [__] has not developed and does not have on file, at each establishment, affirmative action programs as required by the rules and regulations of the Secretary of Labor (41 CFR 60-1 and 60-2) and [__] has, [__] has not filed the required reports with the Joint Reporting Committee, or (2) [__] has not previously had contracts subject to the written affirmative action program requirement of the rules and regulations of the Secretary of Labor.

Remittance Address (if different from Block 14a, PS Form 8203)

______________________________

______________________________

______________________________

______________________________

PART 4 - LIST OF DOCUMENTS, EXHIBITS, AND OTHER ATTACHMENTS

| Attachment No. | No. of Pages | Attachment Title |
|---|---|---|
| 1 | 9 | Statement of Work |

STATEMENT OF WORK

POSTAGE METER MANUFACTURERS

A. INTRODUCTION

The U.S. Postal Service (USPS) is committed to providing the highest possible level of customer service to the American public. While striving to reach this goal, we are entering into a contract with an USPS authorized postage meter provider to furnish postage meters and scales to selected retail stores across the nation.

Providing postage meters to retailers allows extended customer service for the Postal Service. Our goal is to provide customers with convenience and better access to basic postal services by offering these services through retail partnerships. The off site postal offerings may include but are not limited to our most common transactions which are First-Class Mail, Express Mail, and Priority Mail, with additional special services such as Delivery Confirmation, Signature Confirmation, Return Receipt, and Insurance.

USPS in the future is also interested in replacing existing postage machines in USPS postal facilities. The new technology presented in this requirement presents an opportunity to the USPS to update their postal equipment in postal facilities. USPS will be investigating the possibility to utilize the technology provided in response to this solicitation to modernize equipment in postal facilities nationwide.

B. SCOPE

The supplier will provide, on a lease basis, between 1,800 and 2,400 approved Information Based Indicia (IBI) compliant meters with scales and provide adequate reserves for replacement of damaged or broken meters or scales. In addition, the USPS reserves the right to add an additional quantity, up to 40% of the original order, of meters with scales, as they may be needed for the performance of this contract. The USPS will make the effort to deploy up to 2,400 meters with scales. USPS also reserves the right to remove meters with scales from any retail store which breaches the contract with USPS and reserves the option to return such meters to the supplier and terminate their leases. Supplier will ensure that appropriate meter setup instructions are included when the meters are shipped. Supplier will be responsible for all customer support and service functions, including, but not limited to shipping the meters and scales (via USPS) to their destinations, initializing the meter replacing damaged or broken meters, and updating meters for rate cases. Suppliers will also provide technical support and repair of meters and scales for each store. Supplier is responsible for ensuring the retail outlet has sufficient consumables for daily operation. The supplier will deliver a single postage meter to each of the up to 2,400 Hallmark retail outlets nationwide. A list of the Hallmark retail addresses will be furnished by the Postal Service after contract award.

C. REQUIREMENTS

The following is specific information regarding the equipment that will be provided by the supplier, as well as the suppliers responsibilities involving meter maintenance, rate case updates and more. All customer support by the supplier including but not limited to shipping of meters with scales, repairing and replacing meters with scales, must follow the regulations listed in both the USPS *Domestic Mail Manual*, Section P030 - Postage Meters and Meter Stamps, and other sections as applicable, and the *Code of Federal Regulations (CFR)* Title 39, CFR 501, Authorization to Manufacture and Distribute Postage Meters or as appropriate draft Title 39 Code of Federal Regulations, 502, Authority to Produce and Distribute Postage Evidencing Systems that Generate Information-Based Indicia, as published for comment in the Federal Register October 2, 2000. The *Domestic Mail Manual*, and the *CFR* sections are attached. Compliance with Postal Service security requirements are in the attached Information Security Assurance (ISA) Process publication.

C1. Meter and Scale Deployment

a) The supplier will provide up to 2,400 approved Information Based Indicia (IBI) compliant meters with scales. Each individual meter must be electronically linked with a scale to operate as a unit.

b) All components and hardware of the proposed system must be deployed in accordance with a pre-determined rollout schedule provided by the USPS after contract award. Updates to the deployment schedule will be provided by USPS every two weeks thereafter. All meters with scales must be deployed no earlier than December, 2002, and deployment must be completed by no later than February 13, 2002 or as otherwise instructed.

c) Meters with scales will be leased for a minimum of eighteen (18) months. The leasing period will begin no earlier than November 2002 and end no later than June 2004. Fees will be paid to the supplier upon the deployment and start-up date of the meters with scales and end no later than June 2004; however, the leases may be terminated and the meters with scales returned to the supplier, in the event that the retail store breaches its contract with USPS.

d) Supplies and ancillary equipment (such as starter roll of labels, six-foot length telephone cord for data transmitting, etc) needed to begin use of the meter and scale must be included in the original shipment of the equipment.

e) Meter, scale, training information, reference materials and all other components required for installation must be shipped to retailer in one box.

f) Supplier will provide all necessary initialization/installation services to allow operation of the meter by the retailer.

C2. Physical Requirements of the Meter and Scale

a) *Size and Style*

1) Size is a determining factor. The meter and scale must take up to no more than a 1-foot by 1-foot area, and 18 inches in height.
2) The scale must be able to weigh accurately up to a 30lb package.
3) The meter and scale must be stand-alone units that interface electronically with each other. No computer-assisted equipment will be accepted.
4) Meter and scale must link directly to provide an automatic weight and price of the item being weighed.
5) Meter must be able to interface with an analog phone line or use another USPS approved process for the uploading of data and downloading of postage.
6) Meter must provide a simple, one-step method for accessing all mailing options, services and fees, provided under Services & Capabilities.
7) Scale must provide an accurate weight within a .10 ounce tolerance.
8) One-step method of accessing Return Receipt must have a disable capability.
9) Meter must be able to disable the Express Mail and Express Mail Flat Rate service.

b) *Business Functional Requirements*:

| FR # | | | | Functional Requirements Description |
|---|---|---|---|---|
| FR1.0 | | | | **Postage Meter Functionality and Interface with Payment System** |
| | FR1.1 | | | For Meter Provider, Process retail products and services – for each transaction, provide capability to capture postage, print indicia and store the summary details by Origin Destination Information System (ODIS) codes. (NOTE: meter and scale will have standard capability to ion accept and rate up to 30 lbs.).<br>For APPS system that receives transaction and summarized meter usage data from supplier, provide capability to store, update and report on this data |
| | | FR1.1.1 | | Process Priority Mail (NOTE: reference Priority Mail Zone Rate Charts) |
| | | | FR1.1.1.1 | Process Priority Mail 1lb rate |
| | | | FR1.1.1.2 | Process Priority Mail by zone rate for 2 lbs. To 70 lbs. |
| | | | FR1.1.1.3 | Process Priority Mail with Delivery Confirmation |
| | | | FR1.1.1.4 | Process Priority Mail with Signature Confirmation |
| | | | FR1.1.1.5 | Process Priority Mail with Certified |
| | | | FR1.1.1.6 | Process Priority Mail with Certified + Returned Receipt |
| | | | FR1.1.1.7 | Process Priority Mail with Insurance |
| | | | FR1.1.1.8 | Process Priority Mail with Delivery Confirmation and insurance |
| | | | FR1.1.1.9 | Process Priority Mail with Signature Confirmation and insurance |
| | | | FR1.1.1.10 | Process Priority Mail with Delivery Confirmation, Restricted Delivery and insurance |
| | | | FR1.1.1.11 | Process Priority Mail with Signature Confirmation, Restricted Delivery and insurance |
| | | | FR1.1.1.12 | Process Priority Mail with flat rate envelope -- apply the flat rate fee regardless of weight |
| | | FR1.1.2 | | Process First-Class Mail (NOTE: reference First Class Mail Charts) |
| | | | FR1.1.2.1 | Process First Class Mail |
| | | | FR1.1.2.2 | First–Class Mail Parcels with Signature Confirmation |
| | | | FR1.1.2.3 | First–Class Mail Parcels with Delivery Confirmation |
| | | | FR1.1.2.4 | Process First–Class Mail with Certified |
| | | | FR1.1.2.5 | Process First–Class Mail with Certified + Returned Receipt |
| | | FR1.1.3 | | Express Mail |
| | | | FR1.1.3.1 | Process Express Mail |
| | | | FR1.1.3.2 | Custom Designed w/Insurance |
| | | | FR1.1.3.3 | Next Day & Second Day PO to PO |
| | | | FR1.1.3.4 | Next Day & Second Day PO to Addressee |
| | FR1.2 | | | Warnings, Alerts and Special Processing (requirements for meter vendor only) |
| | | FR1.2.1 | | Screen display to alert user of package over 30 lbs. |
| | | FR1.2.2 | | Restricted, and authenticated user, access to meter |
| | | FR1.2.3 | | Automatic meter date change and manual date override |
| | | FR1.2.4 | | Capability to print customer advertising (customer-identified info), in either text, graphics or both |
| | | FR1.2.5 | | Capability to rebuild meter summary data if meter crashes |
| | FR1.3 | | | Exception Processing |
| | | FR1.3.1 | | Process to cancel transaction before completion |
| | | FR1.3.2 | | Mark a transaction that results in spoiled postage |
| | FR1.4 | | | Upload/Download Capabilities (requirements for meter vendor only) |
| | | FR.1.4.1 | | Capability to download postage from meter provider |

| | | | |
|---|---|---|---|
| | | FR1.4.2 | Capability to transmit summary data to USPS (format to be determined during requirements phase) |
| | | FR1.4.3 | Capability to transmit summary data to USPS (format to be determined during requirements phase) |

c) *Service and Capabilities*

1) The meter must provide the capability for the following services and fees: First-Class Mail, First-Class Oversized Mail, Priority Mail, Priority Mail Flat-Rate Envelope, Express Mail and Express Mail Flat Rate.
2) Meter must also provide the capability for these additional Special Services and Fees: Delivery Confirmation, Signature Confirmation and Insurance.
3) Meter must be able to enable and disable data capture functionality and operate as a standard postage meter.
4) Meter must be able to upload summary data based on requirements established by USPS San Mateo Integrated Business Systems Solutions Center (IBSSC).
5) Meter must automatically change the calendar date to the following calendar date at a pre-determined time. This time will be different for each retail store based on the time of the mail and package pick-up. In addition, the meter must have a manual override capability so that the calendar date can be manually adjusted forward only.
6) Meter must be able to determine Domestic Priority Mail and Domestic Express Mail rates by zone and weight. (Excludes APOs, FPOs).
7) Meter must have an USPS approved method to authenticate the user.
8) Meter must automatically disable at midnight on Friday if the retail store does not upload their weekly data from the meter at the end of the week. Meter will return to normal function after the upload of the data is made.

d) *Meter Administrative functions*

(1) Device sleep mode
(2) Sleep mode variable setting
(3) Minimum of six Supervisor IDs
(4) Supervisor has ability to add Users
(5) Supervisor has ability to delete Users
(6) Only Supervisor has ability to upload data
(7) Device has Operating Day data viewable
(8) Device has Operating Day data printable. Supplier shall construct on-line report retrieval tool. This site will be maintained and updated on a daily basis for use by USPS personnel. The site will be password protected and contain the following capabilities and information.
    (a) Ability to query by date range(s).
    (b) Ability to query by transaction type(s).
    (c) Ability to query by location ID(s).
    (d) Ability to provide summary and revenue totals.
    (e) Ability to analyze information according to postal periods, i.e. Accounting Periods/Monthly, Postal Quarters, & Year To Date.

e) *Postage and Postage Updates*

1) The supplier will provide all supplies associated with the meter and scale. These supplies will be sent directly to each retail store via USPS shipping. In addition, the supplier will provide a method for each store to re-order supplies.
2) Meter must be remotely reset by supplier's USPS approved computerized meter resetting system. It must be IBI compliant, and have a minimum download capability of $500 and a maximum postage limit of $10,000. The

postage download process must be able to be completed through an analog telephone line or another acceptable process, in a reasonable amount of time.

3) The download of postage to the postage meter vault must be electronic and have Automatic Clearinghouse (ACH) payment capabilities.

C3. <u>On-Going Requirements of the Supplier</u>

a) *Preventative Maintenance, Repairs and Warranty*

(1) Handling of faulty meters must be in accordance with CFR 501. Defective meters must be replaced with 48 hours.

(2) Supplier must supply sufficient reserve stock to repair or replace any defective, damaged or broken meters or scales at no additional charge.

b) *Rate Case Updates*

(1) Postage meter must always reflect accurate postage rates, and the updating of rate changes to the meter must be done with minimal user intervention. Meters must reflect any changes in rate, upon USPS effective date.

c) *Technical and Informational Support*

(1) Supplier must provide a toll-free phone number for retail store employees to call for technical support and customer service, seven days per week, between the hours of 9:00 A.M. Eastern Standard Time and 9:30 P.M. Pacific Standard Time. If calls are not answered live, the original call must be returned within a 24-hour period so that the store does not experience down time of the meter and scale for longer than 2 business days. The answering device must have sufficient capacity to accommodate the volume of calls from the retailers.

(2) Supplier must support the customer acceptance testing coordinated by the USPS. Note: The hours of support may have to be extended due to time zone differences for customer acceptance testing.

d) *Information and Reference Materials*

(1) Quick reference information must be provided to each store. This information must include, but is not limited to, information on how to solve minor problems, malfunctions, and complications with the meter and scale. In addition, the quick reference information should contain a step-by-step assembly guide for the meter and scale, troubleshooting points, and a toll-free technical support/customer service phone number to call if there are problems assembling the equipment.

(2) The supplier must provide an operation guide for the meter and scale that explains, in detail, each specific function of the meter and scale.

(3) All training and reference material must be included in the original, one box shipment of the meter and scale.

e) *Fees and Expenses*

(1) All fees related to meter and scale lease including: postage resel fees, postage rate case update fees, and monthly leasing fees must be itemized and included in one monthly leasing fee invoices submitted to USPS.

(2) All costs for consumable items must be itemized (including store location) and included in a separated monthly invoice submitted to USPS.

C4. <u>Data Reporting</u>

a) *Data Specifics*

(1) Meter will store summary data broken down by category/AIC (see attached draft file layout):

(a) Mailing Service

- First-Class Mail
- First-Class Parcel
- First-Class Mail Nonstandard Surcharge
- Priority Mail
- Priority Mail Flat-Rate Envelope
- Express Mail
- Express Mail Flat-Rate Envelope

(b) Special Service
- Delivery Confirmation
- Signature Confirmation
- Insurance
- Certified Mail
- Returned Receipt

(c) Summary Data
- Date
- Time
- Price

b) *Supplier Data Capture*

(1) All data uploaded from the meter must provide an audit trail that allows USPS to validate all data at any time.

(2) The supplier must accept weekly uploads of data from the retail store. In addition, the supplier must accept uploads of data any other time the meter is connected to the system for any purpose. Meter provider will support functionality or capability to confirm successful transmission meter usage data from the meter. NOTE: If the retail store does not upload the of meter data by midnight on Friday each week, the meter must automatically disable until the uploading of data occurs.

(3) Retail stores will upload the weekly data after the close of business every Friday. Additionally, the retail store will upload data on the evening of the last day of the USPS Accounting Period for commission payment purposes.

(4) If a meter malfunction occurs, data must be saved and retained in the meter. The data must be transferred to the suppliers file by the service personnel.

(5) Supplier must verify that the information uploaded from stores each Friday evening came from the store the meter was originally assigned to.

(6) Supplier must ensure that proper ports are available on the meter for data transmission.

c) Reporting Information

(1) All data captured/reported is confidential and remains the property of the U.S. Postal Service.

(2) All data must be provided to USPS in an electronic format.

(3) The supplier must save data uploaded from the units by meter serial number after the data is sent to USPS for a period of one (1) year.

(4) Manufacturer will provide all reports required by USPS regulations and procedures for meters and in addition, the following special reports (data files).

(a) Summarized sales data by serial number for each Accounting Period (AP)/Month. File will be transmitted within seven days of the close of the postal AP/Month. This file will be sent by way of VPN to the Accounting Center in San Mateo. (Specific location to be discussed.). Supplier must comply with the Information Security Assurance (ISA) processes in effect.

(b) Detailed summary data by Origin Destination Information System (ODIS) code for each meter. File will be transmitted within seven days of the close of the postal AP/Month. This file will be sent by way of VPN to the Accounting Center in San Mateo. (Specific location to be discussed.)

(c) Process capability to acknowledge that data files are received. All summary data must be sent to Postage Technology Management in accordance with the requirements of the IBIP performance criteria.

5) Promptly report to USPS any problem identified with the operation of meters leased under this contract.
6) Monitor use of consumables and notify USPS when usage is not supported by postage printed.

C5. Supplier Payment

a) *Length of Contract*
   a) USPS expects to award a contract with an 18-month base period, plus four 12-month option periods.

b) *.Billing Cycle/Invoicing*
   (1) USPS Headquarters on an Accounting Period (AP)/Monthly base through invoicing will pay all associated fees to the supplier. USPS will provide the supplier with an Accounting Period calendar.
   (2) USPS will be responsible for all of the following fees: meter/scale lease, rolls of labels, data capture/reports, rate change fees, and postage download fees.

C6. End of Contract

a) USPS will notify the supplier 30 days in advance of the expiration of the then-existing contract of USPS intention to exercise any option period.
b) If contract option is not exercised the USPS shall be responsible for ensuring the return of the meters to the supplier. The USPS shall also bear shipping costs associated with return/disposal of the meters.
c) The USPS shall be responsible for loss/damage/fair wear and tear to the meter during the contractual term.

Timeline:
These dates indicate our current plan. However, these dates cannot be viewed as an unwavering timeframe, since many activities are dependent upon the performance of tasks beyond Postal Service control. Indeed, the timeline does not allow for any delays that may be occasioned by the completion of any activities in less than a complete manner, in accordance with the timeline. However, it is also possible that the timeline may be completed earlier than stated. As such, the timeline is subject to the foregoing Letter of Intent, and reflects the intent of the Postal Service.

| Milestones | Dates |
|---|---|
| Solicitation released | 06/28/02 |
| Questions due back from vendors | 07/09/02 9:00 am |
| *Atlanta Buy Meeting* | *07/09/02 07/11/02* |
| USPS respond to questions | 07/15/02 |
| Vendor proposals due | 07/19/02 3:00 pm |
| *Los Angeles Buy Meeting* | *07/20/02 – 07/21/02* |
| Demo invitations out to vendors | 07/23/02 |
| Demos | 07/24/02 – 07/26/02 |
| *Chicago Buy Meeting* | *07/25/02 – 07/26/02* |
| *Start development of training program w/Hallmark* | *07/28/02* |
| Award contract and notify vendors | 08/19/02 – 08/23/02 |
| Vendor customization per USPS requirements | 08/26/02 – 09/26/02 |
| Provide test file to USPS | 09/20/02 |
| Vendor product test | 09/27/02 – 10/10/02 |
| Customer acceptance test (CAT) - end to end test | 10/11/02 – 11/22/02 |
| Final vendor modifications based on CAT | 11/25/02 – 12/13/02 |
| Preparations for deployment/final sign-offs | 12/16/02 – 12/20/02 |
| Vendor ship meters – Western Area | 12/30/02 – 01/09/03 |
| Vendor ship meters – Pacific Area | 01/10/03 – 01/16/03 |
| Vendor ship meters – Southwest and Southeast Areas | 01/17/03 – 01/23/03 |
| Vendor ship meters – Greater Lakes Area | 01/24/03 – 01/30/03 |
| Vendor ship meters – Eastern and Capital Metro Areas | 01/31/03 – 02/06/03 |
| Vendor ship meters – Northeast and New York Metro Areas | 02/07/03 – 02/13/03 |

Proposed summarized usage data file lay-out (from meter provider):

| Field Number | Field Name | Contents/Format | From | To | Length | Comments |
|---|---|---|---|---|---|---|
| 1 | PARTNERS-MONTH | 9 (2) | 1 | 2 | 2 | 2-byte numeric field containing the month of the year the data is summarized for, e.g. '01' if the usage data in the file is from meter usage uploaded during January. Leading zeroes. |
| 2 | PARTNERS-WEEK-OF-MONTH | 9(1) | 3 | 3 | 1 | 1-byte numeric field containing the week of the month the data in the file is summarized for, e.g. '1' for first week, '2' for second week, etc. |
| 3 | PARTNERS-DATE | | | | | 8-byte numeric field containing the date of when the input file was created by the meter provider and sent to CPPS (file creation date) |
| | PARTNERS-CENTURY | 9(2) | 4 | 5 | 2 | 2-byte numeric field containing the first two digits of file creation year, e.g. '20' for year 2002,etc. |
| | PARTNERS-YEAR | 9(2) | 6 | 7 | 2 | 2-byte numeric field containing the last two digits of file creation year, e.g. '02' for year 2002,etc. Leading zeroes. |
| | PARTNERS-MONTH | 9(2) | 8 | 9 | 2 | 2-byte numeric field containing the file creation month, e.g. '01' for January, etc. Leading zeroes. |
| | PARTNERS-DAY | 9(2) | 10 | 11 | 2 | 2-byte numeric field containing the file creation day |
| 4 | PARTNERS-FINANCE-NUMBER | 9(6) | 12 | 17 | 6 | 6-digit numeric field containing the finance number associated with the local Post Office, the jurisdiction within which the Hallmark store belongs to |
| 5 | PARTNERS-UNIT-ID | 9(4) | 18 | 21 | 4 | 4-digit numeric field containing the unit ID associated with the local Post Office, the jurisdiction within which the Hallmark store belongs to |
| 6 | FILLER | 9(5) | 22 | 26 | 5 | 5-byte filler, zeroes filled |
| 7 | PARTNERS-AIC | X(3) | 27 | 29 | 3 | AIC code |
| 8 | FILLER | X | 30 | 30 | 1 | 1-byte filler, space filled |
| 9 | PARTNERS-REVENUE-AMOUNT | S9(12)v99 | 31 | 44 | 14 | 14-byte signed numeric field with 2 decimal places, containing the total revenue from postage transactions for the month |