# Exhibit 4

HASLER

*America's better choice®*

Monday, August 8, 2005

Ms. Caroline Z. Conway
Category Manager, Retail Products and Services
Travel, Retail and Temporary Services CMC
United States Postal Service
3300 S. Parker Road, Suite 400
Aurora, CO 80014-3500

Dear Caroline:

Thank you for the productive meeting at L'Enfant Plaza on Wednesday, July 13th. We appreciate the time and effort of each of the members of the Postal Service team, both during the meeting and over the full period of our settlement negotiation.

To summarize our agreements during the meeting, we are in agreement on the settlement of the lease obligation for the full, IDIQ minimum 1,800 units, and for extensions by modification, as described in Section A of the settlement proposal. We are also in agreement on payment of the movement fee costs as described in Section F.

For the settlement terms proposed in Sections C, D and E of the settlement proposal, Hasler, Inc. herein asserts a claim to compensation for costs expended in performance of Contract No. 102591-03-P-0454.

This claim is submitted under the Claims and Disputes clause of the Purchasing Manual, consistent with 41 U.S.C. 601-613. It consists of three parts, as summarized below and described in the accompanying claim documentation, and is submitted with data in support of our claim. The certification statement, as required by the Purchasing Manual under Clause B-9, Section d, is stated below.

Under Section C of the settlement proposal, Hasler, Inc. asserts a claim for recovery of $1,033,800.00, representing the residual unit value of the customized PostLink mailing systems at the termination of the lease--Hasler modified the commercial PostLink mailing system hardware and application to conform to the unique requirements specified in the *Statement of Work (SOW) – Section C: Physical Requirements of the Meter and Scale (C2)*, and the remaining value cannot be recouped in the commercial market.

Under Section D of the settlement proposal, Hasler, Inc. asserts a claim for recovery of $776,506.19, representing the value of (a) additional customized part and component inventory that was procured in order to modify the PostLink mailing system for use under the contract; and (b) standalone components procured from third-party suppliers for use under the contract. It is our position that performance under the contract constructively required Hasler to incur the cost of procurement as a condition to being prepared to comply with the delivery requirements of future orders. Hasler acquired the additional parts and component inventory in reliance on the Postal Service's having established sound projections for the number of units to be deployed, and as necessary because of the lead-time for suppliers, minimum quantity purchase commitments, the abbreviated delivery period specified in the contract, and the delivery order trends. We believe that Hasler acted prudently in managing inventory levels; Hasler ceased acquisition of

HASLER

*America's better choice®*

inventory and further manufacture immediately upon receipt of your verbal notification on October 18, 2004 that the Postal Service had decided to terminate the program.

Under Section E of the settlement proposal, Hasler, Inc. asserts a claim for recovery of upfront capital investment in the amount of $660,511.74 for application development and procurement of staging and production server infrastructures. Again, it is our position that performance under the contract constructively required Hasler to incur the full cost of infrastructure deployment as a condition to being prepared to provide system availability and dependable collection and transmission of CPPS data, including scalability for uninterrupted service to support the full population identified in the *SOW*. This investment includes conformance with requirements of the contract and Information Security Assessment (ISA) security hardening and operational guidelines.

Hasler, Inc. expended all of these costs in reasoned, patient anticipation of a long-lived successful program and return on investment, and in confidence in our longstanding, unique partnership with the Postal Service. We believe that they merit your full consideration.

I certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, that the amount requested accurately reflects the contract adjustment for which Hasler believes the Postal Service is liable, and that I am duly authorized to certify the claim on behalf of Hasler

I look forward to reaching an equitable settlement for our claims for compensation under the Hallmark contract. In the event we are unable to arrive at an equitable contract adjustment, Hasler, Inc. does reserve the right to seek and file claims for compensation for incurred expenses not claimed here, including but not limited to recovery of foregone returns on the capital invested in the project, and reasonable settlement and legal costs.

A signed hard copy of this letter and certification to the claim, as well as bound hardcopies of the data in support of the claim, will be forwarded to your office and to Jennifer Burton via USPS Express Mail. The supporting documentation will include copies of invoices that support Claim E that are being retrieved from off-site storage.

Thank you, Caroline. If you or a member of your Postal Service team requires clarification about any of the submitted figures or supporting data, please do not hesitate to contact George Hesse at (203) 925-2412 or me directly at (203) 925-5642.

Respectfully,

Frank Crudo
Chief Financial Officer
Hasler, Inc.

HASLER

*America's better choice®*

cc: John Vavra–President, Hasler, Inc.
Graham Fulghum–Director, Government Relations, Hasler, Inc.
Joseph Bonassar–Vice President & General Counsel, Mailroom Holding, Inc.
Robert Sheehan–Vice President, Postal Affairs, Mailroom Holding, Inc.
George Hesse–Director, Business Services, Hasler, Inc.
Thomas Keenan–Consultant/Advisor to Hasler, Inc.

Enclosures (1): Hasler Claim to USPS–Settlement of Hallmark Contract Termination
(2): Claim D–Hallmark Inventory Summary Schedule
(3): Claim E–Development, Operational Integration & Capital Investment Summary
(4): Binder–Hasler Claim D Supporting Documentation
(5): Binder–Hasler Claim E Supporting Documentation

19 Forest Parkway • Shelton, CT 06484-0903 • Tel: 203.926.1087 • Fax: 203.929.6084 • www.haslerinc.com

HASLER

*America's better choice®*

## Claims in Settlement of USPS Financial Obligations to Hasler, Inc. under The Hallmark Contract

For the settlement terms proposed in Section C, D and E of the settlement proposal, Hasler, Inc. asserts a claim to compensation for recovery of costs expended in the performance of Contract No. 102591-03-P-0454. A claim is listed for each of the corresponding sections of the settlement proposal. Each claim lists the data and documentation provided in support of the claim.

The claim is submitted with bound hard copies of the supporting data. One binder contains Hasler Claim D Supporting Documentation. A second contains Hasler Claim E Supporting Documentation. Both binders contain copies of the Claim Letter (including certification statement), this claim document, and a copy of the contract.

C. Claim: Hasler, Inc. asserts a claim for recovery of the residual value of the customized PostLink mailing system, Scale, and Stand (Hallmark system).

1,723 units x $600.00 $ 1,033,800.00

The claim is asserted in the amount of $600 per unit, for each of the IDIQ minimum 1,800 units not maintained in active service (77).

The per-unit value corresponds to the buyout figure identified in the pricing proposal. Settlement of this claim includes a commitment on the part of Hasler, Inc to provide service and support, including postage downloads and rate change maintenance, at reasonable cost, should the units be redeployed to active service.

Claim C: Support Documentation:

| |
|---|
| Continuation Sheet/Schedule 102591-03-Q-0454 |
| |
| |

© 2005 Hasler, Inc. - CONFIDENTIAL and PROPRIETARY - This document is the property of Hasler, Inc. and may not be reproduced in part or in whole or disclosed in any way to third parties without the prior permission in writing from Hasler, Inc. Violators shall be subject to prosecution.

HASLER

*America's better choice*®

D. Claim: Hasler, Inc. asserts a claim for the costs of inventory procured as preparation to comply with the delivery requirements of future orders, not only for the additional 600 units identified as the maximum in the IDIQ contract, but for the quantity reserved by the Postal Service as an option to the contract: 720 units, representing 40% of the IDIQ minimum of 1,800 units.

| | |
|---|---|
| 720 units | $776,506.19 |

*Note: We have confirmed our inventory counts through physical inventory, and have made adjustments where appropriate. The number of scales in inventory, for example, has been lowered to 699 units. The figure submitted in our proposed settlement for Section D was $ 797,054.40. The figure has been revised downward by $20,548.21 to reflect these inventory revisions as well as negotiations with third-party suppliers*

The Postal Service did not *place orders* for mailing systems above the IDIQ minimum of 1,800 units, but it is the position of Basler, Inc. that the contract *constructively required* Hasler to enter into supplier agreements, procure and manufacture, for delivery upon order, the additional, maximum quantity identified in the schedule.[1]

Hasler acquired the additional parts and component inventory in reliance on the Postal Service's having established sound projections for the number of units to be deployed[2] and the delivery orders trends (reference chart).

Moreover, inventory build up was dictated because of the lead-time for suppliers and the delivery period specified for the contract,[3] a requirement punctuated by the addition of a liquidated damages clause subsequent to the award that Hasler did not sign.[4] The Postal Service also reserved the right to exercise an option for delivery of the additional quantity, with no interruption to delivery and under threat of the same liquidated damages clause, as needed for the performance of the contract.[5]

The trend of delivery orders in the second quarter of 2004, notification of a continued strong flow of applications from additional Hallmark stores, modification of the contract to exercise option periods, and assurances from the Postal Service that the mailing system was fully satisfactory, gave every indication that installation over and beyond the IDIQ minimum of 1,800 units was imminent.

The Postal Service provided no notification to the contrary, and no forewarning of the union dispute risk or advisement that it would jeopardize the future of the program or the flow of delivery orders to the full potential of the CPPS initiative. Hasler ceased acquisition of inventory and further manufacture

[1] See 102590-02-A-0069, § 2.8 Indefinite-Quantity (Clause 2-42)(b): "The supplier must furnish to the Postal Service, when ordered, the supplies or services specified in the Schedule up to and including the quantity designated in the Schedule as the maximum."

[2] See Purchasing Manual, Issue 2, § 2.4.6.c 3 Indefinite-Quantity Contracts: "The minimum quantity must not exceed known requirements and the maximum quantity must be realistic."

[3] One month (see Contract 102591-03-Q-0454 Modifications M002), or less (see Contract 2BRPSR-03-Q-0405 Modifications M003)

[4] See Contract 102591 03-Q-0454 Modifications M002.

[5] See 102590 02-A-0069, § 2.6 Open Item (Clause 2-18): "Delivery of the items added by the exercise of this option will continue immediately after... delivery of [the] items called for under the contract."

© 2005 Hasler, Inc. - CONFIDENTIAL and PROPRIETARY - This document is the property of Hasler, Inc. and may not be reproduced in part or in whole or disclosed in any way to third parties without the prior permission in writing from Hasler, Inc. Violators shall be subject to prosecution.

HASLER
America's better choice®

immediately upon receipt of your verbal notification on October 18, 2004 that the Postal Service had decided to terminate the program.

Claim D: Support Documentation:

| |
|---|
| D_Claim D Hallmark Inventory Summary Schedule |
| D1_Hallmark project order graph2 |
| D2_Hallmark Inventory Detail |
| D3_Postlink SAFE work instructions |
| D4_PostLinkHallmark Overhead Calc FY2004 ref.xls |

© 2005 Hasler, Inc. - CONFIDENTIAL and PROPRIETARY - This document is the property of Hasler, Inc. and may not be reproduced in part or in whole or disclosed in any way to third parties without the prior permission in writing from Hasler, Inc. Violators shall be subject to prosecution.

HASLER
America's better choice.

E. Claim: Hasler, Inc. asserts a claim for its costs of development and capital investment required for performance of the contract and in compliance with the award:

$660,511.74

It is the position of Hasler, Inc. that the IDIQ contract and compliance with the Postal Service's new *Information Security Assurance* (ISA) initiative constructively *required* Hasler to develop a robust server and communications infrastructure to securely manage traffic and statistics for the full quantity identified in the contract.

The upfront investment in development is a required, legitimate capital expense, and we have already adjusted the figure in acceptance of the Postal Service's position that some portion of the program development and hardware expenditures specified in Part E will have already been amortized by program-to-date lease payments.

The infrastructure was required to conform to new USPS hardening standards and comply with the Postal Service's new *Information Security Assurance* (ISA) process, which included *Business Impact Assessment (BIA), Continuity of Operations Planning (COOP)* and *Facility Recovery Planning (FRP).*

At the time Hasler submitted its pricing proposal, the extent, scope, and expense of compliance with the ISA security process was understated and unanticipated. It was known that Hasler had already received NIST security certification for the IBIP SAFE and its associated key management infrastructure, as well as authorization from Postage Technology Management to distribute the SAFE and PostLink commercially. These, together with a record of strong compliance with regulations listed in the DMM P030 and CFR Title 39, Section 50, were considered by Hasler as more than adequate to assure the security of CPPS confidential data and manage the risks of deployment to 2,400 or more Hallmark locations.

IP D&RS conceded that the scope of the ISA initiative was little understood within the Postal Service, and Hasler objected at the time that the cost and schedule impact of compliance was understated by the Postal Service at the time of award. The resulting reassessment of the program requirements subsequent to the award resulted in a modification to the infrastructure. Moreover, Hasler had to dedicate previously unscheduled effort and incur substantial expense to execute the security test plan, prepare the associated documentation, and host an onsite Security Review.

The ISA process occurred under the direction of Thomas Verdun, Jr., ISSO for the Contractors and Partner Payment System (CPPS) Partners project (ISA Number DR20021411091236). The process was initiated in December 2001, with formal submission of the associated documentation package in January 2002, culminating in an onsite inspection and review on 6 February 2002. After subsequent corrective actions as recommended by Mr. Verdun, and submission of restricted information samples and HR non-disclosure policies and guidelines, Hasler received full ISA approval for its Hallmark infrastructure.

© 2005 Hasler, Inc - CONFIDENTIAL and PROPRIETARY - This document is the property of Hasler, Inc. and may not be reproduced in part or in whole or disclosed in any way to third parties without the prior permission in writing from Hasler, Inc. Violators shall be subject to prosecution.

HASLER
*America's better choice.*

Claim E: Support Documentation:

| |
|---|
| E_ Claim E Development, Operational integration and Capital Investment Summary |
| E1_12-30-02 Hallmark Model 481 kenndoc |
| E2_1841_001_HA_SR_D (Software Requirement) |
| E3_CPPS Partners - System Interface Control Document Revision 1.7r |
| E4_HALLMARK SHIP ACCEPTANCE REQUIREMENTS 2 |
| E5_Hallmark statistics project spec |
| E6 PostLink Hallmark Product Spec v1 |
| E7_USPS LOI Hallmark PostLink & 481 SAFE |
| E8.1_ISA_Mary-Ann Lew ISA and Cover Letter |
| E8.2_ISA USPS Attachments |
| E8.3_ISA 8-1 SecurityPlan_100802 Master |
| E8.4_ISA 8-3 TestPlan_102102 CPPS-P UPDT |
| E8.5_ISA 021203 CPPS-P EVAL |
| E8.6_ISA AS805A6BCCP_52 |
| E8.7_ISA Evaluation Report Review minutes |
| E8.8_ISA Security comments 012103 |
| E8.9_ISA SITE REVIEW |
| E9.1_HighLevel CAT Matrix |
| E9.2_Hallmark Participation Spreadsheet to SMIBSSC |
| E9.3_CAT test accounts |
| E9.4_cycle 2 matrix |
| E9.5_cycle 3 matrix |
| E9.6_CAT file 110502 |
| E10_Hallmark Development Chargeback |
| E11_Hallmark Capital Expenses |
| E12_Hallmark Customer Service Tools |
| E13_Section 8 Hallmark (Order Entry Tools and Processes) |
| E14_Minutes from Hallmark Production Network Meeting |
| E15_Hallmark PostLink Incremental Charges |

© 2005 Hasler, Inc. - CONFIDENTIAL and PROPRIETARY - This document is the property of Hasler, Inc. and may not be reproduced in part or in whole or disclosed in any way to third parties without the prior permission in writing from Hasler, Inc. Violators shall be subject to prosecution.

# Hallmark Inventory Summary Schedule - - CONFIDENTIAL

The following schedule provides the roll up to support the USPS Hallmark project. The product inventory is broken into four sections complete manufactured assemblies. Purchased parts supplies (finished goods) work in process/components and additional material to support 1,800 units.

The PostLink base, SAFE and PostLink Scale cable were manufactured by Hasler. The unit cost amounts include material and direct labor only. Additional product related cost such as: overhead including freight, indirect costs, warehousing, etc. are listed separately.

## A. Complete Manufactured Systems

| Description | Qty | Unit Cost* | Extended Value | Comments |
|---|---|---|---|---|
| PostLink Hallmark Base Assy | 230 | $ 210.20 | $ 48,346.00 | Includes direct labor and material only |
| PostLink Hallmark SAFE Assy | 720 | $ 93.00 | $ 66,960.00 | Includes direct labor and material only |
| PostLink to Hallmark Scale Cable | 178 | $ 9.41 | $ 1,674.98 | Includes direct labor and material only |
| *Sub-Total* | | | *$ 116,980.98* | |

***Notes:***

* Unit costs include direct labor for assembly and final testing as follows:
PostLink: 1.15 hour @ $17.50 per hour ($21.87 per unit)
SAFE: 45 minutes @ $17.50 per hour ($13.13 per unit)
Cable: 15 minutes @ $17.50 per hour ($4.38 per unit)

## B. Purchased parts/supplies

These parts were ordered as a finished assembly from a supplier to support the Hallmark project. The assembly of these items into a final Hallmark product was stopped based on notice from the USPS.

| Description | Qty | Unit Cost* | Extended Value | Comments |
|---|---|---|---|---|
| Hallmark Operating Guide (Form S1013) | 715 | $ 1.10 | $ 786.50 | Minimum order 2000 |
| Hallmark System Installation & Setup Guide (Form 51012) | 720 | $ 1.10 | $ 792.00 | Minimum order 2000 |
| Hallmark System Master Carton | 720 | $ 1.10 | $ 792.00 | Able to reduce commitment to vendor |
| Hallmark PostLink base box with inserts | 310 | $ 5.82 | $ 1,804.20 | Able to reduce commitment to vendor |
| Power supply | 720 | $ 21.64 | $ 15,580.80 | |
| Power cords | 720 | $ 2.70 | $ 1,944.00 | |
| Hallmark Plexiglas Stands | 458 | $ 22.40 | $ 10,259.20 | Able to reduce commitment to vendor |
| Cable Assy Telephone | 720 | $ 0.22 | $ 158.40 | |
| 30 Lb. Scales | 699 | $ 159.60 | $ 111,560.40 | Able to reduce commitment to vendor |
| *Sub-Total* | | | *$ 143,677.50* | |

© 2005 Hasler, Inc - This is the Property of Hasler, Inc. and may not be reproduced or disclosed in any way to third parties without prior permission in writing from Hasler.

# Hallmark Inventory Summary Schedule - - CONFIDENTIAL

C. Work In Process

The following items were purchased to assemble the PostLink Base, PostLink SAFE and PostLink to Hallmark scale assy.

| Description | Qty | Unit Cost* | Extended Value | Comments |
|---|---|---|---|---|
| Hallmark Bezel including Silk Screen | 398 | $ 7.73 | $ 3,076.54 | Minimum buy additional balance of 602 units available. |
| Label Hallmark base S/N | 398 | $ 0.35 | $ 139.30 | Minimum buy additional balance of 4,602 units available. |
| Label SAFE 481 S/N.D | 398 | $ 0.35 | $ 139.30 | Minimum buy additional balance of 2,591 units available. |
| Cable Assy | 239 | $ 3.05 | $ 728.95 | Able to reduce vendor commitment |
| Connector 9pin | 542 | $ 0.68 | $ 368.56 | Minimum buy additional balance of 1,431 units available. |
| Hood 9 pin D | 376 | $ 1.30 | $ 488.80 | Able to reduce vendor commitment |
| Screw Threaded | 1,592 | $ 0.0112 | $ 17.83 | 4 per base |
| Screw Threaded | 1,990 | $ 0.0416 | $ 82.78 | 5 per base |
| Washer | 1,597 | $ 0.004 | $ 6.39 | 4 per base |
| Rubber Feet | 1,592 | $ 0.10 | $ 159.20 | 4 per base |
| Bottom housing | 398 | $ 4.33 | $ 1,723.34 | Minimum buy additional balance of 3,086 units available. |
| Middle Housing | 398 | $ 2.67 | $ 1,062.66 | Minimum buy additional balance of 1,762 units available. |
| Support Platform | 398 | $ 1.39 | $ 553.22 | Minimum buy additional balance of 4,379 units available. |
| Assy main board | 398 | $ 105.85 | $ 42,128.30 | |
| Printer Mechanism | 398 | $ 50.00 | $ 19,900.00 | Minimum buy additional balance of 1,817 units available. |
| Printer Door | 168 | $ 1.42 | $ 238.56 | Able to reduce vendor commitment |
| Fastening bracket | 398 | $ 0.67 | $ 266.66 | Minimum buy additional balance of 1,629 units available. |
| Window display | 398 | $ 2.05 | $ 815.90 | Minimum buy additional balance of 1,602 units available. |
| Assy keyboard | 398 | $ 7.91 | $ 3,148.18 | Minimum buy additional balance of 1,304 units available. |
| Keypad | 398 | $ 1.11 | $ 441.78 | Minimum buy additional balance of 7,383 units available. |
| Button door | 398 | $ 0.99 | $ 394.02 | Minimum buy additional balance of 5,025 units available. |
| Actuator door latch | 398 | $ 0.65 | $ 258.70 | Minimum buy additional balance of 2,002 units available. |
| Actuator door switch | 398 | $ 0.32 | $ 127.36 | Minimum buy additional balance of 1,925 units available. |
| Space roller | 398 | $ 0.97 | $ 386.06 | Minimum buy additional balance of 1,831 units available. |
| Screw | 2,388 | $ 0.0304 | $ 72.60 | 6 per system |
| Printer roller | 398 | $ 4.85 | $ 1,930.30 | |
| PostLink Assy | 92 | $ 210.20 | $ 19,338.40 | |
| | | *Sub-Total* | *$ 97,993.69* | |

© 2005 Hasler, Inc - This is the Property of Hasler, Inc. and may not be reproduced or disclosed in any way to third parties without prior permission in writing from Hasler.

## Hallmark Inventory Summary Schedule - - CONFIDENTIAL

### D. Additional Material Cost to support 1,800 units

The accepted proposal request a reduction in documentation to 2 simple reference cards. Based on USPS, Hallmark and internal Hasler Call Centers feedback a complete Operations Guide System Setup and Installation Guide was required and shipped with all systems. Below are the costs for this additional item.

| Description | Qty | Unit Cost* | Extended Value | Comments |
|---|---|---|---|---|
| Hallmark Operating Guide (Form 51013) | 1285 | $ 1.10 | $ 1,413.50 | |
| Hallmark System Installation & Setup Guide (Form 51012) | 1,000 | $ 1.10 | $ 1,100.00 | |
| | | | | |
| *Sub-Total* | | | $ 2,513.50 | |

Summary Costs

| | | |
|---|---|---|
| A. Completed systems | $ | 116,980.98 |
| B. Purchased Parts | $ | 143,677.50 |
| C. Work in process | $ | 97,993.69 |
| D. Additional Material | $ | 2,513.50 |
| Overhead * | | 415,340.52 |
| *Total Inventory Claim* | $ | 776,506.19 |

*Note:*

* As a manufacturer and distributor for this system, Hasler incurred overhead costs for this product beyond the direct material cost including, but not limited to, production planning, purchasing, freight, incoming inspection, stocking, warehousing, shrinkage, damaged/defective, inventory movement, facilities, and utilities.

© 2005 Hasler, Inc - This is the Property of Hasler, Inc. and may not be reproduced or disclosed in any way to third parties without prior permission in writing from Hasler.

## CLAIM E. DEVELOPMENT, OPERATIONAL INTEGRATION & CAPITAL INVESTMENT SUMMARY

| Category / SubCategory / Line Item / Record Item | Dollar Value | § | Reference Document |
|---|---|---|---|
| **Research & Development** | | | |
| MTI / R&D | | | |
| Specification, Development & Testing | | E4 | 1841_001_HA_SR_D, Meter requirements 112002 |
| | | E5 | Hallmark Statistics Project Specification |
| | | E6 | PostLink Hallmark Product Specification |
| R&D Labor Billing FY2002: 157-6883 | 94,325.00 | E10 | Ref: E10_HallmarkDevelopmentChargeback |
| R&D Labor Billing FY2003: 557/6883 | 125,738.00 | E10 | Ref: E10_HallmarkDevelopmentChargeback |
| R&D Labor Billing FY2003: 558/6883 | 20,879.00 | E10 | Ref: E10_HallmarkDevelopmentChargeback |
| R&D Labor Billing FY2004: 558/6883 | 749.00 | E10 | Ref: E10_HallmarkDevelopmentChargeback |
| R&D Misc Office Equip & Supplies FY2002: 157/6229 | 5,031.51 | E10 | Ref: E10_HallmarkDevelopmentChargeback |
| R&D Misc Office Equip & Supplies FY2003: 557/6229 | 307.92 | E10 | Ref: E10_HallmarkDevelopmentChargeback |
| R&D Misc Office Equip & Supplies FY2003: 558/6229 | 7,453.43 | E10 | Ref: E10_HallmarkDevelopmentChargeback |
| R&D Travel FY2002: 157/6011 | 1,431.09 | E10 | Ref: E10_HallmarkDevelopmentChargeback |
| R&D Meals & Entertainment FY2002. 157/6031, 6033 | 75.26 | E10 | Ref: E10_HallmarkDevelopmentChargeback |
| R&D Meals & Entertainment FY2003: 557/6031, 6033 | 28.68 | E10 | Ref: E10_HallmarkDevelopmentChargeback |
| R&D Miscellaneous FY2003: 557/5549 | 2,080.00 | E10 | Ref: E10_HallmarkDevelopmentChargeback |
| R&D Office Telephone FY2003: 558/6321 * | 7,104.12 | E10 | Ref: E10_HallmarkDevelopmentChargeback |
| R&D Office Telephone FY2004: 558/6321 * | 7,867.30 | E10 | Ref: E10_HallmarkDevelopmentChargeback |
| R&D Office Telephone FY2005 through 7/31: 558/6321 * | 2,068.51 | E10 | Ref: E10_HallmarkDevelopmentChargeback |
| MicroTools | | | |
| PostLink Embedded Software Development | | | |
| Other Professional Services FY2002: 6429 | 33,501.75 | E10 | Ref: E10_HallmarkDevelopmentChargeback |
| Other Professional Services FY2003: 157/6429 | 27,489.68 | E10 | Ref: E10_HallmarkDevelopmentChargeback |
| Hasler / IT - Operational Integration | | | |
| Meter Development ** | 5,500.00 | E15 | Hallmark PostLink Incremental Charges |
| Server Development | | | |
| IT/Consultant Labor Billing @ 3 months | 37,500.00 | E3 | CPPS Partners - System Interface Control Document Revision 1.7r |
| Customer Service Support Tool Development | | | |
| IT/Consultant Labor Billing @ 1 month | 12,500.00 | E12 | |
| Hallmark Server / AS/400 Interface Development | | | |
| IT Labor Billing @ 2 months | 25,000.00 | E3 | CPPS Partners - System Interface Control Document Revision 1.7r |

© 2005 Hasler, Inc. - This is the Property of Hasler, Inc. and may not be reproduced or disclosed in any way to third parties without prior permission in writing from Hasler.

| | | | | |
|---|---|---|---|---|
| AS/400 / Hallmark Order Entry Module | | | | |
| IT Labor Billing @ 1 month | | 12,500.00 | E13 | |
| AS/400 File Transfer | | 6,250.00 | E3 | CPPS Partners - System Interface Control Document Revision 1.7r |
| IT Labor Billing @ .5 month | | | | |
| CPPS Integration / CAT Testing | | | | |
| IT Labor Billing @ 1 month | | 12,500.00 | E9 | CAT Documentation |
| ISA Conformance | | | | |
| Review & Documentation @ 2 months | | 25,000.00 | E8 | 8-1 SecurityPlan_100802 Master, 8-3 TestPlan_102102 CPPS-P UPDT, AS805A6BCCP_52, Evaluation Report Review minutes, Mary-Ann Lew ISA and Cover Letter, Hasler deliverables due this week, Minutes - CPPS Partners ISA Evaluation Review, RE CPPS Partners ISA Evaluation Review, Security comments 012103. |
| **Approvals** | | | | |
| USPS Model 481 Meter Approval | | | E1 | 12-30-02 Update of Hallmark Model 481 kenndoc, Hallmark Model 481 kenndoc. |
| | | | E7 | USPS LOI Hallmark PostLink & 481 SAFE |
| CPPS Compliance Approval | | | | |
| ISA Compliance Approval | | | | |
| **Project Administration** | | | | |
| **Project Management** | | 116,771.51 | | |
| **Capital Equipment** | | | | |
| **Hardware** | | | | |
| Power Vault 122T | Puchase Requistion 9: $10,335.00 | 10,335.00 | E11 | E_11: Hallmark Capital Expenses |
| PowerEdge 1650 Rack Mount Server | | 4,169.05 | E11 | E_11: Hallmark Capital Expenses |
| Keyboard + Monitor | | 389.99 | E11 | E_11: Hallmark Capital Expenses |
| KVM Switch | | 700.00 | E11 | E_11: Hallmark Capital Expenses |
| Cables for KVM Switch | | 480.00 | E11 | E_11: Hallmark Capital Expenses |
| Modem Rack | Purchase Requisition 10 | 4,194.24 | E11 | E_11: Hallmark Capital Expenses |
| Modem Rack | Purchase Requisition 11 | 4,194.24 | E11 | E_11: Hallmark Capital Expenses |
| Digi International Port Se | Purchase Requisition 12 | 2,182.00 | E11 | E_11: Hallmark Capital Expenses |
| Cables for Digi Port Serv | Purchase Requisition 13 | 608.00 | E11 | E_11: Hallmark Capital Expenses |
| PowerEdge 1650 Rack M | Purchase Requisition 14 | 9,748.00 | E11 | E_11: Hallmark Capital Expenses |
| PowerEdge 2650 Rack M | Purchase Requisition 15: $16,460.00 | 16,460.00 | E11 | E_11: Hallmark Capital Expenses |
| PowerVault Diskarray | | 7,056.00 | E11 | E_11: Hallmark Capital Expenses |
| Cisco Firewall | | 2,685.00 | E11 | E_11: Hallmark Capital Expenses |
| Cisco Router 2600 | Purchase Requisition 16 | 1,800.00 | E11 | E_11: Hallmark Capital Expenses |
| PowerEdge Rack | | 1,300.00 | E11 | E_11: Hallmark Capital Expenses |
| Power Strips | | 125.00 | E11 | E_11: Hallmark Capital Expenses |

© 2005 Hasler, Inc. - This is the Property of Hasler, Inc. and may not be reproduced or disclosed in any way to third parties without prior permission in writing from Hasler.

Claim E - Development, Operation ... ation Capital Investment Summary
- CONFIDENTIAL and PROPRIETARY

| | | | | |
|---|---|---|---|---|
| 3550 Switch | | 7,200.00 | E11 | E_11: Hallmark Capital Expenses |
| 2950 Switch | | 1,800.00 | E11 | E_11: Hallmark Capital Expenses |
| Patch Pannel | | 45.00 | E11 | E_11: Hallmark Capital Expenses |
| Phone line cables for Patch Pannel | | 1,280.00 | E11 | E_11: Hallmark Capital Expenses |
| **Software** | | | | |
| Oracle | | 146,439.95 | E11 | E_11: Hallmark Capital Expenses |
| **Maintenance Agreements** | | | | |
| Dell | | - | | E_11: Hallmark Capital Expenses |
| Oracle | | 27,564.00 | E11 | E_11: Hallmark Capital Expenses |
| Oracle Database Consulting | | 129,368.00 | E11 | E_11: Hallmark Capital Expenses |
| Cisco | | 1,024.85 | E11 | E_11: Hallmark Capital Expenses |
| Veritas | | 1,659.00 | E11 | E_11: Hallmark Capital Expenses |
| **Network** | | | | |
| Axion Network Solutions | | | | |
| | Paid | 502,098.83 | | |
| **Credits** | | | | |
| ** USPS Model 481 Meter Changes | | (5,500.00) | | Hallmark PostLink Incremental Charges PAID |
| * Telephone Charges | | (17,039.93) | | (Operations covered under Service Charges) |
| | | (22,539.93) | | |
| | Total | 479,558.90 | | |

© 2005 Hasler, Inc. - This is the Property of Hasler, Inc. and may not be reproduced or disclosed in any way to third parties without prior permission in writing from Hasler.

# Exhibit 5

Meeting with Keith Strange – Copy provided to Keith

# USPS Hallmark Project Summary

1. Industry Familiarization:

   - Hasler is one of four postage meter providers regulated by the Postal Service Postage Technology Management team.
   - Hasler accounted for $4.1 billion of the total $19.1 billion of meter revenue during the 2005 Postal Service fiscal year.
   - Meter Market Share (units): Pitney Bowes --78%; Neopost – 9%; Hasler - 9% and Postalia – 4%

2. Hasler Project Introduction / Field Test

   - PTM contacted Hasler to determine level of interest in a new opportunity.
   - PTM recognized that a modified PostLink was an ideal candidate for use in a retail CPU strategy
   - After exploratory meetings with the Postal Service and Hallmark, Hasler proposed a product modification for the purposes of moving to a field test.
   - In its consideration of the opportunity, Hasler factored in:
     - The prominence, likely installation base of the Hallmark Retail channel
     - Its existing partnership with the USPS
     - The fit into the strategy objectives laid out in the Postal Service Transformation plan
   - Hasler developed the modified product.
   - Without compensation, Hasler provided on-site support for installation and deployment of PostLinks at 19 Las Vegas test and 3 Omaha retail sites.
   - The initial 6-month trial period was expanded to 18-months. Hasler provided ongoing service support for the program.

3. The Postal Service issued SOW for the project.

   - In addition to the previously mentioned reasons, Hasler factored the following into its evaluation of the market opportunity:
     - The Postal Service commitment to the success of the venture
     - The quantity estimates and program duration stated in the SOW
     - Recognition that the Purchasing requirements required the figures stated in the SOW to be reasonable
     - The anticipation on the part of the Postal Service and Hallmark that the deployment would exceed the minimum and would likely result in exercise of the option.
   - Hasler was awarded the contract in October 2002

4. Development Kick Off

- The extent to which Hasler would be required to participate and allocate resources for the internal USPS development cycle was not documented in the SOW.
- Systems integration and file interfaces to Hasler were not adequately defined and specified at the time of award. Specifications were modified over the course of development.
- It was clear that adequate program support and uninterrupted service to the full population required that Hasler build a stronger infrastructure than originally envisioned. Hasler expanded its commitment by further investment in a more robust application and capital procurement of staging and production servers.
- USPS introduced its requirements for compliance to the new ISA security initiative. It was clear that the extent, scope and compliance expense was understated and unanticipated at the time of the award. The infrastructure was reworked to conform to the stringent ISA system security and operational requirements.
- Hasler increased this investment on the basis of continued assurances and signals from the Postal Service that the program was a centerpiece of the Postal Service's transformation for the future.
- Over the course of development, Hasler (Brian Leary) objected to the additional workload and ISA conformance requirements. PTM weighed in and stated that Hasler was already an existing, approved partner approved by both PTM and the USPS Inspection service.
- PTM required a modification to the existing meter serial number scheme so that parcels processed through the program at mail processing centers could be recognized as accepted by the Postal Service through its CPU agent.
- The combination of compliance with the USPS development cycle, ISA security requirements, and uncertainty as to the PTM meter approval process resulted in development delays.
- Janet Crowe dismissed Hasler's objections to the ISA compliance requirements and burden of participating in the internal USPS development cycle. The Postal Service agreed to compensate Hasler for the additional meter serial number changes.
- In response to the shift in the development schedule, Janet Crowe issued a modification to the delivery order that imposed a liquidated damages clause as a precondition for continuation of the contract. [Mod 002 to 102591-03-Q-0454]. Hasler did not sign the modification.
- Hasler and the Postal Service launched the product to 75 sites on February 1, 2003.

5. Program Expansion and Rollout

- The Postal Service operations and support plan was not well executed. The program called for district CORs to provide all installation, operations unit training, and all non-meter support.
- Some Postal districts performed well and according to plan.
- For many stores and in many districts, Hasler was the defacto COR presence for installation, operations training and program support, and fielded calls from exasperated and confounded Hallmark stores
- Hasler created (retained a technical writer and printed) both an installation and operations guide for the Hallmark units, at its own expense and despite the fact that the Postal Contract service specifically elected to exclude user documentation from the lease as a cost-savings option.
- Hasler responded to Postal Service requests to provide demonstration units and booth support at Hallmark Buyer Shows in New Jersey, Atlanta, Dallas, Los Angeles, Chicago, Phoenix and Florida. Hasler provided the support and sent representatives to each of the 12 shows at its own expense.

6. Orders and Inventory Management

- The Hallmark PostLinks featured customized parts, modified assemblies, an external scale and an application specific to the Hallmark program requirements. None of these were available on the commercial unit. Hasler had to invest in an inventory of customized part and components.
- The Postal Service was unable to provide any forecasts for deployment of units. Indeed, award quantities and customer information was variable and adjusted up to ship date.
- The unavailability of reliable forecasts, ongoing strong delivery order trends, and the extended lead-times for procurement of system components from Hasler's external suppliers, required Hasler Inc to build up inventory.
- The Postal Service requested that the contract be modified [M 003] to change the delivery and installation schedule – from 30 days after receipt of delivery order to 25 days after receipt of delivery order, effectively reducing Hasler's order fulfillment turnaround time for a delivery order to 10 calendar days. Hasler agreed to the modification, demonstrating its ongoing support for the program.
- The Postal Service issued a modification [M 005] to the contract on May 13, 2004 requesting that all existing delivery orders be closed out to facilitate a consolidation of billing. The customized process originated by the Postal Service was reconsidered and proved to be too difficult to administer by the Postal Service. This required Hasler to cancel and re-book every existing installation order – in effect, overhaul its billing process.

7. Program Momentum and Hasler's Commitment

- Hasler continued to acquire parts and component inventory in reliance on the Postal Service's having established sound projections for the number of units to be deployed and as necessary because of the lead-time for suppliers, minimum quantity purchases commitments, the abbreviated delivery period as modified for the contract, and the delivery order trends.
- The Postal Service continued to highlight the Hallmark partnership publicly and privately – citing it as a key component of its plan to expand access points to its products and services.
    - 2003 Comprehensive Statement on Postal Operations
    - Jack Potter formally recognized the Hallmark program and relationship at the Postal Forum in Anaheim California.
    - At the Hallmark National Gold Crown gatherings in Phoenix and Florida, the Postal Service reiterated its commitment to the partnership and program. Hallmark announced that the commitment would be solidified by a television and advertising campaign designed to drive Postal customer traffic to the stores.
    - Hallmark and the Postal Service privately worked on additional promotions to increase program adoption and drive store traffic.
- The trend of delivery orders in the second quarter of 2004, notification of a continued strong flow of applications from additional Hallmark stores, modification of the contract to exercise option periods, and assurances from the Postal Service that the mailing system was fully satisfactory, gave every indication that installation over and beyond the IDIQ minimum of 1,800 units was imminent.
- The Postal Service provided no notification to the contrary, and no forewarning of the union dispute or advisement that it would jeopardize the future of the program or the flow of delivery orders to the full potential of the CPPS initiative.
- Preliminary notification (partial delivery order) of the delivery order for scheduled July 2004 installations would have placed total installations-to-date over the IDIQ minimum of 1,800 units. This delivery order was subsequently and inexplicably placed on hold in the days prior to shipment.
- Hasler received word that the program was under review.

8. Program Dissolution and Termination

- The Postal Service abruptly announced its intention to discontinue the program effective January 31, 2005
- The delivery order for shipment in June 2004 was cancelled.
- News releases beginning October 10, 2004 announced that the USPS and Hallmark pulled the plug on the program based on pressure Hallmark received from the American Postal Workers Union.

- Hasler ceased acquisition of inventory and further manufacture immediately upon receipt of verbal notification on October 18, 2004 that the Postal Service had decided to terminate the program.
- Steps undertaken to resolve issues of program cancellation:
    - Based on request from the Postal Service, Hasler was requested to provide a letter outlining the compensation for discontinuing the program. (Proposal dated November 5, 2004)
    - In response to Hasler letter USPS requested face-to-face meeting in Denver on December 18, 2005. Four Hasler team members travel to Denver for purpose of resolving program details.
    - At the request to the Postal Service Hasler provided a quotation to provide support for a limited number of field units. (Proposal dated January 3, 2005)
    - Receive Postal Service response to proposal. (Email – January 14, 2005)
    - Hasler provided Counter Proposal dated January 25, 2005.
    - Postal Service requests a face-to-face meeting on February 15, 2005 in Denver. A meeting date and time could not be established.
    - The Postal Service provides a response to the Hasler January 23, 2005 counter proposal. (Letter dated February 10, 2005)
    - Hasler provide a counter proposal to the Postal Service February 10, 2005 proposal. (Letter dated February 18, 2005)
    - The Postal Service provides a response to the Hasler February 18, 2005 counter proposal. (Letter dated March 1, 2005)
    - Hasler provide a counter proposal to the Postal Service March 1, 2005 proposal. (Letter dated April 1, 2005)
    - The Postal Service requests a face to face meeting for two days, July 13 and 14, 2005 in Washington DC. Date is selected based on the availability of the Postal Service team members. (Emails April 18th, May 13th and May 17th)
    - In response to the USPS requested face-to-face meeting in Washington DC on July 13th and 14th. Four Hasler team members travel to Washington DC for purpose of resolving program details. A tow phase plan to resolve this mater is identified including: 1) Hasler to submit appropriate documentation under the "Claims and Disputes" process, 2) the Postal Service will issue a SOW to continue the high volume Hallmark locations. (Email July 18, 2005)
    - Hasler submits Claim submission and supporting documentation package on August 8, 2005
    - The Postal Service issues RFQ for 80 remaining Hallmark units on August 25, 2005.
    - Hasler submits response to RFQ on September 9, 2005
    - The Postal Service rejects Hasler claim and identifies two options for Hasler to appeal the decision – 1) Present appeal to Postal Service Board of Contract Appeals within 90 days of the decision or 2) bring action in the United States Court of Federal Claims within 12 months of the decision. (Letter dated September 14, 2005)

- Hasler receive response to RFP that the CPU program is being discontinued. (Letter dated October 17, 2005)

9. Summary

- Hasler went above-and-beyond terms of the contract precisely because of its longstanding partnership with the Postal Service.
- Hasler always provided a level of service consistent with its standards and appropriate to its longstanding partnership to the Postal Service.
- Hasler became a defacto frontline for the Postal Service, and absorbed much of the stores' frustration and program questions.
- The Postal Service did not divulge that there was potential for dispute with the Postal Service union that could jeopardize the program and the contract.
- We are looking to resolve issue without legal steps
- Equitable settlement for our claims for compensation under the Hallmark contract.
  - Customized inventory
  - Development expenses.
- Highlight handling of the contract resolution process.
- Impact on Hasler goodwill and industry standing.

# Exhibit 6

HASLER Mailing Systems and Solutions
America's better choice.™

February 21, 2006

Ms. Caroline Z. Conway
Category manger, Retail Products and Services
Travel, Rental and Customer
United States Postal Service
3300 S. Parker Rd. Suite 400
Aurora, CO 80014-3500

Dear Caroline:

Thank you for the opportunity to provide you and the USPS with additional information on Hasler's claims under Section D, for procurement of inventory to support requirement of the Hallmark orders, and Section E, for costs of development and capital investment for the performance of the contract and in compliance of the award.

We continue to assert that Hasler is entitled to recovery of the reasonable costs for inventory and development incurred in reliance on the Postal Service's having established sound projections for the number of units to be deployed, and on its ongoing assurance and signals that it was fully committed to the long-term project opportunity.

We look forward to moving this discussion forward toward a fair and equitable compensation for Hasler's investment in this project. We believe this information should support the next step.

**CLAIM D – INVENTORY FOLLOW-UP PO/INVOICES**

This documentation includes an updated matrix titled **"Hallmark Inventory Summary V3.1"**. This document has been updated to include the individual part numbers and a reference number for each PO or invoice

To support the costs of the associated inventory, Hasler also includes copies of actual invoices, printouts from our computer system, or PO's printouts to support the individual parts ordered and a bill of material for the assembled parts. These documents can be found in the scanned file titled **"Hallmark PO-Invoices"**.

A significant quantity of these parts were purchased under a single Purchase Order to Neopost Berne in March of 2002. These parts were sold to Hasler at cost and include no markup. Early in the Hallmark project, Neopost SA purchased Hasler. During the review of the Hasler product line, Neopost decided to discontinue production of the PostLink, subject to a one-time final purchase for U.S. market obligations. Based on the USPS requirements for Hallmark, including maximum requirements, Hasler purchased a

final buy for most parts. These parts were stored and allocated based on our internal projects. As Hasler monitored the success of the Hallmark project, it discontinued marketing the standard PostLink to reserve inventory for the USPS project, mindful that the Postal Service reserved the right to exercise an option for delivery of an additional quantity, with no interruption to delivery and (at the time) under threat of a liquidated damages clause, as needed for the performance of the contract.

During an audit earlier this month, Hasler confirmed the quantities of manufactured parts, purchased finished parts and components listed in this matrix.

In an effort to minimize its costs and exposure, Hasler halted production of manufactured parts as well as purchase of additional customized parts upon receiving word that the USPS intended to terminate the program.

Although the purchasing strategy was to procure enough parts to support the total USPS opportunity for 3,360 systems (2,400 units plus 40%), the quantities presented in the attached matrix of manufactured systems, purchased parts, and work-in-progress parts represent a maximum of 720 systems (1,800 x .40%) or fewer because of the actions Hasler took to cancel orders in process with its vendors.

The expected project volume of at least 2,400 Hallmark retail stores nationwide was confirmed during the ISA review under the terms of the Section 9.13 requirement: Integrat(ion of) Security into the Capacity Planning Process. The USPS identified the need for the Hasler Information resource to be scalable, since the CPPS Partners would in time reach 2,400 Hallmark retail stores nationwide.

The trend of the delivery orders in the second quarter of 2004, notification of a continued strong flow of Hallmark applications from new stores, assurances from the Postal Service that the mailing system was well received and another Hallmark buying show was scheduled in the summer of 2004 gave Hasler every indication that installation were over and beyond the 1,800 units and that the ISA defined 2,400 was imminent.

## CLAIM D: INVENTORY FOLLOW-UP – OVERHEAD

The enclosed document titled **"Hasler Inventory Overhead V.2"** provides the overhead factor that Hasler used as a multiplier to material costs in order to determine the burden/actual cost for each component and system reserved for the Hallmark project, and to assign inventory value. Traditional manufacturing companies would use a higher multiplier to cover all equipment and costs. As a primary Sales and Distribution company with a small assembly and repair facility Hasler was able to keep the overhead costs lower. This lower cost enabled Hasler to meet the targets for the USPS for this project.

## CLAIM E: DEVELOPMENT, OPERATIONAL INTEGRATION AND CAPITAL INVESTMENT

Hasler believes it is entitled to recover the remaining costs of development and capital investment required for performance of the contract and in compliance with the project award. The current claim of $660,511.74 has been adjusted to account for the portion of the development and hardware expenditures listed in Claim E that were amortized by the program to-date lease payments.

The total and remaining costs include expenses incurred by Hasler to develop the product as defined in the specifications, to modify the product in response to changes to the specifications after the award, to dedicate additional resources to support the compressed schedule and to comply with the previously understated ISA requirements. The expense incurred based on the post-award presentation of the ISA documentation includes investment in time and cost to review and produce the required ISA documentation, as well as development and procurement of redundant hardware/software and additional testing to support the ISA requirements.

The ISA documentation requirements for Capacity Planning, Service Level Agreement, System Security, Business Continuity Planning and System Redundancy exceeded the requirement outlined in the request for quotation and the final award.

The ISA requirements go beyond simply completing an assessment and providing documentation. Hasler was required to design and implement a system that ensured long-term compliance with the requirements, and on a compressed development timeline. Failure to adhere to a faithful implementation of the requirements would have compromised the delivery schedule and triggered the liquidated damages clause that the Postal Service imposed in response to Hasler's then-objections to the ISA requirement.

The impact of the ISA requirements on the Hasler development project can be found in the enclosed document titled **"ISA Impact Summary & Costs"**.

Thank you for your time and effort towards a settlement of this project.

We look forward to the opportunity to move the negotiation forward. If you or any member of your Postal Service team requires additional information, please don't hesitate to contact Frank Crudo or me directly.

Sincerely,

*George*

George H. Hesse III
Director, Business Operations
Hasler Inc.

CC: Mr. Frank Crudo -- Chief Financial Officer – Hasler

Enclosed: Hallmark Inventory Schedule V.3
Hallmark Project Inventory PO_Invoices
Hallmark Project Overhead Analysis
ISA Impact Summary & Cost

# Exhibit 7

HASLER
America's better choice®

November 5, 2004

Ms. Caroline Z. Conway
Category Manager, Retail Products and Services
Travel, Retail and Temporary Services CMC
United States Postal Service
3300 S. Parker Road, Suite 400
Aurora, CO 80014-3500

Dear Ms. Conway:

Thank you for providing verbal confirmation on October 18, 2004 that the U.S. Postal Service (USPS) will terminate the Hallmark Project effective January 31, 2005.

We regret that the USPS is unable to continue with the project and share its disappointment in the circumstances that have led to USPS' decision to terminate and close the project.

Hasler shared the Postal Service's enthusiasm for the Retail Partnership Program and its vision for providing customers increased convenience and better access to postal services. We are proud to have been awarded a contract by the USPS to be the sole provider of customized postage metering systems to its Hallmark retail partners and data transfer services to its CPPS infrastructure.

The purpose of this letter is to inform the U.S. Postal Service that Hasler, Inc. will be seeking compensation from USPS for our performance under the Contract award per the original USPS Solicitation #102590-02-A-0069.

As you are aware, Hasler substantially modified the commercial PostLink mailing system hardware and application to conform to the unique requirements specified in the *Statement of Work (SOW) – Section C: Physical Requirements of the Meter and Scale (C2).* Hasler also entered into supplier agreements with third parties in reliance on the USPS' continued performance under the contract.

In anticipation of a long-term relationship with CPPS, Hasler, Inc. invested in application development and procurement of staging and production servers that would meet the requirements of the Hallmark initiative, including scalability to the full population identified in the *SOW*. The server infrastructure was additionally required to conform to stringent Information Security Assessment (ISA) system security and operational requirements, which necessitated on-site review, documentation submission, and facility renovations.

Pursuant to the *SOW – Section B: Scope*, the contract required Hasler, Inc. to provide as many as 2,400 units. *SOW – Section C: Requirements (C1)* stipulated a minimum eighteen (18) months lease commitment for each of the units. In addition, the USPS reserved the right to add an additional quantity, up to 40% of the original order, as needed for performance of the contract.

HASLER
*America's better choice®*



Ms. Caroline Z. Conway, USPS
Hasler Proposal to USPS (Cont'd)
November 5, 2004

Hasler, Inc. is entitled to adequate and reasonable compensation for the abrupt termination of the Retail Partnership Program and the U.S. Postal Service is financially responsible for performance of the contract.

Our proposal for settlement of USPS financial obligations to Hasler, Inc. under the Hallmark Contract is attached.

We have received the USPS' suggested modification M 012 to Contract #102591-03-P-0454 dated 10/25/2004 and do not agree to its terms.

If you or any member of the USPS requires additional information, please do not hesitate to contact me directly at (703) 758-1590.

Respectfully,

*Graham Fulghum*

Graham Fulghum
Director, Government Relations
Hasler, Inc.

cc: John Vavra – President, Hasler, Inc.
Christopher O'Brien – Sr. Vice President, Sales, Hasler, Inc.
Frank Crudo – Chief Financial Officer, Hasler, Inc.
Joseph Bonassar – Vice President & General Counsel, Mailroom Holding, Inc.
Robert Sheehan – Vice President, Postal Affairs, Mailroom Holding, Inc.
George Hesse – Director, Business Services, Hasler, Inc.

Enclosures (2):
1. Hasler Proposal To USPS – Settlement of Hallmark Contract Termination
2. Hallmark Contract Orders To Date – November 5, 2004

HASLER
America's better choice®

# Hasler Proposal: Settlement Of USPS Financial Obligations to Hasler, Inc. under The Hallmark Contract

A. The United States Postal Service shall compensate Hasler, Inc. for outstanding lease commitments in the amount of:

| | | |
|---|---|---|
| *18 month lease term* x 2,400 *units* x *$69.71 per month:* | $ | 3,011,472.00 |
| *3 months extension* x 227 *units* x *$69.71 per month:* | $ | 47,472.51 |
| *less payments received (current as of 10/31/04):* | $ | 793,000.00 |
| *less adjustments for invoices outstanding, payments applied, payments in transit and adjustments:* | $ | |
| *Amount owed:* | $ | 2,265,944.51 |

B. The United States Postal Service shall compensate Hasler, Inc. for outstanding lease commitments automatically triggered by 12-month extension in the amount of:

| | | |
|---|---|---|
| *12 month lease term* x *323* units* x *$69.71 per month:* | $ | 270,195.96 |

| Delivery Order | Phase | Lease Expiration (Extension) Date | Quantity | Required Notification Date |
|---|---|---|---|---|
| IBITTL-03-M-2976 | 3 | September 30, 2004 | 28 | 8/31/04 |
| IBITTL-03-M-3698 | 4 | October 31, 2004 | 28 | 09/30/04 |
| IBITTL-03-M-4396 | 5 | November 30, 2004 | 28 | 10/31/04 |
| IBITTL-03-M-5163 | 6 | *Phase 6 placements expire on December 31, 2004. In order to avoid an automatic 12-month extension, the U.S. Postal Service must notify Hasler, Inc on or before November 30, 2004 of its intent to terminate Phase 6 systems on December 31, 2004. | 12 | 11/30/04 |
| Extension: Phase 1 | Extension Phase 1 | (October 31, 2004) | 66 | 09/30/04 |
| Extension: Phase 2 | Extension Phase 2 | (November 30, 2004) | 161 | 10/31/04 |

C. The United States Postal Service shall compensate Hasler, Inc. for the purchase residual associated with the lease of 2,400 units:

| | | |
|---|---|---|
| *Purchase residual* x 2,077 *units* x *$600.00:* | $ | 1,246,200.00 |
| *Purchase residual* x *323 units* x *$380.00:* | $ | 122,740.00 |
| *Amount owed:* | $ | 1,368,940.00 |

© 2004 Hasler, Inc. - CONFIDENTIAL and PROPRIETARY - This document is the property of Hasler, Inc. and may not be reproduced in part or in whole or disclosed in any way to third parties without the prior permission in writing from Hasler, Inc. Violators shall be subject to prosecution.

HASLER
*America's better choice®*

D. The United States Postal Service shall compensate Hasler, Inc. for its costs of inventory build-up for 960 additional mailing systems, representing 40% of the original order, as needed for performance of the contract.

| | |
|---|---|
| *960 units x $1,107.02 per unit:* | $ 1,062,739.20 |

E. The U.S. Postal Service shall compensate Hasler, Inc. for the cost of development and capital investment required for performance of the contract and in compliance with the award:

| | |
|---|---|
| *Research and Development* | $ 445,251.00 |
| *Capital Costs: Hardware and Software* | $ 385,327.32 |
| *Server Software Maintenance Agreements* | $ 30,000.00 |
| *Amount owed:* | $ 860,578.32 |

F. The U.S. Postal Service shall compensate Hasler, Inc. for movement of the installed base at the agreed fee of $50.00 per instance:

| | |
|---|---|
| *1,756 units x $50.00/each* | $ 87,800.00 |

## Summary of Specified Compensation

| | |
|---|---|
| Part A: Outstanding Lease Commitments | $ 2,265,944.51 |
| Part B: Extended Lease Commitments | $ 270,195.96 |
| Part C: Purchase Residual: 2,400 Units | $ 1,368,940.00 |
| Part D: Cost of Inventory: 960 Units | $ 1,062,739.20 |
| Part E: Research & Development, Capital Investment | $ 860,578.32 |
| Part F: Movement Fees | $ 87,800.00 |
| *Amount owed:* | $ 5,916,197.99 |

## Additional, Variable and Unspecified Compensation

In addition to the specified compensation from the U.S. Postal Service for settlement of the obligation to Hasler, Inc. listed above, Hasler, Inc. seeks additional, variable and unspecified compensation as listed below.

G. Per *Statement of Work §C6*, the U.S. Postal Service shall be responsible for the return of each deployed mailing system to Hasler's distribution facility in Memphis, TN via FOB Destination freight.

© 2004 Hasler, Inc - CONFIDENTIAL and PROPRIETARY - This document is the property of Hasler, Inc. and may not be reproduced in part or in whole or disclosed in any way to third parties without the prior permission in writing from Hasler, Inc. Violators shall be subject to prosecution.

HASLER

*America's better choice®*

H. Per *Statement of Work §C6*, the U.S. Postal Service remains liable for the return of each SAFE CV meter to Hasler's distribution facility in Memphis, TN. SAFE CV meters are to be returned to Hasler, Inc. within 15 days of termination of the Hallmark Program. SAFE CV meters that are not returned are each subject to a $1,000.00 replacement fee. Withdrawals of the SAFE CV meters from USPS service and return of funds to the associated TMS account will be processed within 30 days of return of the meters.

I. Per *Statement of Work §C6*, Hasler, Inc. retains the right to invoice the U.S. Postal Service for system components that are lost, damaged, or otherwise not returned to Hasler, Inc. within the specified 15-day period following the termination of the Hallmark Program on January 31, 2005.

J. Hasler, Inc. reserves the right to seek unspecified damages in claims against the U.S. Postal Service for injury to its reputation and competitive standing related to termination of the Retail Partnership Program.

K. Hasler, Inc. reserves the right to seek additional compensation for incurred expenses omitted or not identified in this proposal, including but not limited to recovery of legal costs.

© 2004 Hasler, Inc. - CONFIDENTIAL and PROPRIETARY - This document is the property of Hasler, Inc. and may not be reproduced in part or in whole or disclosed in any way to third parties without the prior permission in writing from Hasler, Inc. Violators shall be subject to prosecution.

# *Hallmark Contract Orders Summary (Total Shipments)*

| Phase | Delivery Order # | Delivery Order Start Date | Qty | Time Installed (As of Nov. 1) | Funds Earned (Invoiced?) | Remaining Time | Remaining Value (To be invoiced)) |
|---|---|---|---|---|---|---|---|
| 1 | IBITTL-03-M-1241 | 2/1/2003 | 75 | 18 | $94,108.500 | 0 | $0.000 |
| 2 | IBITTL-03-M-2657 | 3/1/2003 | 177 | 18 | $222,096.060 | 0 | $0.000 |
| 3 | IBITTL-03-M-2976 | 4/1/2003 | 28 | 18 | $35,133.840 | 0 | $0.000 |
| 4 | IBITTL-03-M-3698 | 5/1/2003 | 28 | 18 | $35,133.840 | 0 | $0.000 |
| 5 | IBITTL-03-M-4396 | 6/1/2003 | 28 | 17 | $33,181.960 | 1 | $1,951.880 |
| 6 | IBITTL-03-M-5163 | 7/1/2003 | 12 | 16 | $13,384.320 | 2 | $1,673.040 |
| 7 | IBITTL-03-M-5691 | 8/1/2003 | 31 | 15 | $32,415.150 | 3 | $6,483.030 |
| 8 | IBITTL-03-M-6612 | 9/1/2003 | 29 | 14 | $28,302.260 | 4 | $8,086.360 |
| 9 | IBITTL-03-M-7037 | 10/1/2003 | 172 | 13 | $155,871.560 | 5 | $59,950.600 |
| 10 | 2DRPSR-03-M-7949 | 11/1/2003 | 144 | 12 | $120,458.880 | 6 | $60,229.440 |
| 11 | 2BRPSR-04-M-0036 | 2/1/2004 | 385 | 9 | $241,545.150 | 9 | $241,545.150 |
| 12 | 2BRPSR-04-M-1689 | 4/15/2004 | 362 | 6.5 | $164,027.630 | 11.5 | $290,202.730 |
| 13 | 2BRPSR-04-M-3597 | 5/15/2004 | 116 | 5.5 | $44,474.980 | 12.5 | $101,079.500 |
| 14 | 2BRPSR-04-M-4356 | 6/15/2004 | 169 | 4.5 | $53,014.455 | 13.5 | $159,043.365 |
| 15 | Extended Phase 1 - 3 months | 8/1/2004 | 66 | 3 | $13,802.580 | 0 | $0.000 |
| 16 | Extended Phase 2 - 3 months | 9/1/2004 | 161 | 2 | $22,446.620 | 1 | $11,223.310 |
| 17 | Extend Phase 3 - 12 months | 10/1/2004 | 28 | 0 | $0.000 | 12 | $23,422.560 |
| 18 | Extend Phase 4 - 12 months | 11/1/2004 | 28 | 0 | $0.000 | 12 | $23,422.560 |
| 19 | Extend Phase 5 - 12 months | 12/1/2004 | 28 | 0 | $0.000 | 12 | $23,422.560 |
| 20 | Extend Phase 6 - 12 months | 1/1/2005 | 12 | 0 | $0.000 | 12 | $10,038.240 |
| 21 | Extend Phase 1 - 12 months | 10/1/2004 | 66 | 0 | $0.000 | 12 | $55,210.320 |
| 22 | Extend Phase 2 - 12 months | 11/1/2004 | 161 | 0 | $0.000 | 12 | $134,679.720 |
| | *Totals* | | | | *$ 1,309,397.79* | | *$ 1,211,664.37* |

| | |
|---|---|
| Total Units ordered on DO | 1756 |
| Units Extended for 3 months | 227 |
| Units Extended for 12 months | 323 |

*Monthly Value:* $69.71

# Exhibit 8

## George Hesse

**From:** Conway, Caroline Z - AURORA, CO [caroline.z.conway@usps.gov]

**Sent:** Friday, January 14, 2005 5:49 PM

**To:** Frank Crudo; Graham Fulghum; George Hesse; Thomas Keenan

**Cc:** Barnett, Claudia O - Washington, DC; Hamilton, Kathleen - Aurora, CO; Burton, Jennifer K - Washington, DC; Siegel, Lisa - Aurora, CO; Shively, Joseph A - Aurora, CO

**Subject:** Contract No. 102591-03-P-0454, Limited Service CPU Meters

TO: Hasler, Inc.

This email is a recap of our discussion on the afternoon of 01/14/05.

I would like to reiterate our preference to reach a negotiated agreement that is mutually and reasonably acceptable to Hasler and the Postal Service. If we are unable to reach such an agreement, however, our only option will be to exercise our rights under the Termination for Convenience clause. Under this option, you would be entitled to lease payments for the existing meters through 03/31/05 ($189,820.33). You may also be entitled to the movement fee charges of $82,750 which covers 1,655 meters. If we believe it is beneficial to the Postal Service, we would be interested in purchasing 100 meters (per the contract for $600 each). We would then enter into a separate contract for maintenance of these 100 meters.

As I stated above, the Postal Service would prefer to reach a negotiated settlement with Hasler. I would encourage you to submit a counterproposal so we could continue to try to reach a compromise.

Thank you.

Caroline Z. Conway
Category Manager, Retail Products and Services
Travel, Retail and Temporary Services CMC
3300 S. Parker Road, Suite 400
Aurora, CO 80014-3500
303-369-1226 (Tel)
303-369-1251 (Fax)
caroline.z.conway@usps.gov

# Exhibit 9

HASLER
*America's better choice®*

January 25, 2005

Ms. Caroline Z. Conway
Category Manager, Retail Products and Services
Travel, Retail and Temporary Services CMC
United States Postal Service
3300 S. Parker Road, Suite 400
Aurora, CO 80014-3500

Dear Ms. Conway:

Hasler, Inc. shares the Postal Service's preference to reach a reasonable, mutually acceptable negotiated agreement. We hold firm in our belief that Hasler, Inc. is entitled to adequate and reasonable compensation for the premature termination of the Retail Partnership Program and Hasler continues to believe in the validity of its claim as represented in the Settlement Proposal provided to your office on 5 November 2004.

In an effort to reach some middle ground, we have prepared the attached counterproposal for settlement of USPS financial obligations to Hasler, Inc. under the Hallmark Contract.

This counterproposal includes adjusted figures that are advanced solely for the purpose of moving towards an equitable negotiated settlement with the Postal Service. We do not waive our rights to move forward with separate remedies or actions available under the Postal Service's Termination for Convenience clause in the event settlement of our claim cannot be reached.

As an indication of our good faith and openness towards an equitable settlement, we have reduced our expectation of 2,400 units under the contract to 2,100 units.

For the purpose of moving towards settlement of our claim, Hasler accepts the Postal Service's position that a portion of the program development and hardware expenditures specified in Part E of the Settlement Proposal will have already been amortized by program-to-date lease payments, and our counterproposal reflects the adjustment.

Please note that Part A of the Settlement Proposal has been modified to reflect (a) update of the line item for payments received and (b) addition of an extension of the lease payments through 31 January 2005, as agreed per Modification M 012 to Contract 102591-03-P-0454 signed by me on 22 December 2004.

As regards the Postal Service's intent to maintain limited-CPU operations at as many as 100 Hallmark locations, and to enter into a separate contract with Hasler for their maintenance and support, we are amenable to a Postal Service proposal to include both the purchase of PostLinks and inclusion of the requested software modification in your response.

HASLER
*America's better choice®*

If we can reach an equitable settlement on other terms and conditions stated herein, we would be in a position to offer the 100 units at the stated exercise price plus application modification costs. Service costs for the 100 units would be comparable to like products.

In order to ensure uninterrupted operation at the 100 sites, Hasler will extend the availability of the existing statistics collection infrastructure for upload of CPPS data beyond the program termination date – 31 January 2005 – until such time as all locations can be set up for independent operation with a modified PostLink application that communicates with the standard Hasler infrastructure.

Again, we are intent upon reaching an equitable agreement for settlement of the Hallmark contract. We truly enjoy the CPPS relationship with the Postal Service and we share in the disappointment at the turn in circumstances that led to termination of the project. We regret that none of us – the Postal Service, Hallmark, or Hasler – will emerge from the program's dissolution with the successes that we each had anticipated.

Nonetheless, Hasler values its special relationship with the Postal Service, and I look forward to continued negotiations toward settlement with you and your team.

If you or a member of your Postal Service team requires additional information, please do not hesitate to contact me directly at (203) 925-5642, or Graham Fulghum at (703) 758-1590.

Respectfully,

*Frank Crudo*

Frank Crudo
Chief Financial Officer
Hasler, Inc.

cc: John Vavra – President, Hasler, Inc.
Christopher O'Brien – Sr. Vice President, Sales, Hasler, Inc.
Graham Fulghum - Director, Government Relations, Hasler, Inc.
Joseph Bonassar – Vice President & General Counsel, Mailroom Holding, Inc.
Robert Sheehan – Vice President, Postal Affairs, Mailroom Holding, Inc.
George Hesse – Director, Business Services, Hasler, Inc.

Enclosures (1): 1. Hasler Counterproposal To USPS – Settlement of Hallmark Contract Termination

HASLER
America's better choice®

# Hasler Counterproposal: Settlement Of USPS Financial Obligations to Hasler, Inc. under The Hallmark Contract

A. The United States Postal Service shall compensate Hasler, Inc. for outstanding lease commitments in the amount of:

| | | |
|---|---|---|
| *18 month lease term* x 2,100 *units* x *$69.71 per month:* | $ | 2,635,038.00 |
| *3 months extension x 227 units x $69 71 per month:* | $ | 47,472.51 |

*Extension per Modification M 012:*

| *Meters Expiring* | *USPS* | *Hasler* | *Months Extended* | | |
|---|---|---|---|---|---|
| *10/1/2004* | *28* | *28* | *4* | *$* | *7,807.52* |
| *11/1/2004* | *28* | *28* | *3* | *$* | *5,855.64* |
| *11/30/2004* | *75* | *66* | *3* | *$* | *13,802.58* |
| *12/1/2004* | *28* | *28* | *2* | *$* | *3,903.76* |
| *12/31/2004* | *177* | *161* | *1* | *$* | *11,223.31* |
| *1/1/2004* | *12* | *12* | *1* | *$* | *836 52* |
| | | | *Mod M 012 Sub-Total* | *$* | *43,429 33* |

| | | |
|---|---|---|
| *less payments received (current as of 1/19/05).* | $ | 1,114,982.00 |
| *less adjustments for invoices outstanding, payments applied, payments in transit and adjustments:* | $ | |
| *Amount owed:* | $ | 1,610,957.84 |

B. The United States Postal Service shall compensate Hasler, Inc. for outstanding lease commitments automatically triggered by 12-month extension.

*For the sole purpose of moving towards an equitable negotiated settlement with the Postal Service, Hasler is willing to waive its interest in this dollar figure. The waiver is based on Hasler's position that the residual will have been exercised on 2,100 units under Part C, below, as such, recovery of lease commitments under Part B are redundant.*

*This offer does not constitute a waiver of Hasler's rights to recovery of automatically triggered lease extensions in the event no settlement is reached.*

© 2005 Hasler, Inc. - CONFIDENTIAL and PROPRIETARY - This document is the property of Hasler, Inc. and may not be reproduced in part or in whole or disclosed in any way to third parties without the prior permission in writing from Hasler, Inc. Violators shall be subject to prosecution.

HASLER
America's better choice®

C. The United States Postal Service shall compensate Hasler, Inc. for the purchase residual associated with the lease of 2,100 units:

| | | |
|---|---|---|
| *Purchase residual x 2,100 units x $600 00:* | $ | 1,260,000.00 |
| *Amount owed:* | $ | 1,260,000.00 |

D. The United States Postal Service shall compensate Hasler, Inc. for its costs of inventory build-up for 960 additional mailing systems, representing 40% of the original order, as needed for performance of the contract.

| | | |
|---|---|---|
| *960 units* x *$1,107.02 per unit:* | $ | 1,062,739.20 |

E. The U.S. Postal Service shall compensate Hasler, Inc. for the cost of development and capital investment required for performance of the contract and in compliance with the award:

| | | |
|---|---|---|
| *Amount owed.* | $ | 660,511.74 |

*We are mindful that the Postal Service expressly recognizes a remedy for recovery of reasonable costs in its Termination for Convenience clause. We believe that the same consideration and remedy is available under a settlement agreement.*

*For the sole purpose of moving towards settlement of our claim, Hasler accepts the Postal Service's position that a portion of the program development and hardware expenditures specified in Part E of the Settlement Proposal will have already been amortized by program-to-date lease payments, and our counter proposal reflects this adjustment.*

F. The U.S. Postal Service shall compensate Hasler, Inc. for movement of the installed base at the agreed fee of $50.00 per instance:

| | | |
|---|---|---|
| *1,756 units x $50.00/each* | $ | 87,800.00 |

© 2005 Hasler, Inc. - CONFIDENTIAL and PROPRIETARY - This document is the property of Hasler, Inc. and may not be reproduced in part or in whole or disclosed in any way to third parties without the prior permission in writing from Hasler, Inc. Violators shall be subject to prosecution

HASLER
America's better choice®

## Summary of Specified Compensation

| | | |
|---|---|---|
| *Part A: Outstanding Lease Commitments* | $ | *1,610,957.84* |
| *Part B: Extended Lease Commitments* | $ | *0.00* |
| *Part C: Purchase Residual. 2,100 Units* | $ | *1,260,000.00* |
| *Part D: Cost of Inventory: 960 Units* | $ | *1,062,739.20* |
| *Part E: Research & Development, Capital Investment* | $ | 660,511.74 |
| *Part F: Movement Fees* | $ | *87,800.00* |
| Amount owed: | $ | 4,682,008.78 |

## Additional, Variable and Unspecified Compensation

*In addition to the specified compensation from the U.S. Postal Service for settlement of the obligation to Hasler, Inc. listed above, Hasler, Inc. reserves the right to seek additional, variable and unspecified compensation as listed below.*

G. Per *Statement of Work §C6*, the U.S. Postal Service shall be responsible for the return of each deployed mailing system to Hasler's distribution facility in Memphis, TN via FOB Destination freight.

H. Per *Statement of Work §C6*, the U.S. Postal Service remains liable for the return of each SAFE CV meter to Hasler's distribution facility in Memphis, TN. SAFE CV meters are to be returned to Hasler, Inc. within 15 days of termination of the Hallmark Program. SAFE CV meters that are not returned are each subject to a $1,000.00 replacement fee. Withdrawals of the SAFE CV meters from USPS service and return of funds to the associated TMS account will be processed within 30 days of return of the meters.

I. Per *Statement of Work §C6*, Hasler, Inc. retains the right to invoice the U.S. Postal Service for system components that are lost, damaged, or otherwise not returned to Hasler, Inc. within the specified 15-day period following the termination of the Hallmark Program.

J. Hasler, Inc. reserves the right to seek unspecified damages in claims against the U.S. Postal Service for injury to its reputation and competitive standing related to termination of the Retail Partnership Program.

K. Hasler, Inc. reserves the right to seek additional compensation for incurred expenses omitted or not identified in this proposal, including but not limited to recovery of legal costs.

© 2005 Hasler, Inc. - CONFIDENTIAL and PROPRIETARY - This document is the property of Hasler, Inc. and may not be reproduced in part or in whole or disclosed in any way to third parties without the prior permission in writing from Hasler, Inc. Violators shall be subject to prosecution

# Exhibit 10

TRAVEL, RETAIL AND TEMPORARY SERVICES CATEGORY MANAGEMENT CENTER

UNITED STATES
POSTAL SERVICE

February 10, 2005

Mr. Frank Crudo
Chief Financial Officer
Hasler, Inc.
19 Forest Parkway
Shelton, CT 06484-0903

RE: Contract No. 102591-03-Q-0454, Limited Service CPU Meters

Dear Frank:

This letter is in response to your counterproposal of January 25, 2005.

As I have continuously reiterated in our previous communications, the above-referenced contract is an Indefinite Delivery Indefinite Quantity (IDIQ) contract. Following is the section in the Purchasing Manual (PM), Issue 2, with the definition of such a contract.

> *2.4.6.c Indefinite-Quantity Contracts*
>
> *1. An indefinite-quantity contract provides for an indefinite quantity of specific supplies or services, within a stated minimum and maximum, to be delivered during the contract period to designated locations when ordered. It is used when precise requirements for supplies or services ordered over the term of the contract, above known minimums, cannot be determined. The minimum and maximum are provided to limit the pricing risk to the supplier.*
>
> *2. The contract must require the Postal Service to order, and the supplier to deliver, a minimum quantity of supplies or services over the term of the contract, and requires the supplier to deliver any additional quantities ordered, not to exceed a maximum amount.*
>
> *3. The minimum quantity must not exceed known requirements, and the maximum quantity must be realistic. The contract may specify minimum or maximum quantities for individual delivery orders, and a maximum that may be ordered during a specified time.*
>
> *4. Contract maximums may be exceeded upon the mutual agreement of the Postal Service and the supplier.*

Due to the uncertainty of the number of meters needed for this program, the contracting officer selected to award an IDIQ contract with a stated minimum of 1,800 and a maximum of 2,400 units. This was spelled out very clearly, confirmed and acknowledged in the following documents:

- solicitation issued for this requirement under Solicitation No. 102591-02-A-0069
- in the Statement of Work (SOW), on page 1, issued as an attachment to the previously-referenced solicitation
- during the Questions and Responses dated July 17, 2002, issued under an amendment (A002) against the previously-referenced solicitation
- in Hasler's proposal to the previously-referenced solicitation on July 24, 2002

3300 SOUTH PARKER ROAD, SUITE 400
AURORA, CO 80014-3500
TEL: (303) 369-1226
FAX: (303) 369-1251
EMAIL: CAROLINE.Z.CONWAY@USPS.GOV

Due to the above-stated reasons, I propose the following as a settlement to end our contractual relationship in an amicable way.

The master contract itself will expire as scheduled on September 7, 2007, but all leases that are still valid after January 31, 2005, will be allowed to expire when scheduled (at the end of their 18 month term) with the last one ending on December 31, 2005.

| | |
|---|---|
| Leases still current from February 1 through December 2005 | $581,729.95 |
| Lease (85) meters at current lease price for a 12-month term | $ 71,104.20 |
| Movement Fee per contract at $50 each for 1,670 meters | $ 83,500.00 |
| | $736,334.15 |

Hasler will continue to invoice the Postal Service for each of the items listed above in arrears as required by the contract. The Postal Service will return all meters to Hasler (except for the ones the USPS chooses to continue to lease). We will continue to work with Hasler until December 31, 2005, to investigate alternative uses of these meters within the USPS, other government agencies, or any entities outside the federal government.

I hope you will find this proposal acceptable. Please let me know at your earliest convenience.

Thank you.

Sincerely,

Caroline Z. Conway

Caroline Z. Conway
Category Manager
Retail Products and Services

**U. S. POSTAL SERVICE: CONTRACT/ORDER MODIFICATION** | Page 1 of 1

1. MODIFICATION NO.: M013 TO CONTRACT/ORDER NO: 102591-03-P-0454
2. a. DATE ISSUED: 01/31/2005 b. REQUEST NO: e-mail rqst
c. FINANCE NO: 692470 SSN/TIN: 06-0798198

3. CONTRACTOR:
Hasler Inc.
19 Forest Pkwy
Shelton CT 06484-6140

ATTENTION: Frank Crudo
PHONE: (203) 925-5642
FAX NO: (203) 926-4327

4. ISSUED BY:

U S POSTAL SERVICE
TRAVEL, RETAIL AND TEMPORARY SERVICES CMC
3300 S PARKER RD SUITE 400
AURORA CO 80014-3500

FOR INFORMATION CALL:
Lisa Siegel
303/369-1218 Fax 303/369-1251
lisa.siegel@usps.gov
ACO CODE: 2BRPSR

The above-numbered contract/order/agreement is modified as set forth in Block 6 by supplemental agreement entered into pursuant to authority of mutual agreement.

6. DESCRIPTION OF MODIFICATION:

The purpose of this modification is to affirm that the leases for the (83) meters on the attached list will remain in operation through March 31, 2005, unless Hasler receives written notification from the Postal Service before that date that these meters are no longer required. This will enable the specified locations to continue operating without any interruption in service while Hasler and the Postal Service continue the negotiation process.

The operation of these meters will be under current contract pricing of $69.71 per meter per month, as well as under current SOW requirements including the regularly scheduled data uploads from Hallmark CPUs to Hasler.

Billing for these (83) meters will be submitted on one consolidated invoice, which will be certified and processed under standard USPS invoice procedures. There will not be any additional charge for this change

Except as provided herein, all terms and conditions of the document referenced in Block 1, remain unchanged and in full force and effect.

7. ACCOUNTS PAYABLE DATA is changed, see below.
Previous Grand Total: $1,978,901.06

Value of Modification: 0
New Grand Total: $1,978,901.06

The supplier is required to sign and return a copy of this modification to the Issuing Office (see Block 4).

8. SIGNATURES: SUPPLIER

Signature Date

Name of Person Authorized to Sign

Title

U. S. POSTAL SERVICE

Signature Date

Caroline Z. Conway
Contracting Officer

# Exhibit 11

HASLER
America's better choice.

Friday, February 18, 2005

Ms. Caroline Z. Conway
Category Manager, Retail Products and Services
Travel, Retail and Temporary Services CMC
United States Postal Service
3300 S. Parker Road, Suite 400
Aurora, CO 80014-3500

Dear Caroline:

For the purpose of advancing towards equitable settlement of our claim, Hasler is prepared to stipulate that the intent of the Postal Service was to award an IDIQ Contract with a stated minimum quantity of 1,800 units.

In the attached counterproposal, we have included modifications to sections A, B and C that reflect adjustment for the minimum 1,800 units. I urge the Postal Service to adjust its settlement proposal to reflect the Postal Service's obligation to order this full, minimum quantity, consistent with section 2.4.6.c (2) of the Purchasing Manual.

I also request that the Postal Service acknowledge Hasler's position that premature dissolution of the Hallmark initiative exposes Hasler to losses for sunk hardware costs as itemized in sections C and D of our settlement proposal, and that performance under the contract required additional specialized, upfront capital investment as itemized in section F:

(C) The unamortized, residual unit value of customized PostLink mailing systems at the termination of an 18-month lease, value that cannot be recouped in the commercial market;

(D) The value of additional customized part and component inventory acquired to modify the PostLink mailing system hardware and application for conformance to the unique requirements specified in the *Statement Of Work – Section C: Physical Requirements of the Meter and Scale (C2)*, and exposure to supplier agreements with third parties;

(E) Investments in application development and capital procurement of staging and production server infrastructures, which were reworked to conform to stringent USPS Information Security Assessment (ISA) system security and operational requirements – the extent, scope, and compliance expense of which was understated and unanticipated at the time of award. (*reference* Hasler's e-mail to your office on 4 January 2005)

The Postal Service explicitly recognizes a remedy for recovery of legitimate supplier costs in its Termination for Convenience clause. Hasler reiterates its belief that its sunk costs should be accorded the

HASLER

*America's better choice.*

same legitimacy, and afforded the same consideration and remedy, under a negotiated settlement proposal, and I am confident that an equitable and amicable settlement can be reached.

I urge you to revisit your consideration of our settlement proposal and I look forward to continued negotiations toward settlement with you and your team.

If you or any member of your Postal Service team requires further information or clarification, please do not hesitate to contact me directly at (203) 925-5642, or Graham Fulghum at (703) 758-1590.

Respectfully,

*Frank Crudo*

Frank Crudo
Chief Financial Officer
Hasler, Inc.

cc: John Vavra -- President, Hasler, Inc.
Christopher O'Brien – Sr. Vice President, Sales, Hasler, Inc.
Graham Fulghum -- Director, Government Relations, Hasler, Inc.
Joseph Bonassar – Vice President & General Counsel, Mailroom Holding, Inc.
Robert Sheehan – Vice President, Postal Affairs, Mailroom Holding, Inc.
George Hesse – Director, Business Services, Hasler, Inc.

Enclosures (1): Hasler Second Counterproposal To USPS -- Settlement of Hallmark Contract Termination

HASLER
*America's better choice*®

## Hasler Second Counterproposal: Settlement Of USPS Financial Obligations to Hasler, Inc. under The Hallmark Contract

A. The United States Postal Service shall compensate Hasler, Inc. for outstanding lease commitments in the amount of:

| | | |
|---|---|---|
| *18 month lease term* x 1,800 *units* x *$69.71 per month:* | $ | 2,258,604.00 |
| *3 months extension x 227 units x $69.71 per month.* | $ | 47,472.51 |

*Extension per Modification M 012:*

| *Meters Expiring* | *USPS* | *Hasler* | *Months Extended* | | |
|---|---|---|---|---|---|
| *10/1/2004* | *28* | *28* | *4* | $ | *7,807.52* |
| *11/1/2004* | *28* | *28* | *3* | $ | *5,855.64* |
| *11/30/2004* | *75* | *66* | *3* | $ | *13,802.58* |
| *12/1/2004* | *28* | *28* | *2* | $ | *3,903.76* |
| *12/31/2004* | *177* | *161* | *1* | $ | *11,223.31* |
| *1/1/2004* | *12* | *12* | *1* | $ | *836.52* |
| | | | *Mod M 012 Sub-Total* | $ | *43,429.33* |

| | | |
|---|---|---|
| *less payments received (current as of 1/19/05):* | $ | 1,114,982.00 |
| *less adjustments for invoices outstanding, payments applied, payments in transit and adjustments:* | $ | |
| *Amount owed:* | $ | 1,234,523.84 |

B. The United States Postal Service shall compensate Hasler, Inc. for outstanding lease commitments automatically triggered by 12-month extension.

*For the sole purpose of moving towards an equitable negotiated settlement with the Postal Service, Hasler is willing to waive its interest in this dollar figure. The waiver is based on Hasler's position that the residual will have been exercised on 1,800 units under Part C, below; as such, recovery of lease commitments under Part B are redundant.*

*This offer does not constitute a waiver of Hasler's rights to recovery of automatically triggered lease extensions in the event no settlement is reached.*

© 2005 Hasler, Inc - CONFIDENTIAL and PROPRIETARY - This document is the property of Hasler, Inc and may not be reproduced in part or in whole or disclosed in any way to third parties without the prior permission in writing from Hasler, Inc. Violators shall be subject to prosecution

HASLER
America's better choice.®

C. The United States Postal Service shall compensate Hasler, Inc. for the purchase residual associated with the lease of 1,800 units:

| | | |
|---|---|---|
| *Purchase residual x 1,800 units x $600.00:* | $ | 1,080,000.00 |
| *Amount owed:* | $ | 1,080,000.00 |

D. The United States Postal Service shall compensate Hasler, Inc. for its costs of inventory build-up for 960 additional mailing systems, representing 40% of the original order, as needed for performance of the contract.

| | | |
|---|---|---|
| *960 units x $1,107.02 per unit:* | $ | 1,062,739.20 |

E. The U.S. Postal Service shall compensate Hasler, Inc. for the cost of development and capital investment required for performance of the contract and in compliance with the award:

| | | |
|---|---|---|
| *Amount owed:* | $ | 660,511.74 |

*We are mindful that the Postal Service expressly recognizes a remedy for recovery of reasonable costs in its Termination for Convenience clause. We believe that the same consideration and remedy is available under a settlement agreement.*

*For the sole purpose of moving towards settlement of our claim, Hasler accepts the Postal Service's position that a portion of the program development and hardware expenditures specified in Part E of the Settlement Proposal will have already been amortized by program-to date lease payments, and our counter proposal reflects this adjustment*

F. The U.S. Postal Service shall compensate Hasler, Inc. for movement of the installed base at the agreed fee of $50.00 per instance:

| | | |
|---|---|---|
| *1,756 units x $50.00/each* | $ | 87,800.00 |

© 2005 Hasler, Inc - CONFIDENTIAL and PROPRIETARY - This document is the property of Hasler, Inc. and may not be reproduced in part or in whole or disclosed in any way to third parties without the prior permission in writing from Hasler, Inc Violators shall be subject to prosecution

HASLER
America's better choice.

Summary of Specified Compensation

| | | |
|---|---|---|
| *Part A: Outstanding Lease Commitments* | $ | *1,234,523.84* |
| *Part B: Extended Lease Commitments* | $ | *0.00* |
| *Part C: Purchase Residual: 2,100 Units* | $ | *1,080,000.00* |
| *Part D: Cost of Inventory: 960 Units* | $ | *1,062,739.20* |
| *Part E: Research & Development, Capital Investment* | $ | *660,511.74* |
| *Part F: Movement Fees* | $ | *87,800.00* |
| Amount owed: | $ | 4,125,574.78 |

Additional, Variable and Unspecified Compensation

*In addition to the specified compensation from the U.S. Postal Service for settlement of the obligation to Hasler, Inc. listed above, Hasler, Inc. reserves the right to seek additional, variable and unspecified compensation as listed below.*

G. Per *Statement of Work §C6*, the U.S. Postal Service shall be responsible for the return of each deployed mailing system to Hasler's distribution facility in Memphis, TN via FOB Destination freight.

H. Per *Statement of Work §C6*, the U.S. Postal Service remains liable for the return of each SAFE CV meter to Hasler's distribution facility in Memphis, TN. SAFE CV meters are to be returned to Hasler, Inc. within 15 days of termination of the Hallmark Program. SAFE CV meters that are not returned are each subject to a $1,000.00 replacement fee. Withdrawals of the SAFE CV meters from USPS service and return of funds to the associated TMS account will be processed within 30 days of return of the meters.

I. Per *Statement of Work §C6*, Hasler, Inc. retains the right to invoice the U.S. Postal Service for system components that are lost, damaged, or otherwise not returned to Hasler, Inc. within the specified 15-day period following the termination of the Hallmark Program.

J. Hasler, Inc. reserves the right to seek unspecified damages in claims against the U.S. Postal Service for injury to its reputation and competitive standing related to termination of the Retail Partnership Program.

K. Hasler, Inc. reserves the right to seek additional compensation for incurred expenses omitted or not identified in this proposal, including but not limited to recovery of legal costs.

© 2005 Hasler, Inc. - CONFIDENTIAL and PROPRIETARY - This document is the property of Hasler, Inc. and may not be reproduced in part or in whole or disclosed in any way to third parties without the prior permission in writing from Hasler, Inc. Violators shall be subject to prosecution.

# Exhibit 12

TRAVEL, RETAIL AND TEMPORARY SERVICES CATEGORY MANAGEMENT CENTER

UNITED STATES
POSTAL SERVICE

March 1, 2005

Mr. Frank Crudo
Chief Financial Officer
Hasler, Inc.
19 Forest Parkway
Shelton, CT 06484-0903

RE: Contract No. 102591-03-Q-0454, Limited Service CPU Meters

Dear Frank:

This letter is in response to your counterproposal of February 18, 2005.

Although the Hallmark CPU program has ended, the Postal Service does not intend to terminate the above-referenced contract for convenience. The Postal Service will pay Hasler for the 1,800 meters (details are described in the attachment). The 83 meters that are currently situated in selected Hallmark CPUs will continue to be leased and renewed until their lease expires on January 31, 2006.

The contract will expire on September 7, 2007, as scheduled, and meters will no longer be leased over and above the 1,800 meters, its obligation to the contract. At the expiration of the contract, the total value of the contract will be $2,405,831.52. This amount includes the lease of 1,800 meters and the extension of the lease terms as described in the attached. As of December 31, 2004, the Postal Service has paid Hasler invoices amounting to $1,483,267.16. After further calculations (also described in the attached) of extended lease terms, the addition of 45 meters to fulfill its 1,800 obligation and movement fees of the returned meters, the Postal Service will owe a balance of **$1,006,164.36**. The Postal Service is willing to pay Hasler a lump sum of $56,465.10 which covers the 45 meters and Hasler will continue to invoice the Postal Service for each of the items left in the contract ($949,699.26) in arrears, on a monthly basis, as required by the contract.

The Postal Service did not authorize Hasler to manufacture meters over and above its obligation of 1,800. For this reason, the Postal Service denies Hasler's claim for residuals as described in Section C, inventory build-up in Section D, and cost of development and capital investment in Section E. The Postal Service does not also acknowledge Hasler's rights as stated in Sections J and K.

Thank you.

Sincerely,

Caroline Z. Conway

Caroline Z. Conway
Category Manager
Retail Products and Services

3300 SOUTH PARKER ROAD, SUITE 400
AURORA, CO 80014-3500
(303) 369-1226
FAX: (303) 369-1251

A. The United States Postal Service shall compensate Hasler, Inc. for outstanding lease commitments in the amount of:

| | | | | | | |
|---|---|---|---|---|---|---|
| 18 month lease term | x | 1755 | x | $69.71 | | $2,202,138.90 |
| 18 month lease term | x | 45 | x | $69.71 | | $56,465.10 |
| | | 1800 | | | | $2,258,604.00 |
| 3 months extension | x | 227 | x | $69.71 | | $47,472.51 |
| | | | | | | $2,306,076.51 |

Extension per M012:

| Date Meters Expired | Number of Units | Months Extended | | |
|---|---|---|---|---|
| 10/1/2004 | 28 | 4 | $7,807.52 | |
| 11/1/2004 | 28 | 3 | $5,855.64 | |
| 11/30/2004 | 66 | 2 | $9,201.72 | |
| 12/1/2004 | 28 | 2 | $3,903.76 | |
| 12/31/2004 | 161 | 1 | $11,223.31 | |
| 1/1/2005 | 12 | 1 | $836.52 | $38,828.47 |
| | | | | $2,344,904.98 |

Extension of meters at selected Hallmark CPUs:

| Date Meters Expired | Number of Units | Months Extended | |
|---|---|---|---|
| 1/31/2006 | ~~93~~ | 12 | ~~$69,434.16~~ |
| LESS: (27) of these meters which expired after 01/31/2005 to avoid double payment | | | $8,504.62 |
| | | | $2,405,831.52 |
| LESS: payments received (current as of 12/31/2004) | | | $1,483,267.16 |
| | | *Amount owed:* | $922,564.36 |

B. The United States Postal Service shall compensate Hasler, Inc. for outstanding lease commitments automatically triggered by 12-month extension

There is no provision in the contract for an automatic trigger of a 12-month lease extension. Only provision in the contract is for the exercise of option periods. **Number B in this claim is denied.**

Hasler demonstrated its understanding of option periods in the contract (1) in its price proposal dated July 24, 2004 to Solicitation No. 102590-02-A-0069. Item number 19 states, "Term of agreement will be minimum of eighteen months. With option to extend agreement for up to 4 – 12 month extensions; and, (2) when a Hasler authorized representative signed USPS Contract No. 102591-03-Q-0454, which included on page 3 of 35, Section 1.4, Period of Performance, which references four (4) option periods each 12 months in duration.

C. The United Sates Postal Service shall compensate Halser, Inc. for the purchase residual associated with the lease of 1,800 units in the amount of $1,080,000.00.

The USPS is not obligated to pay for any residuals in the contract; therefore, **Number C in this claim is denied.**

D. The United States Postal Service shall compensate Hasler, Inc. for its costs of inventory build-up for 960 additional mailing systems, representing 40% of the original order, as needed for performance of the contract.

The Postal Service is obligated to Hasler for the minimum quantity of 1,800 units in this IDIQ contract. Hasler was not authorized to build its inventory beyond the guaranteed quantity of 1,800 units. **Number D in this claim is denied.**

E. The U.S. Postal Service shall compensate Hasler, Inc. for the cost of development and capital investment required for performance of the contract and in compliance with the award in the amount of $660,511.74.

Contract is a firm fixed price (FFP) contract. There are no Contract Line Items Numbers (CLINs) in the contract that allow for payment of the claim in Number E. **Number E is denied.** This should have been built into the unit price of each leased unit.

Hasler clearly demonstrated its understanding of the CLINs in its proposal to USPS Solicitation No. 102590-05-A-0069 dated July 24, 2002, (1) page 3 of 5, Item number 5, "The development charges for phase 1 and phase 2 are included in the purchase price." and (2) Item F, page 6, Additional application or software change cost. "This proposal includes the development for the requested solution. Additional device software changes will be provided upon request. Hasler would be pleased,..."

F. The U.S. Postal Service shall compensate Hasler, Inc. for movement of the installed base at the agreed fee of $50.00 per instance.

The Postal Service agrees to pay this amount (<u>$83,600</u>) which covers the handling of the meters when returned to Hasler.

| Returned Meters | Movement Fee | |
|---|---|---|
| 1672 | $50.00 | $83,600.00 |

Note: 83 meters are being kept and not being moved. Movement fee for these meters will be paid at the end of their lease term.

**The master contract itself will expire as scheduled on September 7, 2007, but all leases that are still valid after January 31, 2005, will be allowed to expire when scheduled (at the end of their 18 month term) with the last one ending on January 31, 2006.**

**Hasler will continue to invoice the Postal Service for each of the items listed in *<u>Section A</u>* and *<u>Section F</u>* in arrears (monthly) as required by the contract. The Postal Service will return meters to Hasler as their lease term expires. At each end of term lease, Hasler will send an invoice for the movement fee.**

G. Per Statement of Work, Section C6, the U.S. Postal Service shall be responsible for the return of the each deployed mailing system to Hasler's distribution facility in Memphis, TN via FOB Destination freight.

The Postal Service agrees to be responsible for the return of the meters to Hasler. In accordance with the Statement of Work, Section C, Requirements, Paragraph C6 (b) states: "If contract option is not exercised the USPS shall be responsible for ensuring the return of the meters to the supplier. The USPS shall also bear shipping costs associated with the return/disposal of the meters.

H. Per Statement of Work, Section C6, the U.S. Postal Service remains liable for the return of each SAFE CV meter to Hasler's distribution facility in Memphis, TN. SAFE CV meters are to be returned to Hasler, Inc. within 15 days to termination of the Hallmark Program. SAFE CV meters that are not returned are each subject to a $1000.00 replacement fee. Withdrawals of the SAFE CV metes from USPS service and return of funds to the associated TMS account will be processed within 30 days of return of the meters.

Hasler will provide documentation that requires the return of the meters within 15 days of termination. Postal field offices will be responsible for $600 replacement fee (or buy option price) if unreturned to Hasler.

I. Per Statement of Work Section C6, Hasler Inc. retains the right to invoice the U.S. Postal Service for system components that are lost, damaged, or otherwise not returned to Hasler, Inc. within the specified 15-day period following the termination of the Hallmark Program on January 31, 2005.

Hasler will provide documentation that requires the return of the meters within 15 days of termination. Postal field offices will be responsible for costs identified in Number "I".

J. Hasler, Inc. reserves the right to seek unspecified damages in claims against the U.S. Postal Service for injury to its reputation and competitive standing related to termination of the Retail Partnership Program.

The Postal Service does not acknowledge this right.

K. Hasler, Inc. reserves the right to seek additional compensation for incurred expenses omitted or not identified in this proposal, including but not limited to recovery of legal costs.

The Postal Service does not acknowledge this right.

# Exhibit 13

HASLER

America's better choice®

Friday, April 1, 2005

Ms. Caroline Z. Conway
Category Manager, Retail Products and Services
Travel, Retail and Temporary Services CMC
United States Postal Service
3300 S. Parker Road, Suite 400
Aurora, CO 80014-3500

Dear Caroline:

This letter is in response to your counterproposal of March 1, 2005.

Thank you for revising your settlement proposal to include the lease of the full, IDIQ minimum 1,800 units.

Hasler does not dispute that the Postal Service did not *place orders* for mailing systems above the set IDIQ minimum of 1,800 units. IDIQ contracts nonetheless *required* Hasler to enter into supplier agreements and manufacture, for delivery upon order, the additional, maximum quantity identified in the schedule.[1]

Hasler acquired the additional parts and component inventory in reliance on the Postal Service's having established sound projections for the number of units to be deployed.[2]

Moreover, inventory build up was dictated because of the lead-time for suppliers and the delivery period specified for the contract,[3] a requirement punctuated by the addition of a liquidated damages clause subsequent to the award.[4] The Postal Service also reserved the right to exercise an option for delivery of the additional quantity, with no interruption to delivery and under threat of the same liquidated damages clause, as needed for the performance of the contract.[5]

---

[1] See *102590-02-A-0069*, § 2.8 *Indefinite-Quantity (Clause 2-42)(b). "The supplier must furnish to the Postal Service, when ordered, the supplies or services specified in the Schedule up to and including the quantity designated in the Schedule as the maximum."*

[2] See *Purchasing Manual, Issue 2*, § 2 4.6.c.3 *Indefinite-Quantity Contracts:* "The minimum quantity must not exceed known requirements and *the maximum quantity must be realistic.*"

[3] One month (*see Contract 102591-03-Q-0454 Modifications M002*), or less (*see Contract 2BRPSR-03-Q-0454 Modifications M003*).

[4] See *Contract 102591-03-Q-0454 Modifications M002.*

[5] See *102590-02-A-0069*, § 2.6 *Option Item (Clause 2-18): "Delivery of the items added by the exercise of this option will continue immediately after. ..delivery of [the] items called for under the contract."*

HASLER
America's better choice®

The trend of delivery orders in the second quarter of 2004, notification of a continued strong flow of applications from additional Hallmark stores, modification of the contract to exercise option periods, and assurances from the Postal Service that the mailing system was fully satisfactory, gave every indication that installation over and beyond the IDIQ minimum of 1,800 units was imminent.

The Postal Service provided no notification to the contrary, and no forewarning of the union dispute or advisement that it would jeopardize the future of the program or the flow of delivery orders to the full potential of the CPPS initiative. Hasler ceased acquisition of inventory and further manufacture immediately upon receipt of your verbal notification on October 18, 2004 that the Postal Service had decided to terminate the program.

The IDIQ contract and compliance with the Postal Service's new *Information Security Assurance* (ISA) initiative *required* Hasler to develop a robust server infrastructure to securely manage traffic and statistics for the full quantity identified in the contract. IP D&RS conceded that the scope of the ISA initiative was little understood within the Postal Service, and Hasler objected at the time that the cost and schedule impact of compliance was understated by the Postal Service at the time of award. Contracting Officer Janet Crowe nonetheless imposed strict compliance as a condition of moving forward with the contract, under threat of non-performance and exercise of the liquidated damages clause added subsequent to the award.[6] The upfront investment in development is a required, legitimate capital expense, and we have already accepted the Postal Service's position that some portion of the program development and hardware expenditures specified in Part E will have already been amortized by program-to-date lease payments; our first counterproposal dated January 25, 2005 reflects the adjustment.

Hasler believes that its claim for recovery of costs expended in performance of the contract has merit, and is grounded in both the contract and an underlying principle of equity.

I remain confident that both the Postal Service and Hasler can negotiate a settlement that is satisfactory to both parties. I am open to full consideration of the Postal Service's counter-arguments.

For the purpose of further advancement towards an equitable middle ground in settlement of our claim, we have revised our claim for recovery of costs associated with inventory build up under Section D of the counterproposal. We have also adjusted our claim under Section C to reflect the ongoing lease of systems for the 83 Hallmark CPUs.

We have reviewed the figures provided by the Postal Service in its response dated March 1, 2005. We have adjusted our figures in the attached third counterproposal to reflect credit of wire

[6] See e-mail, *Hasler ISA Supporting Documentation*, from Thomas Keenan to Conway, Caroline (January 04, 2005).

HASLER
*America's better choice*®

payments not previously applied. We have also adjusted the Postal Service's calculation of payments applied to subtract payments for equipment and supply invoices in the amount of $60,410.47 that are not lease payments and separate from our settlement discussions. I propose that Hasler and the Postal Service collaborate to confirm this adjustment and to quickly reconcile an additional discrepancy in payments applied in the amount of $75,322.42.

Thank you, Caroline. If you would like to coordinate reconciliation of the Postal Service account, and discuss or require clarification about this settlement proposal, please do not hesitate to contact me directly at (203) 925-5642.

Sincerely,

*Frank Crudo*

Frank Crudo
Chief Financial Officer
Hasler, Inc.

cc: John Vavra – President, Hasler, Inc.
Marc Morgan –Vice President, Sales, Hasler, Inc.
Graham Fulghum – Director, Government Relations, Hasler, Inc.
Joseph Bonassar – Vice President & General Counsel, Mailroom Holding, Inc.
Robert Sheehan – Vice President, Postal Affairs, Mailroom Holding, Inc.
George Hesse - Director, Business Services, Hasler, Inc.

Enclosures (1): Hasler Third Counterproposal To USPS – Settlement of Hallmark Contract Termination

19 Forest Parkway • Shelton, CT 06484-0903 • Tel: 203.926.1087 • Fax: 203.929.6084 • www.haslerinc.com

HASLER
*America's better choice®*

## Hasler Third Counterproposal: Settlement Of USPS Financial Obligations to Hasler, Inc. under The Hallmark Contract

A. The United States Postal Service shall compensate Hasler, Inc. for outstanding lease commitments in the amount of:

| | | | | | |
|---|---|---|---|---|---|
| *18 month lease term* x 1,800 *units* x *$69.71 per month:* | | | | $ | 2,258,604.00 |
| *3 months extension x 227 units x $69.71 per month:* | | | | $ | 47,472.51 |
| *Extension per Modification M 012:* | | | | | |
| *Meters Expiring* | *USPS* | *Hasler* | *Months Extended* | | |
| *10/1/2004* | *28* | *28* | *4* | *$* | *7,807 52* |
| *11/1/2004* | *28* | *28* | *3* | *$* | *5,855.64* |
| *11/30/2004* | *75* | *66* | *2* | *$* | *9,201 72* |
| *12/1/2004* | *28* | *28* | *2* | *$* | *3,903.76* |
| *12/31/2004* | *177* | *161* | *1* | *$* | *11,223 31* |
| *1/1/2004* | *12* | *12* | *1* | *$* | *836 52* |
| | | | *Mod M 012 Sub-Total* | *$* | *38,828.47* |
| *Extension of meter leases at select Hallmark CPUs:* | | | | | |
| *Meters Expire* | *Units* | | *Months Extended* | | |
| *12/31/2006* | *31* | | *12* | *$* | *69,431.16* |
| *less 27 meters expired after 01/31/2005:* | | | | $ | 8,504.62 |
| | | | *Extended Leases Sub-Total* | *$* | *60,926.54* |
| *Total Lease Commitments:* | | | | *$* | *2,405,831.52* |
| *less payments received (current as of 3/18/05, see clarification below):* | | | | $ | 1,347,534.27 |
| *less adjustments for invoices outstanding, payments applied, payments in transit and adjustments:* | | | | $ | |
| | | | *Amount owed:* | $ | 1,058,297.25 |

© 2005 Hasler, Inc. - CONFIDENTIAL and PROPRIETARY - This document is the property of Hasler, Inc and may not be reproduced in part or in whole or disclosed in any way to third parties without the prior permission in writing from Hasler, Inc. Violators shall be subject to prosecution

HASLER
*America's better choice®*

*Hasler Clarification:*

*Hasler requests the Postal Service's cooperation in resolving Postal Service account discrepancies.*

| | |
|---|---|
| Total Invoices Paid, as per USPS: | $1,483,267.16 |
| Adjusted for equipment & supplies*: | ($60,410.47) |
| Lease Invoices Paid, adjusted: | $1,422,856.69 |
| Payments confirmed-to-date by Hasler: | $1,347,534.27 |
| Payments not reconciled: | $75,322.42 |

*Invoices: 1580484, 1629799, 1630945, 1649778, 1750964, 406542, 413861, 1814020, 1813539, 1827160, & 1838438

B. The United States Postal Service shall compensate Hasler, Inc. for outstanding lease commitments automatically triggered by 12-month extension.

*For the sole purpose of moving towards an equitable negotiated settlement with the Postal Service, Hasler is willing to waive its interest in this dollar figure The waiver is based on Hasler's position that the residual will have been exercised on 1,800 units under Part C, below; as such, recovery of lease commitments under Part B are redundant.*

*This offer does not constitute a waiver of Hasler's rights to recovery of automatically triggered lease extensions in the event no settlement is reached*

*Postal Service Response There is no provision in the contract for an automatic trigger of a 12-month lease extension. Only provision in the contract for the exercise of option periods. (March 1, 2005)*

*Hasler Counter-Response. The trigger for automatic extension of the lease is timely notification, as defined in item 19, page 3 of the pricing proposal to USPS Solicitation No. 102590-05-A-0069 dated July 24, 2002. Hasler has already waived its interest in this dollar figure, as stated above, conditional upon recovery of equipment costs remaining and not amortized at the conclusion of the 18-month lease.*

© 2005 Hasler, Inc. - CONFIDENTIAL and PROPRIETARY - This document is the property of Hasler, Inc. and may not be reproduced in part or in whole or disclosed in any way to third parties without the prior permission in writing from Hasler, Inc Violators shall be subject to prosecution.

HASLER
*America's better choice®*

C. The United States Postal Service shall compensate Hasler, Inc. for the purchase residual associated with the lease of 1,717 units:

| | |
|---|---|
| *Purchase residual x 1,717 units x $600.00:* | $ 1,030,200.00 |
| *Amount owed:* | $ 1,030,200.00 |

*Hasler has adjusted this figure to reflect the 83 units that will be retained under lease by the Postal Service.*

D. The United States Postal Service shall compensate Hasler, Inc. for its costs of inventory build-up for 720 additional mailing systems, representing 40% of the original order, as needed for performance of the contract.

| | |
|---|---|
| *720 units x $1,107.02 per unit:* | $ 797,054.40 |

*Postal Service Response. The Postal Service is obligated to Hasler for the minimum quantity of 1,800 units in this IDIQ contract. Hasler was not authorized to build its inventory beyond the guaranteed quantity of 1,800 units.*

*Hasler Counter-Response: The provisions of the IDIQ contract required Hasler to enter into supplier agreements and manufacture, for delivery upon order, the additional, maximum quantity identified in the schedule.[1] Inventory build up was dictated by the lead-time for suppliers and manufacture, and the one-month delivery period specified for the contract.[2] The Postal Service added a liquidated damages clause to the contract subsequent to the award.[3]*

*For the purpose of moving towards settlement of its claim, Hasler has adjusted the base on which the 40% is calculated to the IDIQ minimum 1,800 units.*

E. The U.S. Postal Service shall compensate Hasler, Inc. for the cost of development and capital investment required for performance of the contract and in compliance with the award:

| | |
|---|---|
| *Amount owed:* | $ 660,511.74 |

*We are mindful that the Postal Service expressly recognizes a remedy for recovery of reasonable costs in its Termination for Convenience clause. We believe that the same consideration and remedy is available under a settlement agreement.*

*For the sole purpose of moving towards settlement of our claim, Hasler accepts the Postal Service's position that a portion of the program development and hardware expenditures specified in Part E of the Settlement Proposal will have already been amortized by program-to-date lease payment.*

[1] See *102590-02-A-0069*, § 2.8 *Indefinite-Quantity (Clause 2-42)(b)*.
[2] One month (*see Contract 102591-03-Q-0454 Modifications M002*), or less (*see Contract 2BRPSR-03-Q-0454 Modifications M003*)
[3] See *Contract 102591-03-Q-0454 Modifications M002*.

© 2005 Hasler, Inc. - CONFIDENTIAL and PROPRIETARY - This document is the property of Hasler, Inc. and may not be reproduced in part or in whole or disclosed in any way to third parties without the prior permission in writing from Hasler, Inc. Violators shall be subject to prosecution

HASLER
America's better choice®

*Postal Service Response: Contract is a firm fixed price (FFP) contract. This should have been built into the unit price of each leased unit.*

*Hasler Counter-Response: The Postal Service has already recognized, citing basic economic principles and accepted accounting practices, that a portion of the program development and hardware expenditures specified in Part E of the Settlement Proposal will have already been amortized by program-to-date lease payments. Hasler conceded and accepted the Postal Service's position and made the adjustment in its counterproposal dated January 25, 2005.*

F. The U.S. Postal Service shall compensate Hasler, Inc. for movement of the installed base at the agreed fee of $50.00 per instance:

| | | |
|---|---|---|
| *1,672 units x $50.00/each* | $ | 83,600.00 |

## Summary of Specified Compensation

| | | |
|---|---|---|
| *Part A: Outstanding Lease Commitments* | $ | 1,058,297.25 |
| *Part B: Extended Lease Commitments* | $ | 0.00 |
| *Part C: Purchase Residual: 1,717 Units* | $ | 1,030,200.00 |
| *Part D. Cost of Inventory: 720 Units* | $ | 797,054 40 |
| *Part E. Research & Development, Capital Investment* | $ | 660,511.74 |
| *Part F: Movement Fees* | $ | 83,600.00 |
| Amount owed: | $ | 3,629,663.39 |

## Additional, Variable and Unspecified Compensation

*In addition to the specified compensation from the U.S. Postal Service for settlement of the obligation to Hasler, Inc. listed above, Hasler, Inc. reserves the right to seek additional, variable and unspecified compensation as listed below.*

G. Per *Statement of Work §C6*, the U.S. Postal Service shall be responsible for the return of each deployed mailing system to Hasler's distribution facility in Memphis, TN via FOB Destination freight.

H. Per *Statement of Work §C6*, the U.S. Postal Service remains liable for the return of each SAFE CV meter to Hasler's distribution facility in Memphis, TN. SAFE CV meters are to be returned to Hasler, Inc. within 15 days of termination of the Hallmark Program. SAFE CV meters that are not returned are each subject to a $1,000.00 replacement fee. Withdrawals of the SAFE CV meters from USPS service and return of funds to the associated TMS account will be processed within 30 days of return of the meters.

© 2005 Hasler, Inc. - CONFIDENTIAL and PROPRIETARY - This document is the property of Hasler, Inc. and may not be reproduced in part or in whole or disclosed in any way to third parties without the prior permission in writing from Hasler, Inc. Violators shall be subject to prosecution.

HASLER

*America's better choice®*

I. Per *Statement of Work §C6*, Hasler, Inc. retains the right to invoice the U.S. Postal Service for system components that are lost, damaged, or otherwise not returned to Hasler, Inc. within the specified 15-day period following the termination of the Hallmark Program.

J. Hasler, Inc. reserves the right to seek unspecified damages in claims against the U.S. Postal Service for injury to its reputation and competitive standing related to termination of the Retail Partnership Program.

K. Hasler, Inc. reserves the right to seek additional compensation for incurred expenses omitted or not identified in this proposal, including but not limited to recovery of legal costs.

© 2005 Hasler, Inc. - CONFIDENTIAL and PROPRIETARY - This document is the property of Hasler, Inc. and may not be reproduced in part or in whole or disclosed in any way to third parties without the prior permission in writing from Hasler, Inc. Violators shall be subject to prosecution.

# Exhibit 14

**George Hesse**

**From:** Conway, Caroline Z - AURORA, CO [caroline.z.conway@usps.gov]

**Sent:** Monday, July 18, 2005 1:31 PM

**To:** Frank Crudo; George Hesse; Thomas Keenan; Graham Fulghum; Barnett, Claudia O - Washington, DC; Hamilton, Kathleen - Aurora, CO; Myers, Jeffrey J - Topeka, KS; Shively, Joseph A - Aurora, CO; Burton, Jennifer K - Washington, DC

**Cc:** Webster, Janet L - Washington, DC; McKeen, Susan T - Washington, DC

**Subject:** USPS/Hasler Meeting

All --

Thank you for a productive meeting last week.

I would like to summarize the points we have agreed to in order to alleviate any confusion and ensure that we are all on the same page. For your convenience, attached are the documents we referred to during our discussions. If I misstated or forgot to mention anything, please do not hesitate to let me know.

1. The Postal Service does NOT intend to issue a Termination for Convenience against the current contract with Hasler, Contract No. 102591-03-P-0454.

2. **Section A.** We all agreed on the numbers provided in Section A. We anticipate that there will be adjustments to the numbers as Hasler continues to invoice under the terms and conditions of the contract and the USPS continues to pay. Jennifer Burton from Retail Marketing will continue to work with Hasler to expedite all payments.

**Section F.** The Postal Service is responsible for movement fee costs as described in the contract.

3. All other sections in Hasler's proposal. Since the Postal Service and Hasler could not reach an agreement on the remaining sections, Hasler was advised to submit all required documentation as a claim under the "Claims and Disputes" process. Hasler was further advised to consult with legal counsel familiar with government contracting, specifically the rules and regulation of the USPS Purchasing Manual. Hasler was reminded that the submission of a claim does not guarantee that Hasler will receive all monies requested.

Upon Hasler's submission of a claim, appropriate sections will be submitted to the appropriate departments for examination, analysis and possibly an audit. Under the CD process, the CO has 60 days from receipt of the claim to respond to the supplier. Hasler plans to submit their claim on or before Monday, August 8.

4. The Postal Service would like to continue a relationship with Hasler. Since Hasler meters continue to be located at selected Hallmark Gold Crown CPUs, Jennifer will write a new Statement of Work (SOW) that is specific to these CPUs. She will also submit a noncompetitive justification and eBuy requisition so a new contract could be issued for these meters. Jennifer plans to submit all required documents on or before Monday, July 25.

5. Under the contract with Hasler, the Postal Service has a buy-out option. If the Postal Service decides to buy these meters, Postal-customer or non-Postal locations for these meters will have to be determined. Retail Marketing will continue to work with our item manager, Jeff Myers, to look for possible uses for these meters within the Postal Service.

Thank you.

Caroline Z. Conway
Category Manager, Retail Products and Services
Travel, Retail and Temporary Services CMC
3300 S. Parker Road, Suite 400

# Exhibit 15

TRAVEL, RETAIL AND TEMPORARY SERVICES CATEGORY MANAGEMENT CENTER

UNITED STATES
POSTAL SERVICE

September 14, 2005

Mr. Frank Crudo
Chief Financial Officer
Hasler, Inc
19 Forest Parkway
Shelton, CT 06484-0903

RE: Contract No. 102591-03-Q-0454; Limited Service CPU Meters

Dear Frank:

This letter is in response to your letter dated August 8, 2005 submitted under the Claims and Disputes clause of Purchasing Manual, Version 2, consistent with the Contract Disputes Act of 1978 (41 U.S.C. 601-613).

Before answering the points raised in your letter, I would first like to confirm the following items that the Postal Service and Hasler have agreed to during our meeting on Wednesday, July 13, 2005.

- The Postal Service will compensate Hasler for the guaranteed minimum quantity of 1,800 units under the terms and conditions of the above-referenced IDIQ contract for Hasler meters. Hasler will continue to work with the Postal Service to pay all lease invoices for these units at $69.71 per month. Invoices will be mailed to the Contracting Officer's Representative (COR) for processing.
  - As of September 14, 2005, the Postal Service has paid Hasler a total of $1,698,617.62. It should be noted that this total amount includes invoices for non-meter items, i.e., supplies
  - Hasler has submitted invoices which are awaiting payment at USPS San Mateo ASC in the amount of $561,514.05. It is anticipated that these invoices will be paid on or before the end of USPS FY05, ending September 30, 2005
  - The Postal Service anticipates that Hasler will send invoices with the total amount of $98,709 37 (through December 2005) for the remaining meters in the field. This number may change, but will be discussed and agreed to by the Postal Service and Hasler before payment processing.
- The Postal Service agrees to the payment of $84,000 to Hasler for movement fees (return of meters to Hasler). Hasler has submitted an invoice for this amount and is awaiting payment from USPS San Mateo ASC.

<u>Claim C -- Claim for Recovery of the Residual Unit Value of the Customized Meters</u>

The Postal Service must deny Hasler's claim for $1,033,800 representing the residual unit value of the customized meters at the expiration of the lease term.

First, this contract has not been terminated for convenience or for default. Instead, the Postal Service will continue to pay the agreed upon lease rate for the 1,800 minimum guaranteed meter quantity until the expiration of their leases on or before September, 2007, when this contract term expires

3300 SOUTH PARKER ROAD, SUITE 400
AURORA, CO 80014-3500
TEL: (303) 369-1226
FAX: (303) 369-1251
EMAIL: CAROLINE.Z.CONWAY@USPS.GOV

Second, and more importantly, there is no agreement by the Postal Service to pay the residual value of the meters once the lease term ends. The terms of this lease are clear - the Postal Service agreed to lease a minimum quantity (1,800) of postage meters for a set original term of eighteen (18) months with four (4) one-year option periods. In a product lease situation, such as this contract, the lessee is not obligated to pay for the remaining value of the product once the lease ends. The language of the Statement of Work ("SOW") of Contract No. 102591-03-Q-0454 states that, "The supplier will provide, *on a lease basis*, between 1,800 and 2,400 meters." It further states, on the last page, that at the end of the contract, "the USPS shall be responsible for ensuring the return of the meters to the supplier. The USPS shall also bear shipping costs associated with return/disposal of the meters." No where in the contract does it state the Postal Service would be responsible for residual value of the meters, even if they were customized for postal use. Instead, Hasler should have attempted to factor this value into the contract price, up front. If it did not, it cannot request additional money from the Postal Service for its business omission in bidding.

**Claim D – Claim for Cost of Inventory Build-up**

Hasler's request for $776,506.19, representing the value of the inventory Hasler had to purchase in order to customize the postal meters, must also be denied. Hasler relies upon a constructive theory for why the Postal Service should pay for this value. Unfortunately, again, the contract is silent about such an arrangement and there is no government contracts regulation that adds a constructive duty on the part of the government buyer to later pay for inventory necessary for the supplier to perform the contract requirements. Again, it was up to Hasler to include such costs in its bid lease price to the Postal Service. Since it did not, Hasler cannot now attempt to have the Postal Service pay these costs. Any costs that are needed to perform the original contract requirements must be bid up front.

**Claim E – Claim for Cost of Development and Capital Investment**

The Postal Service denies Hasler's claim for $660,511.74 for recovery of upfront capital investment and conformance with the Information Security Assessment guidelines as well. As previously stated, it was up to Hasler to determine what its investment cost would be for this contract and roll those costs, along with its desired profit margin, into its lease bid price to the Postal Service. The Postal Service's acceptance of Hasler's bid price presumed all costs for performance were included.

Furthermore, it was a specific contract requirement in the SOW that Hasler comply with the ISA guidelines. Section C. specifically stated that "[c]ompliance with Postal Service security requirements are in the attached Information Security Assurance (ISA) Process publication." It began with the statement that: "[t]he following is specific information regarding the equipment that will be provided by the supplier, as well as the supplier's responsibilities involving meter maintenance, rate case updates and more." Therefore, when the Postal Service required Hasler's compliance with the ISA, it was not a change to the contract, but an insistence that Hasler comply with the stated and agreed upon original contract terms.

Finally, it seems that Hasler did not fully take into consideration the business risk it was undertaking when agreeing to perform an indefinite quantity government contract. PM 2.4.6 c. 1. explains that "[a]n indefinite-quantity contract provides for an indefinite quantity of specific supplies or services, within a stated minimum and maximum, to be delivered during the contract period to designated locations when ordered. It is used when precise requirements for supplies or services ordered over the term of the contract, above known minimums, cannot be determined. The minimum and maximum are provided *to limit the pricing risk to the supplier*." It is possible that risk can only be understood by one familiar with indefinite quantity government contracts. The Court of Federal Claims has jurisdiction, under the Contract Disputes Act, to interpret government contracts. Its

appellate court has stated that "[t]he key consideration . . . is the allocation of risk under the contract. . . . The general rule is clear: a contractor cannot sign a contract which allocates risk to it and then four (4) years later come to this court, having lost its gamble, and insist that the risk be placed on the Government. . . . The present contract is . . . an indefinite quantity contract. This distinction is crucial to an understanding of the parties' legitimate expectations and their responsibilities." Dot Systems, Inc. v. U.S., 231 Ct.Cl. 765 (1982). The Federal Circuit has recently held that for indefinite quantity contracts, the Government's "only obligation was to order at least the minimum quantity of relevant [product] during the . . . term of the contract. The contractor here cannot expect the kind of accuracy in estimation that it can in a requirements or fixed price contract." Varilease Tech. Group v. U.S., 289 F.3d 795, 800-801 (Fed. Cir. 2002).

Based upon these firm legal principles and on the contract terms, the Postal Service must deny Hasler's total certified claim for $2,470,817.93, in its entirety.

This is the final decision of the contracting officer pursuant to the Contract Disputes Act of 1978 and the clause of your contract entitled Claims and Disputes. You may appeal this decision to the Postal Service Board of Contract Appeals by mailing or otherwise furnishing written notice (preferably in triplicate) to the contracting officer within 90 days from the date you receive this decision. The notice should identify the contract by number, reference this decision, and indicate that an appeal is intended. Alternatively, you may bring an action directly in the United States Court of Federal Claims within 12 months from the date you receive this decision.

Sincerely,

Caroline Z. Conway

Caroline Z. Conway
Contracting Officer
Category Manager
Retail Products and Services